Paul Kissel, Esq., SBN 114526
Jonathan P. Geen, Esq., SBN 189184
BORTON PETRINI, LLP
1320 Columbia Street, Suite 210
San Diego, California 92101
Telephone (619) 232-2424; Fax (619) 531-0794
E-mail: pkissel@bortonpetrini.com; jgeen@bortonpetrini.com

Attorneys for Defendants Jani-King of California,
Inc.; and Jani-King International, Inc.

UNITED STATE DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

TERVON, LLC, a California limited liability
company, SUNYATA LITTLE and ELEANOR
LITTLE, individuals; and MARIO
GUTIERREZ, an individual,

                    Plaintiffs,

v.

JANI-KING OF CALIFORNIA, INC., a Texas
corporation, JANI-KING OF TEXAS, INC., a
Texas corporation; JANI-KING
INTERNATIONAL, INC., a Texas corporation;
and DOES 1-100, inclusive,

                    Defendants.

Case No.  '14CV0367 BEN JMA

APPENDIX TO DEFENDANTS' NOTICE
OF REMOVAL TO FEDERAL COURT

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the following appendix was forwarded via electronic mail and certified mail on the _17_ day of February, 2014, to:

Kara Gervaís, Esq.
Gervaís Law
10636 Scripps Summit Court, Suite 142
San Diego, CA 92131

_Diane M. Clancey_
Diane M. Clancey

1  KARA L. GERVAÍS, ESQ.  (State Bar No. 217134)
2  **GERVAIS LAW**
   10636 Scripps Summit Court, Suite 142
3  San Diego, CA 92131
   Phone (858) 549-1071
4  Fax (858) 549-1743

5
6  Attorneys for Tervon LLC, Sunyata and Eleanor Little and Mario Gutierrez

7

8           SUPERIOR COURT OF THE STATE OF CALIFORNIA

9               FOR THE COUNTY OF SAN DIEGO

10                    CENTRAL DIVISION

11  TERVON, LLC, a California limited liability    )   CASE NO.    37-2014-00083675-CU-FR-CTL
    company, SUNYATA LITTLE and                    )
12  ELEANOR LITTLE, individuals; and MARIO         )   **COMPLAINT FOR DAMAGES**
13  GUTIERREZ, an individual;                      )
                                                   )   1.  Deceit by Intentional Misrepresentation
14              Plaintiffs,                         )       (Civil Code §§ 1709, 1710)
                                                   )   2.  Deceit by Concealment
15          v.                                      )       (Civil Code §§ 1709, 1710)
                                                   )   3.  Negligent Misrepresentation
16  JANI-KING OF CALIFORNIA, INC., a Texas         )       (Civil Code §§ 1709, 1710)
    corporation, JANI-KING OF TEXAS, INC., a       )   4.  Breach of Contract
17  Texas corporation; JANI-KING                   )   5.  Breach of Implied Covenant of Good Faith
18  INTERNATIONAL, INC., a Texas                   )       and Fair Dealing
    corporation; and DOES 1-100, Inclusive,        )   6.  Violation of Business and Professions
19                                                 )       Code § 17200 *et seq.*
                Defendants.                        )   7.  Intentional Infliction of Emotional Distress
20                                                 )   8.  Declaratory Relief
21                                                 )
                                                   )   **REQUEST FOR PUNITIVE DAMAGES**
22                                                 )
                                                   )   **DEMAND FOR JURY TRIAL**
23                                                 )
24

25

26

27  ///

28  ///

---
1.
COMPLAINT FOR DAMAGES

ELECTRONICALLY FILED
Superior Court of California,
County of San Diego

**01/15/2014** at 08:22:48 AM

Clerk of the Superior Court
By My-Vinh B. Pham,Deputy Clerk

Plaintiffs allege:

## PARTIES

1.      Plaintiff, TERVON, LLC, ("Tervon") is a California limited liability company, with its principle place of business in San Diego, California.   At all relevant times, Tervon was owned and operated a Jani-King franchise, performing cleaning and janitorial services.   Tervon purchased the franchise on or about October 2010.

2.      Plaintiffs SUNYATA LITTLE and ELEANOR LITTLE ("Little") are individuals residing in San Diego, California.   At all relevant times, Little owned and operated a Jani-King franchise, performing cleaning and janitorial services.   Little purchased the franchise on or about October 30, 2008.

3.      Plaintiff MARIO GUTIERREZ ("Gutierrez") is an individual residing in San Diego, California.   At all relevant times, Gutierrez owned and operated a Jani-King franchise, performing cleaning and janitorial services.    Gutierrez purchased the franchise on or about November 2008.

4.      Tervon, Little and Gutierrez are collectively referred to herein as "Plaintiffs."

5.      Defendant Jani-King of California, Inc. ("Jani-King of California") is a Texas corporation with its principal place of business in Addison, Texas.   Jani-King of California has four (4) regional offices in California, which presently are located in Concord, Sacramento, Orange, and San Diego.   Jani-King of California is a wholly owned subsidiary of Defendant Jani-King, Inc.

6.      Defendant Jani-King, Inc. is a Texas corporation with its principal place of business in Addison, Texas.   Jani-King, Inc. is the parent corporation of Jani-King of California. Jani-King, Inc. provides administrative and management services to its operating affiliates, including Jani-King of California.   Jani-King, Inc. is a wholly owned subsidiary of Defendant Jani-King International, Inc.

7.      Defendant Jani-King International, Inc. ("Jani-King International") is a Texas corporation with its principal place of business in Addison, Texas.   Jani-King International is

the parent corporation of Jani-King, Inc. Jani-King International provides administrative and management services to its operating affiliates, Jani-King of California, Inc.

8.    At all times relevant Defendants Jani-King of California, Jani-King, Inc., and Jani-King International will collectively be referred to as "Jani-King" or "Defendants".

9.    Plaintiff is informed and believes and thereon alleges that all Defendants are doing business as Jani-King, and are operating a single, integrated business of providing cleaning services and janitorial services to commercial clients throughout the State of California. Jani-King, Inc. and Jani-King International provide and/or determine the standard policies, forms, contracts and marketing practices utilized by Jani-King of California.

10.    Plaintiff is ignorant of the true names and capacities of the defendants who are sued herein as DOES 1 through 100, inclusive, and therefore sues these defendants by such fictitious names. Plaintiff will amend this complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believes, and thereon alleges, that each of said fictitiously named defendants is responsible in some manner for the occurrences herein alleged, and that Plaintiff's injuries as herein alleged were proximately caused by such unlawful conduct.

11.    Plaintiff is informed and believes and thereon alleges that the Defendants, and each of them, at all times relevant herein, acted in concert with each and every other defendant, intended to and did participate in the events, acts, practices, and courses of conduct alleged herein, and was a proximate cause of damage and injury thereby suffered by Plaintiff as alleged herein.

12.    At all times relevant herein, each defendant was the agent or employee of each of the other Defendants and was acting within the course and scope of such agency or employment.

## JURISDICTION & VENUE

13.    The Superior Court of the State of California in and for the County of San Diego has jurisdiction over the subject matter pursuant to California Code of Civil Procedure § 410.10 and pursuant to California Business and Professional Code §17200 et seq., and other common and statutory laws.

///

14. Jurisdiction is proper because the unlawful acts and practices alleged herein were committed by Defendants within this jurisdiction and the amount of damages sought exceeds the minimum jurisdiction of this court ($25,000).  Venue is proper in this Court pursuant to § 395.5 and California Business and Professions Code 17202 and 17203 because Defendants conduct substantial business activity throughout San Diego County.

## GENERAL FACTUAL ALLEGATIONS

15.     When Plaintiffs purchased the Jani-King franchises, Jani-King required Plaintiffs to sign a standard adhesion contract ("Franchise Agreement") delineating the governing terms of the franchisor-franchisee relationship.  Plaintiff Gutierrez and Jani-King entered into the contract on or about November 2008. Plaintiff Little entered into the contract on or about October 2008. Plaintiff Tervon LLC entered into the contract on or about October 2010.   Attached hereto as Exhibits 1, 2 and 3 are true and correct copies of those Franchise Agreements.

16.     In or about March 2011, Jani-King submitted a bid to the City of San Diego ("City") for janitorial/cleaning services for Qualcomm Stadium, pursuant to the City's Request for Proposal ("RFP").  The contract was to be for a three (3) year period (seasons), with options to renew.

17.     The City's RFP requested bids for an approximate thirty (30) event season, which would include staffing and services for the "Event Day" itself, as well as days for "Post Event" cleaning.  The City's RFP stated *"the typical number of eight (8) hour work shifts following a major event is approximately two and one half (2 ½) to three (3) days but may vary depending on type of event and event scheduling."*

18.     According to the Jani-King bid submitted in or about March 2011, Jani-King only bid on two days for Post Clean.   Jani-King bid $0.00 for the third day post event clean for ALL of the stadium's events.

19.     It is believed and alleged that Jani-King also submitted a $0 dollar bid for the entire parking lot cleanup, a $0 dollar bid for the outside concrete areas, a $0 dollar bid for the entire stair cleaning, a $0 dollar bid for the entire escalator cleaning, a $0 dollar bid for the entire elevator cleaning, and a $0 dollar bid for the entire End Zone cleaning.

20.     It is believed and herein alleged that, after Jani-King submitted its bid to the City, a City representative contacted Jani-King to inform them that Jani-King's bid did not include the parking lot cleanup, the third Post Event Clean day for all events, and various other costs.  As a result, Jani-King was informed that its bid was significantly lower than the other bids. The City representative informed Jani-King that the City would allow Jani-King to resubmit a corrected bid.

21.     It is further believed and alleged that in response to this discussion, Jani-King's Randall Frazine informed the City that Jani-King's bid was accurate and that Jani-King would not submit a corrected bid but would "figure something out."

22.     Under the City's contract, the City also required background checks for all personnel working at the stadium to be completed prior to any staff being given a Qualcomm badge.

23.     The City's contract also required a Training Certification for Janitorial Personnel. This required that the bidder certify that all "employees" working under the contract had received specific training related to, including but not limited to, safety, injury, and use of "green cleaning techniques."  The certification required the bidder to identify by name(s) the personnel which would be working under the contract.   In the bid submitted by Jani-King on or about March 14, 2011, Randall Frazine signed the Certification on behalf of Jani-King verifying that all "employees" had received the necessary training, but listed "TBD" instead of identifying specific personnel by name.

24.     The City's contract also required that the bidder's provided chemicals shall be certified as green.

25.     The City awarded Jani-King the contract in or about March or April 2011.

26.     It is herein believed and alleged that on or about June 22, 2012, Defendants requested a meeting with Plaintiffs at Qualcomm Stadium to discuss the possibility of Plaintiffs accepting the Qualcomm Stadium cleaning and janitorial account.   Present at this meeting were Little, Sotero Enriquez (on behalf of Tervon LLC) and Salvador Gutierrez (on behalf of Mario Gutierrez). Another franchise owner was asked to attend, but did not.

27.    At the June 22, 2012 meeting, Paul Johnson, who was Jani-King's Qualcomm Stadium Operations Manager, made a presentation to the Plaintiffs regarding the Qualcomm Stadium account. Paul Johnson explained that this account was a Jani-King "premier" account. He also provided each Plaintiff with a Qualcomm Stadium Standard Operating Procedure Manual ("Manual"). This Manual included, but was not limited to, the scope of the janitorial work requirements, each franchise owner's "Quad Descriptions" (which were the areas each franchise owner would be responsible for cleaning) and the Qualcomm season event schedule. Also included in the Manual were spreadsheets explaining the projected profit to each franchise owner for San Diego Chargers football games and San Diego State Aztec football games ("Spreadsheets").

28.    At this June 22, 2012 meeting, it is believed and alleged that Paul Johnson presented the Manual as well as the two Spreadsheets. Paul Johnson explained that, based on the historical data of this account, each franchise owner was to expect a $3261.49 profit for each Charger game and a $1178.02 profit for each Aztec game. These expected profits were also indicated on the Spreadsheets. The Plaintiffs asked Paul Johnson to confirm that these numbers were correct and Paul Johnson assured Plaintiffs that the numbers were correct and derived from the financials collected from the previous years.

29.    Paul Johnson also presented Plaintiffs with a "Labor Hour Summary" which identified the hours attributable to certain cleaning tasks. This Labor Hour Summary clearly includes cleaning hours for those tasks on which Jani-King bid $0.00. Further, at this June 22, 2012 meeting, Paul Johnson was clear that the Post Event clean would be three days. The Labor Hour Summary presented to Plaintiffs also indicated a third day of post event cleaning.

30.    In reliance on the information presented by Paul Johnson, the Plaintiffs all signed contracts accepting the Qualcomm account.

31.    At no time after Plaintiffs accepted this account were they informed, or required to participate in the specified training required under Jani-King's contract with the City.

32.    At no time after Plaintiffs accepted this account were they informed, or required to use only "green" cleaning products, as was required under Jani-King's contract with the City.

33.    Prior to the first cleaning event, Jani-King contacted the Plaintiffs, informing them that a number of employees had already been working under this account.   Jani-King told the Plaintiffs that since Jani-King could not "employ" them directly, the Plaintiffs would have to pay these employees (for work that was not done during the Plaintiffs' employ).

34.    After the first two cleaning events at Qualcomm, a fourth franchise owner, Carl White (not a party to this lawsuit), was brought in on the Qualcomm account.   After the two following events (August 9 and August 18, 2012), all the franchise owners knew that each of them had incurred significant financial losses and not the represented profit Paul Johnson promised.

35.    In or about August 2012, Plaintiffs spoke with Paul Johnson regarding the significant losses sustained by the franchise owners.   It is believed and alleged that, within a week, Paul Johnson once again confirmed that the numbers and expected profits he originally presented to the Plaintiffs were correct.

36.    Thereafter, Sotero Enriquez, on behalf of Plaintiff Tervon LLC, contacted Randall Frazine, President of the San Diego Jani-King office, explaining the significant losses the franchise owners were incurring as a result of the Qualcomm account.   It is believed and alleged that Randall Frazine began working with the Jani-King corporate office to determine how to resolve the issues surrounding the Qualcomm account.

37.    On or about September 4, 2012, Mr. Frazine called the Plaintiffs to a meeting at Qualcomm Stadium to discuss his proposed resolution.   Also present at this meeting were Sean Ayers (Jani-King Int. Executive Director) and David Huntington (new Qualcomm Operations Manager).   The Plaintiffs were informed that Paul Johnson was "no longer with the company" and that David Huntington would now take over his position.

38.    At this meeting, Plaintiff Tervon LLC's Sotero Enriquez presented information on the actual financials related to the Qualcomm account versus those which were originally represented. It is believed and alleged that Randall Frazine agreed with the numbers presented by Sotero Enriquez and asked where the Spreadsheets came from.   When informed that the Spreadsheets came from the Manual Paul Johnson presented to the franchise owners in order to

1   get them to accept the accounts, Randall Frazine told the Plaintiffs that he knew nothing about the

2   Manual, but the numbers in it were all wrong and the Plaintiffs should just throw the Manual

3   away.

4       39.   At the September 4, 2012 meeting, Randall Frazine's proposed resolution was to

5   restructure the cleaning responsibilities from a "Quad" schedule to a "Task Based" schedule for

6   the post event cleaning.

7       40.   Thereafter, the Plaintiffs implemented this new "task based" approach.   After the

8   September 8, 2012 event, the Plaintiffs again assessed the financials and concluded again that no

9   profit was realized and instead, the Plaintiffs were continuing to incur significant losses.   As a

10  result, at this point franchise owner Carl White elected to turn in the account.

11      41.   For approximately another month, the remaining three franchise owners

12  (Plaintiffs), (Tervon took over the tasks assigned to Carl White) continued to work the account.

13  However, after each event, it still appeared that the numbers did not match those represented by

14  Paul Johnson originally, or any expected profit.   As such, on or about September 24, 2012,

15  Plaintiff Mario Gutierrez elected to turn in the account.

16      42.   At all times mentioned herein, as a result of Plaintiffs incurring significant losses

17  on this account, it became very difficult for the Plaintiffs to have enough money to pay their

18  employees.   The employees were aware of the situation and became very angry and upset with

19  the Plaintiffs, creating an environment of distrust between employee and employer and causing

20  emotional distress to the Plaintiffs.

21      43.   In addition, making matters worse was the fact that Jani-King was, in essence,

22  holding the Plaintiffs hostage on this account because of the way the accounts were paid and the

23  significant losses being incurred.   Because the Qualcomm account was not generating enough

24  income to cover the employee salaries, the Plaintiffs were forced to take out advances from Jani-

25  King each month in order to cover expenses and pay its employees for the prior month.   As a

26  result, each month the Plaintiffs were reluctant to turn in the account because the Plaintiffs had

27  already taken out an advance that was owed the following month, resulting in a Catch-22.

28      ///

44.   On or about November 15, 2012, Tervon LLC turned in the account (taking effect December 15, 2012), leaving Plaintiff Little as the sole franchise owner on the account.   Due to the significant advances Plaintiff Little took out during this time frame, Little could not turn in the account and stayed on until the end of the season (i.e. February 2013).

45.   At the time of purchasing the franchises, all Plaintiffs were presented with a copy of a standardized "Account Acceptance/Finder's Fee Agreement" ("Acceptance Form") as part of the Franchise Disclosure Document.   The Acceptance Form purports to provide the franchise owner with all the terms of a potential account, including, but not limited to, the monthly billing amount, the start date and all fees which will be assessed against the franchise owner on that account.   The Acceptance Form also refers to a "Maintenance Agreement" and "Cleaning Schedule," which apparently the franchise owner is to be given.

46.   At the time of purchasing the franchises, all Plaintiffs were also presented with a copy of a standardized "Equipment Lease Agreement" ("Lease Agreement") as part of the Franchise Disclosure Document.   The Lease Agreement purports to provide the franchise owner with all the terms for when a franchise owner leases equipment for a particular account.

47.   It is believed and alleged that, despite Jani-King's representations that an Acceptance Form and Lease Agreement were part of the standard forms provided to franchise owners, Jani-King routinely fails to and refuses to provide these forms to its franchise owners. Instead, Jani-King, when "offering" an account to Plaintiffs, will generally only do so verbally and insist that the Plaintiffs agree or not to accept the account immediately, without anything in writing as to the terms of the account itself, or without providing Plaintiffs the opportunity to view the premises which is to be cleaned.    As a result, Plaintiffs are prohibited from knowing whether any information presented by Jani-King, either verbally (or IF an Acceptance Form is provided) is even true.

48.   It is also believed and alleged that Jani-King routinely fails and refuses to enter into written Lease Agreements with its franchise owners.   However, Jani-King continues to charge the franchise owners with fees associated with leasing equipment.   With respect to the Qualcomm Account, none of the Plaintiffs were ever asked to, or signed, a Lease Agreement for

1    any equipment used for the Qualcomm account.   However, Jani-King continually charged

2    Plaintiffs for "leased equipment."

3         49.    It is also believed and alleged that Jani-King fails to provide accurate accounting

4    for Plaintiff's accounts, claiming Plaintiffs were required to pay certain fees, including, but not

5    limited to, "royalty fees," accounting fees," Business Protection Plan" fees, finder's fees,

6    miscellaneous fees, advertising fees, administrative fees, charge backs and charge back

7    protection, insurance, complaint fees, and special deductions, without sufficient cause to charge

8    these fees to Plaintiffs.

9         50.    Jani-King continues to intentionally misrepresent and/or make omissions with

10   respect to the accounts "offered" to Plaintiffs.   Jani-King represented Plaintiffs would receive

11   cleaning accounts that were reasonably and profitably bid so that Plaintiffs would make a profit

12   from working the accounts.   However, Jani-King knows that the structure of the cleaning

13   contracts preclude Plaintiffs from making any profit.

14        51.    Plaintiffs believe and herein allege that Jani-King engages in a fraudulent scheme

15   of setting contract terms with commercial clients which are not feasible for Plaintiffs to fulfill.

16        52.    Plaintiffs believe and herein allege that Jani-King engages in a practice of under

17   bidding contracts with its commercial clients thereby precluding Plaintiffs to profit.  Specifically,

18   Jani-King promises to offer janitorial services for prospective and existing clients at amounts and

19   projected hours (per cleaning) that it knows to be insufficient and/or cannot be reasonably

20   completed for a fair and reasonable hourly wage and profit by Plaintiffs.

21        53.    Jani-King routinely, negligently and/or intentionally misrepresents the amount of

22   time required to perform cleaning services for a commercial account.   Plaintiffs are not made

23   aware of the actual terms of the contracts between Jani-King and the commercial client upon or

24   before accepting the offer.    Plaintiffs are then forced to hire additional employees at their own

25   expense to service such accounts due to time constraints, thereby precluding Plaintiffs from

26   profiting on the accounts.

27        54.    Jani-King routinely, negligently and/or intentionally misrepresents the square

28   footage requested to be cleaned for a particular cleaning account.  Plaintiffs are not made aware

1   of the actual terms of the contracts between Jani-King and the commercial client upon accepting

2   the offer.  Plaintiffs are then forced to hire additional employees at their own expense to service

3   such accounts due to the large amount of square footage that required cleaning thereby

4   precluding Plaintiffs from profiting on the accounts.

5       55.    As part of and in order to effectuate its scheme to systematically underbid

6   janitorial accounts, Jani-King routinely, negligently, and/or intentionally misrepresents the

7   number of hours that will be required to service the accounts offered to franchisees. The accounts

8   typically require substantially more hours of work than Jani-King represents. Jani-King's

9   misrepresentations and/or omissions are knowingly false when made to induce individuals to

10  accept these accounts. Jani-King is aware of the falsity of its misrepresentations and/or omissions

11  because it receives a significant number of complaints from franchisees about the underbid

12  accounts and extra work required to clean accounts and Jani-King continues to make these

13  misrepresentations and omissions.  In the case of the Qualcomm account, Jani-King was

14  specifically notified by the City that Jani-King's bid was grossly underbid.

15      56.    Jani-King routinely offers accounts through phone calls (or voice mails) to

16  Plaintiffs who are told they must accept the accounts immediately (or without sufficient time to

17  examine them) or will be deemed to have "declined" them. Phone calls from Jani-King provide

18  little, if any, detail about cleaning accounts. Jani-King routinely fails to provide written

19  documentation or information which would enable franchisees to evaluate the actual work

20  requirements to service the account before accepting the account.

21      57.    The franchise contracts between Plaintiffs and Jani-King are contracts of adhesion

22  in that they were offered to Plaintiffs on a take-it-or-leave-it basis with no opportunity to

23  negotiate any of its terms.

24      58.    The contract is written only is English, is highly technical, legalistic, and contains

25  confusing language. It includes misleading language, misleading section headings, and

26  provisions which purport to waive significant rights buried deep within the small print.  Portions

27  of the franchise agreement are unconscionable, contrary to California law and public policy.

28      ///

**FIRST CAUSE OF ACTION**
Deceit by Intentional Misrepresentation
<u>Violations of California Civil Code §§ 1709, 1710</u>
<u>(AGAINST ALL DEFENDANTS )</u>

59.     Plaintiffs re-allege and incorporate by reference, each and every allegation in paragraphs 1-58.

60.     At all times relevant to this action, Jani-King intentionally misrepresented material facts including, but not limited to: (a) that Jani-King would guarantee a certain amount of income to Plaintiffs relating to the Qualcomm account and that Plaintiffs would receive cleaning accounts from which they would earn a profit.

61.     Jani-King specifically represented to Plaintiffs that they would each make a certain amount of profit on the Qualcomm account, and even provided Plaintiffs with written materials showing expected profit, and labor/hour summaries.   Jani-King made these representations with full knowledge that they were false because (1) they knew the bid submitted to the City did not support the man hours or cleaning schedules they were asking Plaintiffs to complete, (2) Jani-King had full knowledge that their bid to the City was grossly underbid, (3) Jani-King also knew, based on historical data, that the post event cleaning of the stadium actually took three days and did not disclose to Plaintiffs that Jani-King's bid only included hours and payment for only two days of post clean.   Jani-King, instead, passed on its grossly underbid Qualcomm account to unsuspecting Plaintiffs.  Jani-King continued to make these misrepresentations knowing that they were false without regard for their truth.

62.     Plaintiffs reasonably relied, to their detriment, on Jani-King's misrepresentations. Jani-King's misrepresentations were objectively material to the reasonable individual, and therefore reliance upon such representations may be presumed reasonable as a matter of law.

63.     As a proximate result of Jani-King's conduct, Plaintiffs were damaged, including sustaining substantial economic injury for loss of earnings,  expenditures made in preparation and performance of their duties, and other economic losses.

64.     Accordingly, Plaintiffs are entitled to actual damages and compensatory damages.

///

65.   In addition, Plaintiffs suffered emotional distress damages for which they are entitled to compensation.

66.   The conduct of Jani-King and its agents and employees was malicious, fraudulent and/or oppressive and done with a willful disregard for Plaintiffs' rights.   Consequently, Plaintiffs are entitled to punitive damages against Jani-King.

### SECOND CAUSE OF ACTION
### Deceit by Concealment
### Violation of California Civil Code §§ 1709, 1710
### (AGAINST ALL DEFENDANTS)

67.   Plaintiff re-alleges and incorporates by reference, each and every allegation in paragraphs 1-66.

68.   At all times relevant to this action, Jani-King failed to disclose material facts including, but not limited to: (a) that the information and numbers presented to Plaintiffs at the June 22, 2012 meeting regarding the Qualcomm account were incorrect and not based on either historical data or on the numbers actually presented in the bid to the City of San Diego; (b) that Jani-King intentionally underbids its cleaning contracts with commercial clients such that it would not be possible for Plaintiffs to make a profit from the cleaning accounts offered; and (c) that Jani-King was made aware that the Qualcomm account was grossly underbid.

69.   Jani-King knew of these material facts, has a duty to Plaintiffs to disclose these material facts, and intentionally failed to disclose these material facts.

70.   Plaintiffs reasonably relied to their detriment on Jani-King's omissions.   Jani-King's omissions were objectively material to the reasonable individual, and therefor reliance upon such representations may be presumed reasonable as a matter of law.

71.   As a proximate result of Jani-King's conduct, Plaintiffs were damaged and will continue to suffer damage, including substantial economic injury such loss of earnings, expenditures made in preparation and performance of their duties, and other economic losses.

72.   Accordingly, Plaintiffs are entitled to actual damages and compensatory damages.

73.   In addition, Plaintiffs suffered emotional distress damages to which they are entitled to compensation.

13.
COMPLAINT FOR DAMAGES

74.     The conduct of Jani-King and its agents and employees was malicious, fraudulent and/or oppressive and done with a willful disregard for Plaintiffs' rights.  Consequently, Plaintiffs are entitled to punitive damages against Jani-King.

### THIRD CAUSE OF ACTION
### Negligent Misrepresentation
### Violation of California Civil Code §§ 1709, 1710
### (AGAINST ALL DEFENDANTS)

75.     Plaintiffs re-allege and incorporate by reference, each and every allegation in paragraphs 1-74.

76.     At all times relevant to this action, Jani-King misrepresented material facts including, but not limited to: (a) that the numbers presented to Plaintiffs at the June 22, 2012 meeting were incorrect and not based on either historical data or on the numbers actually presented in the bid to the City of San Diego; (b) that Jani-King intentionally underbids its cleaning contracts with commercial clients such that it would not be possible for Plaintiffs to make a profit from the cleaning accounts offered; and (c) that Jani-King was made aware that the Qualcomm account was grossly underbid.

77.     Jani-King did not have reasonable grounds for believing the misrepresentations were true as (a) they had full knowledge that the Qualcomm account was grossly underbid (b) they had full knowledge that it historically took three days to complete post event cleaning and (c) that, based on the numbers, Plaintiffs would not make a profit on the Qualcomm account.

78.     Jani-King failed to exercise reasonable care and/or diligence in communicating its representations.

79.     Jani-King knew, or should have known, that its actions would cause damage to Plaintiffs because Jani-King was passing on its grossly underbid account on to Plaintiffs.

80.     Plaintiffs reasonably relied to their detriment on Jani-King's misrepresentations. Jani-King's misrepresentations were objectively material to the reasonable individual, and therefor reliance upon such representations may be presumed reasonable as a matter of law.

///

81.     As a proximate result of Jani-King's conduct, Plaintiffs were damaged, including sustaining substantial economic injury such as loss of earnings, expenditures made in preparation and performance of their duties, and other economic losses.

82.     Accordingly, Plaintiffs are entitled to actual damages and compensatory damages.

83.     In addition, Plaintiffs suffered emotional distress damages to which they are entitled to compensation.

## FOURTH CAUSE OF ACTION
### Breach of Contract
### AGAINST ALL DEFENDANTS

84.     Plaintiff re-alleges and incorporates by reference, each and every allegation in paragraphs 1-83.

85.     Jani-King failed to perform under its contractual agreement with Plaintiff. Jani-King's refusal to perform was unlawful, without justification and/or excuse, and constituted a total and material breach of the contract between the parties.

86.     Jani-King breached the franchise contract with Plaintiff by doing inter alia, the following: (a) offering Plaintiffs accounts that Jani-King had full knowledge would not be profitable (b) making intentional misrepresentations to Plaintiffs regarding the history of the Qualcomm account and its profitability (c) failing to provide Plaintiffs with training which was mandated by Jani-King's contract with the City; (d) failing to advise Plaintiffs of material requirements included in Jani-King's contract with the City, subjecting Plaintiffs to potential liability (e) failing to adequately account for the charges Jani-King posted to Plaintiffs' account; (f) failing to properly advise Plaintiffs of account specifics before requiring Plaintiffs to accept an account, (g) failing to provide information related to the leasing of equipment, and (h) charging Plaintiffs for monies associated with leasing equipment, even though Plaintiffs did not sign any agreement to lease equipment on the Qualcomm Account.

87.     Plaintiffs gave consideration that was fair and reasonable, and performed the conditions, covenants, and promises required to be performed under their contracts with Jani-King.

88.     By reason of Jani-King's breaches, Plaintiff suffered and will continue to suffer reasonable and foreseeable consequential damages resulting from such breaches, including loss of earnings, expenses for cleaning supplies, transportation costs, leasing costs and other damages for breach of contract.

89.     Jani-King directly benefits. from, and was unjustly enriched by, its contractual breaches alleged herein.

90.     Plaintiffs have been damaged by Jani-King's breach of contract in an amount to be proven at trial.

### FIFTH CAUSE OF ACTION
### Breach of Implied Covenant of Good Faith and Fair Dealing
### (AGAINST ALL DEFENDANTS)

91.     Plaintiffs re-allege and incorporate by reference, each and every allegation in paragraphs 1-90.

92.     Under common law, a covenant of good faith and fair dealing is implied into every contract.

93.     Jani-King has violated and continues to violate this covenant of good faith and fair dealing in its agreements with Plaintiffs by doing, including, but not limited to, the following:

(a)     Jani-King significantly underbids the cleaning contracts it negotiates with its commercial clients and thereafter assigned such contracts to Plaintiffs making it impossible for Plaintiffs to operate a viable business;

(b)     Jani-King offered accounts to Plaintiffs without sufficient notice or information, such that Plaintiffs could not make informed decisions and thereby making it impossible for Plaintiffs to operate a viable business;

(c)     Making intentional misrepresentations to Plaintiffs regarding the history of the Qualcomm account and its profitability;

(d)     Failing to provide Plaintiffs with training which was mandated by Jani-King's contract with the City;

///

(e)    Failing to advise Plaintiffs of material requirements included in Jani-King's contract with the City, subjecting Plaintiffs to potential liability;

(f)    Failing to adequately account for the charges Jani-King posted to Plaintiffs' account;

(g)    Failing to properly advise Plaintiffs of account specifics before requiring Plaintiffs to accept an account;

(h)    Failing to provide information related to the leasing of equipment.

(i)    Requiring Plaintiffs to pay individuals for time spent working on the Qualcomm account, even though those individuals were working prior to Plaintiffs accepting the Qualcomm account; and

(j)    Charging Plaintiffs "leasing" costs for equipment on the Qualcomm account, even though Plaintiffs never agreed to lease, or signed any agreement, to lease equipment.

94.    As a result of Jani-King's breach of this implied covenant, Plaintiffs suffered and will continue to suffer reasonable and foreseeable consequential damages, including loss of earnings expenses for cleaning supplies, transportation costs, leasing costs and other damages in an amount to be proven at trial.

**SIXTH CAUSE OF ACTION**
**Violations of California Business Code § 17200 et seq.**
**(AGAINST ALL DEFENDANTS)**

95.    Plaintiffs re-allege and incorporate by reference, each and every allegation in paragraphs 1-94.

96.    The California Unfair Competition Law, Cal. Bus. &Prof. Code § 17200 et seq. ("UCL"), defines unfair competition to include any "unlawful," "unfair" or "fraudulent" business act or practice. Cal. Bus. & Prof. Code § 17200.

97.    Jani-King's conduct as described above constitutes unlawful business practices for the reasons set forth below, without limitation:

///

1        (a)   Jani-King has committed torts of intentional misrepresentation, concealment, and negligent misrepresentation as described above;

3        (b)   Jani-King has breached the franchise contract as described above;

4        (c)   Jani-King induced Plaintiffs to accept the Qualcomm account based on willful misrepresentations by Jani-King representatives. Jani-King knew that it grossly underbid the Qualcomm account, yet it passed on the account to unsuspecting Plaintiffs, with false promises of profitability. Jani-King represented to Plaintiffs it would take three days to clean the stadium, yet it was fully aware that its bid only included man hours for two days. Jani-King also knew, based on historical data from prior years, that post event cleaning could not be performed in two days;

11        (d)   Jani-King offered a contract to Plaintiffs that was filled with unconscionable terms;

13        (e)   Jani-King lured Plaintiffs into accepting the Qualcomm account, knowing it would not be profitable, yet continued to charge Plaintiffs with exorbitant fees;

15        (f)   Jani-King systematically underbids other cleaning accounts, charging excessive and unwarranted fees, deducting these fees from any income generated by Plaintiffs;

17        (g)   Jani-King routinely refuses to provide adequate information about the nature of the cleaning services required at its cleaning accounts and requires Plaintiffs to "accept" the accounts prior to them viewing the premises;

20        (h)   Jani-King failed to properly train Plaintiffs as was required under its contract with the City of San Diego;

22        (i)   Jani-King lied to the City regarding the "employees" which would be working on the Qualcomm account and represented that those "employees" had received specific training; which they had not;

25        (j)   Jani-King failed to advise Plaintiffs of specific requirements in Jani-King's contract with the City which required "green" cleaning supplies. Jani-King never informed Plaintiffs of this requirement, nor provided Plaintiffs with supplies that satisfied this requirement.

28        ///

(k)    Jani-King routinely fails to provide Plaintiffs with information regarding the leasing of equipment, but yet continues to charge Plaintiffs fees for such leases. If Plaintiffs did execute a lease for equipment, when Plaintiffs turn in an account, Jani-King refuses to honor the terms of the contract but continues to charge Plaintiffs with lease fees; and

(l)    Jani-King required Plaintiffs to pay individuals for time spent working on the Qualcomm account, even though those individuals were working prior to Plaintiffs accepting the Qualcomm account.

98.    As a result of Jani-King's unlawful, unfair, and fraudulent conduct, Plaintiffs suffered injury in fact and lost money, including, but not limited to loss of earnings promised, loss of income, expense for cleaning supplies, leasing costs and transportation costs.

99.    Pursuant to California Business and Professions Code §17203, Plaintiffs seek declaratory relief for Jani-King's unlawful, unfair and fraudulent conduct and to recover restitution.

100.    Pursuant to California Business and Professions Code § 1021.5, Plaintiffs are entitled to recover reasonable attorney's fees, costs, and expenses incurred in bringing this action.

## SEVENTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress
### (AGAINST ALL DEFENDANTS )

101.    Plaintiffs re-allege and incorporate herein by reference paragraphs 1-102 as though fully set forth herein.

102.    Defendants engaged in outrageous and unprivileged conduct that Plaintiffs are informed and believes was intended to cause his harm. Alternatively, Defendants acted with reckless disregard of the probability that Plaintiffs would suffer severe emotional distress as a result of their outrageous conduct as described *supra*.

103.    As a direct and proximate result of Defendants', and each of their, outrageous, unprivileged, and extreme conduct alleged above, Plaintiffs suffered severe, substantial and enduring emotional distress, including humiliation, embarrassment, anxiety and indignity, in an amount which will be proven at trial.

104.   Defendants', and each of their conduct, was intentional and malicious, and done for the purpose of causing Plaintiffs to suffer severe, substantial and enduring humiliation, mental anguish, and emotional and physical distress.

105.   In failing to correct, prevent or refrain from fraudulent conduct, Defendants caused Plaintiffs severe harm.  Defendants', and each of their, conduct was malicious and oppressive, in willful and conscious disregard of Plaintiffs' rights and subjected Plaintiffs to cruel and unjust hardship.   Thus, an award of exemplary and punitive damages is justified in an amount to be proven at trial.

**EIGHTH CAUSE OF ACTION**
**DECLARATORY RELIEF**
**(AGAINST ALL DEFENDANTS)**

106.   Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through 105 above as though fully set forth herein.

107.   An actual controversy has arisen and now exists between Plaintiffs and Defendants, concerning their respective rights and duties under the Franchise Agreements in that (a) Plaintiffs assert multiple causes of action against Defendants and (b) inasmuch as Plaintiffs contend that Defendants' actions were willful and malicious, Plaintiffs demand an award for punitive damages.

108.   The Franchise Agreements between Plaintiffs and Jani-King provide the following:  THE PARTIES AGREE THAT ANY DAMAGES SOUGHT BY OR AWARDED TO FRANCHISEE SHALL BE LIMITED TO FRANCHISEE'S TOTAL INVESTMENT WITH FRANCHISOR, AND NO PUNITIVE DAMAGES OR EXEMPLERY DAMAGES WILL BE AWARDED TO FRANCHISEE."

109.   Plaintiffs believe and allege that the above referenced language contained in the Franchise Agreements is unconscionable and against public policy, as it is facially one-sided, as the damages limit is only applicable to the Franchisee.

110.    Plaintiffs desire a judicial determination, interpretation and declaration that the foregoing Franchise Agreement language is unenforceable as it is contained within a contract of adhesion and the language is unconscionable and contrary to public policy.

111.    A judicial determination, interpretation and declaration is necessary and appropriate at this time so that Plaintiffs may properly exercise their rights under the provisions of the Franchise Agreements.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs make the following demand:

(a)    For general, special, actual, compensatory and/or nominal damages as against Defendants, and each of them, in an amount to be determined at trial;

(b)    For punitive damages in an amount to be determined at trial sufficient to punish, penalize and/or deter Defendants, and each of them, from further engaging in the conduct described herein;

(c)    That Jani-King be ordered to make restitution to Plaintiffs pursuant to California Business and Professions Code § 17200;

(d)    That the court make such orders as may be necessary to restore to Plaintiff any monies which may have been obtained from them by means of Defendants' unlawful, unfair, and fraudulent business practices pursuant to California Business and Professions Code §§ 17203 and 17535;

(e)    For a judicial determination declaring that Defendants' limit on punitive damages contained in its Franchise Agreements is unenforceable;

(f)    For statutory penalties as allowed by law;

(g)    For costs and expenses of this litigation;

(h)    For reasonable attorneys' fees where appropriate and allowed by law;

(i)    For pre and post-judgment interest on all damages and other relief awarded herein from all entities against whom such relief may be properly awarded; and,

///

1    (j)    For all such other relief as this Court deems just and appropriate.

2

3    Dated:   January 10, 2014                              **GERVAIS LAW**

4

5

6                                                          Kara L. Gervais, Esq., attorneys for Plaintiffs
7                                                          Tervon LLC, Sunyata and Eleanor Little and
                                                           Mario Gutierrez
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# JANI-KING OF CALIFORNIA, INC.

## FRANCHISE AGREEMENT

AN AGREEMENT made and entered into in Addison, Dallas County, Texas by and between JANI-KING OF CALIFORNIA, INC., a Texas Corporation, hereinafter referred as either "JANI-KING" or "Franchisor", and

MARIO GUTIERREZ

hereinafter referred to, singularly or collectively, as "Franchisee", doing business as a:

[  ] Corporation,
incorporated under the
laws of _____,

[  ] Partnership

[ X ] Sole Proprietorship

for the purposes of allowing Franchisee to operate a business as a Franchisee of JANI-KING.

## FRANCHISE SUMMARY

EFFECTIVE DATE: NOVEMBER 21 _____, 2008____.    PLAN: N/A____

INITIAL FRANCHISE FEE DOWN PAYMENT AND INITIAL FINDER'S FEE DOWN PAYMENT:

($N/A_____ )  SEE TRANSFER AGREEMENT ATTACHED HERETO_____  Dollars

PROJECTED INITIAL FRANCHISE FEE AND INITIAL FINDER'S FEE MONTHLY PAYMENT:

$ N/A____  PER MONTH FOR N/A  MONTHS

INITIAL FINDER'S FEE BUSINESS:

($ N/A_____ )  SEE TRANSFER AGREEMENT ATTACHED HERETO_____  (Thousand)

INITIAL OFFERING PERIOD: SEE TRANSFER AGREEMENT ATTACHED HERETO_____ ( N/A__ ) Days

TERRITORY:  Counties:

San Diego in the State of California.

FRANCHISEE ADDRESS:
602 WEST 7TH AVE

CITY: ESCONDIDO_____    STATE: CA_____    ZIP CODE: 92025_____

COUNTY: SAN DIEGO_____    TELEPHONE NUMBER: ( 760 ) ▓▓▓▓▓

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INIT M G INT J.J.B.
PAGE 1 OF 33

# RECITALS

## SECTION 1

1.1.   WHEREAS, Franchisor owns a system (the "System") consisting of the Proprietary Marks (as defined herein), and certain proprietary know-how and other Confidential Information (as defined herein) for:

(a)   the operation and franchising of comprehensive cleaning and maintenance businesses using the System and the Confidential Information, and the supply and distribution of complete cleaning and/or maintenance related services, including, but not limited to, commercial, industrial, institutional and residential cleaning (the "Services"); and

(b)   the supply and distribution of maintenance products using the System and the Confidential Information, and the promotion, sale and delivery of the same (the "Products").

1.2.   WHEREAS, Franchisor is authorized to grant a license to use the System, the Proprietary Marks and/or the Confidential Information.

1.3.   WHEREAS, Franchisee desires to use the System in Franchisee's business as a Jani-King Franchisee.

1.4. WHEREAS, the parties to this Agreement desire that the Franchisor grant to the Franchisee a license to use the System developed by Jani-King in the Territory for the business, and agree that such business shall be governed by the terms, covenants, and conditions contained in this Agreement.

1.5.   NOW, THEREFORE, in consideration of the full and faithful performance of each and every one of the covenants, terms and conditions contained herein, the parties agree as follows:

## SECTION 2

2.1.   Franchisor grants to the Franchisee, upon the terms and conditions herein contained, the right to establish and operate a Jani-King business and a license to use the System developed by Jani-King in connection therewith for its business in the territory described in the Franchise Summary (the "Territory"). The Franchise Summary is defined as all information contained on the first page of this Agreement appearing below the words "Franchise Summary."

## SECTION 3

## GRANT OF FRANCHISE

3.1.   For and in consideration of the full and faithful performance of each and every one of the covenants, terms and conditions herein contained and agreed to by Franchisee, Franchisor grants to the Franchisee the right to establish and operate a Jani-King franchise within the Territory.

3.2.   Franchisee shall operate the business at or from a location of its choosing within the Territory subject to the approval of Franchisor and Franchisee's continued compliance with the terms and conditions set forth herein.

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT _MG_ INT _ff.B_
PAGE 2 OF 33

## SECTION 4

## FRANCHISEE PLEDGES

4.1.   To operate a Jani-King Franchise cleaning and maintenance services company in the Territory described herein, using the trade name "Jani-King" in conjunction with its business name, as "John Doe, d/b/a Jani-King", or "ABC Inc., d/b/a Jani-King".   Franchisee agrees not to use as part of a corporate name or other legal name, (i) the name "Jani-King of (any city, state, or other region)", (ii) any other janitorial, maintenance or cleaning service name in conjunction with their formal name, i.e.   such as "ABC Custodials", "ABC Maintenance", "ABC Cleaning Services" etc., (iii) a name prefix of "Jani-", or any other similarly spelled or sounding prefix, (iv) the words "Services", "Cleaning", and "Maintenance" or (v) any other trademarks, trade names or service marks or any name that has not been granted prior written approval by Jani-King's Corporate Office.   All names of the entity operating as Franchisee, including corporate names, business names, trade or assumed names, or other legal names shall be approved in writing by Franchisor prior to adoption for use by Franchisee.   All directory listings, advertising, letterhead, or any other visual or printed matter used by Franchisee to communicate to anyone shall conform to Franchisor's established Jani-King policies and shall be subject to review and approval by Franchisor prior to use by Franchisee.

4.1.1.   Franchisor has developed and used and continues to develop, use and control in connection with its System certain Proprietary Marks that have become associated with its System so as to impart to the public superior standards of quality and service.   The "Proprietary Marks" as used in this Agreement shall mean all trademarks, trade names, trade dress, service marks, slogans and logos, including, but not limited to, the mark Jani-King, or any other trademark or service mark which may be authorized in writing by an officer of Franchisor now or at any time in the future.

4.1.2.   Franchisor has developed and used, and continues to develop, use and control in connection with its System, certain confidential information, programs, devices, methods, techniques and processes which are not generally known to the public pertaining to franchising, promotion, marketing, operation and management of a business, including, but not limited to, the System, as defined herein, which includes but is not limited to information regarding the operational, sales, promotional methods and techniques, and marketing methods and techniques of Franchisor and the Jani-King program.   Such information includes but is not limited to  (a) Jani-King's manuals and forms, the information contained and compiled therein, and the updates and memoranda thereto; (b) names of Jani-King's agents, suppliers, and customers, and their requirements, specifications, and preferences; (c) the contractual arrangements between Jani-King and its agents, suppliers, and customers; (d) the financial details (including but not limited to credit and discount terms) of Jani-King's relationship with its agents, suppliers, or customers; (e) the names of prospective Jani-King customers and their requirements, specifications, and preferences; (f) information concerning the remuneration paid by Jani-King to its employees; (g) Jani-King's accounting software and forms; (h) information concerning and presented at Jani-King meetings; (i) security and access information; (j) information provided through initial and ongoing specialized training; and (k) Jani-King's business plans and strategies (collectively, the "Confidential Information").

4.1.3.   All use of the Proprietary Marks and Confidential Information by Franchisee shall be in accordance with the terms of this Agreement and shall inure to the benefit of Franchisor and all such Proprietary Marks and Confidential Information shall remain the sole property of Franchisor.

4.1.4.   Franchisee agrees to submit to Franchisor, prior to use by Franchisee, samples of any and all advertising and promotional plans and materials of any type which contain in any manner any of the Proprietary Marks, including without limitation the trade names, trademarks, service marks, slogans and logos as are now or which in the future may be approved for use by Franchisee.

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT $\mathcal{ML}$ INT $\mathcal{JJB}$.
PAGE 3 OF 33

4.2.1.  Franchisee agrees to devote sufficient time and effort to its business pursuant to this Agreement and that all work and services performed under this Agreement will be performed and/or supervised by Franchisee or authorized agents/employees of Franchisee that comply with all terms of this Agreement.

4.2.2.  Franchisee, its agents, and employees will follow current established Jani-King policies, practices and procedures, and as they may be amended from time to time, and agrees not to deviate therefrom without prior written consent of Franchisor.

4.2.3.  Franchisee and officers and directors (if Franchisee is a corporation) who will actively participate in the operations of the franchise business agree to successfully complete the initial training program within six (6) months of the signing of this Agreement.

4.3.  In consideration of the franchise herein granted under the plan identified in the Franchise Summary (the "Plan"), and the initial services to be performed by Franchisor in connection with Franchisee's use in the Territory of the System, Proprietary Marks and Confidential Information as pledged herein, Franchisee shall pay to the Franchisor, upon execution of this instrument, the INITIAL FRANCHISE FEE DOWN PAYMENT AND INITIAL FINDER'S FEE DOWN PAYMENT, as stated in the Franchise Summary herein ("the Initial Franchise Fee Down Payment and Initial Finder's Fee Down Payment" or the "Initial Franchise Fee and Initial Finder's Fee Down Payment").  Franchisee authorizes Franchisor's deduction of Initial Franchise Fee Monthly Payments and Initial Finder's Fee Monthly Payments, as stated in the Franchise Summary herein, (the "Initial Franchise Fee Monthly Payments and Initial Finder's Fee Monthly Payments" or the "Initial Franchise Fee and Initial Finder's Fee Monthly Payments) from the Gross Revenue, as defined herein, in the amount and number of payments stated in the Franchise Summary, provided Franchisee's franchise produces Gross Revenue in an amount equal to or greater than the Initial Franchise Fee Monthly Payments and Initial Finder's Fee Monthly Payments.

4.3.1.  Payment of this sum shall entitle Franchisee to the non-exclusive right to operate a Jani-King franchised business in the Territory described herein.  Franchisor will secure commercial cleaning and maintenance contracts and offer to Franchisee the opportunity to perform services in accordance with those commercial cleaning and maintenance contracts which contracts will have cumulative initial gross monthly billings in the amount equal to the amount stated as the "INITIAL FINDER'S FEE BUSINESS" in the Franchise Summary (the "Initial Finder's Fee Business").  The Initial Finder's Fee Business may also be referred to as the "Initial Business."  All commercial cleaning and maintenance contracts will remain the sole property of Jani-King.

4.3.2.  Except as otherwise noted herein, the Initial Franchise Fee Down Payment and the Initial Finder's Fee Down Payment is non-refundable and is in addition to royalties and other payments set out herein.

4.3.3.  In the event that Franchisor is unable to secure and offer to the Franchisee the right to provide services to commercial cleaning and maintenance contracts with a cumulative total of initial gross monthly billings equal to or greater than the Initial Finder's Fee Business within the time period stated as the Initial Offering Period in the Franchise Summary (the "Initial Offering Period"), a portion of the Initial Franchisee Fee Down Payment and the Initial Finder's Fee Down Payment may be refundable.  If the Franchisor fails to offer the full amount of Initial Finder's Fee Business, an amount equal to the lesser of (i) three (3) times the amount of Initial Finder's Fee Business not offered to the Franchisee or (ii) the total Initial Franchise Fee Down Payment and the Initial Finder's Fee Down Payment paid by Franchisee to Franchisor may be refunded.  Any refund will be first applied to any money owed to Franchisor, Jani-King Leasing Corporation, or an affiliate of Franchisor, any unpaid fees or charges that would result in a negative due Franchisee Report.  Any remaining portion of the refund will be credited to the Franchisee, unless agreed to otherwise, in writing, by Franchisor and Franchisee.  A refund, or other written agreement between the parties, under this provision will fulfill Franchisor's obligation to offer any remaining portion of the Initial Finder's Fee Business used to calculate the refund.

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT *MG* INT *J.J.B.*
PAGE 4 OF 35

4.4. In addition to the Office Supply and Advertising Package provided to Franchisee by Franchisor as described in Schedule One of this Agreement, Franchisee is required to purchase the Professional Products and Equipment listed in Schedule One as the "Supply and Equipment Package", and also purchase, lease or provide proof of ownership to Franchisor of the following:

A commercial vacuum cleaner, a commercial floor polisher, a commercial wet/dry vacuum and a compact portable vacuum cleaner (canister type) w/shoulder strap and cloth bag, identified as "Additional Electric Equipment" in Schedule One. These items are not included in the Office Supply and Advertising Package furnished by Franchisor.

The Supply and Equipment Package and the Additional Electric Equipment must be obtained by the Franchisee before any Initial Finder's Fee Business will be offered.

4.5.1 Franchisee agrees to pay to Franchisor or its designee, by the fifth (5th) day of each month a royalty fee equal to ten percent (10%) of the monthly Gross Revenue. Gross Revenue is defined as all revenue invoiced by anyone for any contract services, one time cleans, extra work, sales of supplies, equipment or goods and any other revenue related to or derived from the provision of any cleaning and maintenance services including, but not limited to, commercial, industrial, institutional and residential, as well as the sale, leasing or distribution of related supplies and equipment in connection with the conduct and operation of Franchisee's business or otherwise directly or indirectly, in whole or in part, performed or sold by, or for the benefit of Franchisee, Franchisee's principals, guarantors, spouse(s), officers, directors, shareholders, agents, or employees, regardless of the entity or business name used. The minimum royalty shall be Fifty Dollars ($50.00) monthly during the first twelve (12) months of operation and One Hundred Dollars ($100.00) per month thereafter. Such minimum royalty is subject to annual adjustment for increases in the Consumer Price Index.

A fee of $25 per day (the "Non-Reported Business Fee") will be charged to Franchisee for each day Franchisee fails to report all Gross Revenue, in addition to any and all fees, payments, charges, chargebacks, or other amounts due and owing Franchisor under the terms of this agreement as a result of such Gross Revenue, whether or not collected by Franchisee. Such amounts shall be immediately due and payable. The payment of the Non-Reported Business Fee shall constitute liquidated damages and not a penalty, and shall be in addition to any other remedies available to Franchisor at law or in equity.

4.5.2. Franchisee agrees to pay Franchisor an advertising fee (the "Fee") equal to one percent (1%) of Franchisee's Gross Revenue as defined above. Franchisee agrees to pay the Fee, in addition to the royalty payment, commencing on the fifth (5th) day of the month and continuing on the fifth (5th) day of every month thereafter for the remainder of the term. Franchisee agrees that the Fee shall be maintained and administered by Franchisor or its designee as follows:

The Fee will be used by us or our designee as follows:

1. We will direct all advertising programs and will have sole discretion to approve or disapprove the creative concepts, materials and media used in the programs. The Fee is intended to be used to maximize general public recognition and acceptance of the registered trademarks and enhance the collective success of all franchises operating under the Jani-King system. None of the Fee is specifically or principally used for advertising that is principally a solicitation for the sale of franchises. In using the Fee, we and our designees are not required to make expenditures for you which are equivalent or proportionate to your payment or to ensure that any particular franchisee benefits directly or pro rata from the placement of advertising. We or our designees are also not required to advertise in the area where you are located.

2. The Fee may be used to satisfy any and all costs of maintaining, administering, directing and preparing advertising (including, without limitation, the cost of preparing and conducting television, radio,

JANI-KING OF CALIFORNIA, INC.  
FRANCHISE AGREEMENT: 5/08

INT. *MG* INT *S.J.B.*  
PAGE 5 OF 33

magazine and newspaper advertising campaigns; direct mail and outdoor billboard advertising; vehicle decaling, public relations activities; employing advertising agencies to assist therein; travel and associated expenses of personnel dispatched to assist in account start ups and account bidding; and costs of our personnel and other departmental costs for advertising that is internally administered or prepared by us). Sums paid by you relating to the Fee will also be used to defray any of our administrative costs incurred in activities reasonably related to advertising programs. This Fee is a payment to us for advertising and related costs and we do not have any duty to you related to the use of the Fee.

3. The Fee may also be used in our National Vehicle Program ("NVP") which is a voluntary program through which you can purchase a select number of vehicles from a national vehicle manufacturer. In the event Franchisee participates in the NVP, Franchisee is required to have a decal installed on any vehicle purchased through the NVP. The cost and installation of the vehicle decal will be paid out of the Fee.

4.6. Franchisee further agrees to pay to Franchisor a Finder's Fee on any additional business in excess of the Initial Finder's Fee Business of which Franchisee accepts the designation, from Franchisor, as authorized franchisee to provide service to such business, whether or not that additional business or contract resulted from an increase in the contract price for an existing business being serviced by Franchisee, an expansion of service for existing business being serviced by Franchisee at the same or other locations, or completely new business. Finder's Fees are in addition to royalties, Initial Franchise Fee and Initial Finder's Fee Monthly Payments, and other payments set out in this Agreement, and are calculated on the gross monthly billing for an account according to the formulas listed below. Franchisor has no obligation to offer Franchisee for the right to provide service to additional business or contracts beyond the Initial Finder's Fee Business. Should Franchisor, in its sole opinion, decide to offer Franchisee the right to service any additional business or contracts, Franchisee may either decline or accept the offer at the time it is made.

Following Franchisor's offer and Franchisee's acceptance of the right to provide service to any additional business or contract, the Franchisee agrees to pay an amount as a Finder's Fee according to the guidelines established by the Franchisor. Franchisor will, from time to time, establish such guidelines, policies and procedures as necessary to calculate the applicable Finder's Fee, taking into consideration industry standards and increases in costs and expenses of soliciting new accounts, and Franchisor reserves the right to increase or decrease the Finder's Fee in all categories. Currently, the following guidelines will apply, but any guideline or policy regarding the calculation of a Finder's Fee or the payment thereof, for any account, may be changed by the Franchisor at any time prior to the offering of the account:

(1) Upon acceptance of the right to perform services on any additional business, the Franchisee will sign an Account Acceptance/Finder's Fee Agreement, that will include the Finder's Fee payment calculations, if any, according to the provisions set out in the Finder's Fee Schedules below.

(2) For each of the Finder's Fee Schedules set out below, the following terms apply to calculate the Finder's Fee for the additional business: ·

"OVER" / "UP TO": To determine the proper formula for a Finder's Fee payment structure within the appropriate Schedule, the Monthly Billing categories are listed by ranges, where the monthly billing will exceed the amount listed as "OVER", but less than the amount listed as "UP TO". If the monthly billing may fluctuate, the proper category of Monthly Billing will be determined by the maximum gross monthly billing allowed by the account contract.

DOWN PAYMENT: The initial payment due at the time of acceptance of the right to provide services to the account, or as otherwise established under these guidelines, calculated by multiplying the percentage stated in the appropriate category of Monthly Billing under Down Payment, times the appropriate gross monthly billing. All Down Payments will be calculated using the gross billing for the First Full Month of Service. "First Full

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT. _M_ _INT_ _P.f.B._
PAGE 6 OF 33

28

Month of Service", for purposes of calculating the Down Payment, is defined as the first month in which the service is performed on or before the 15th day of the month. If a partial month is the First Full Month of Service, the gross monthly billing, for purposes of calculating the Down Payment, is determined as though the account had been serviced for the entire month. If the account begins service after the 15th, the following month will be used for purposes of the Down Payment, and no payment is due for the initial period. The Down Payment is due along with the monthly franchisee report for the First Full Month of Service (and second month as required) and may be payable as a deduction from the account billing on the franchisee report.

MONTHLY PAYMENT: The payment made each month for the designated number of months, calculated by multiplying the percentage stated in the appropriate schedule under Monthly Payment, times the gross monthly billing for the current accounting month. However, the total of the amounts paid as Monthly Payments (exclusive of the Down Payment) shall not exceed a sum greater than 300% of: (a) for Variable Rate Accounts, the maximum gross monthly billing that would be generated in a month in which the building was at a one hundred percent (100%) occupancy factor, exclusive of any down payment; or (b) for Public Event or Seasonal Accounts, the average gross monthly billing for the first twelve months service is performed under the account contract, exclusive of any down payment. Monthly Payments will begin the month following any scheduled Down Payment.

MONTHS: The number of months a Monthly Payment must be made under the terms of the Account Acceptance/Finder's Fee Agreement, subject to the maximum sum described in the definition of Monthly Payment.

(3) Accounts will be identified according to the following definitions and the Finder's Fee will be calculated using the formula set out in the appropriate Finder's Fee Schedule for the type of account:

1. FIXED RATE ACCOUNT: An account that has a constant monthly billing established by the account contract, and has a term of one year or longer. The Finder's Fee may be paid in full at the time of acceptance of the account, in which event, Franchisee will pay three (3) times the amount of the maximum gross monthly billing allowed under the contract, or the fee and payment will be structured according to the Schedule.

### FINDER'S FEE SCHEDULE:

| MONTHLY BILLING: | | DOWN | MONTHLY | |
| OVER | UP TO | PAYMENT | PAYMENT | MONTHS |
|---|---|---|---|---|
| 50 | 1,500 | 60% | 20% | 13 |
| 1,500 | 3,000 | 40% | 15% | 20 |
| 3,000 | 6,000 | 30% | 10% | 30 |
| 6,000 | 10,000 | 15% | 10% | 32 |
| 10,000 | unlimited | 5% | 5% | 65 |

2. VARIABLE RATE ACCOUNT: An account with a monthly billing that may fluctuate, depending on the occupancy of the property, where the billing is based on a set price per square foot of service area, and has a term of one year or longer. Any city, State or Federal account or Public School will be bid as a Multi-Tenant account. The Finder's Fee may be paid in full at the time of acceptance of the account, in which event, Franchisee will pay three (3) times the amount of the maximum gross monthly billing that would be generated in a month in which the building was at a one hundred percent (100%) occupancy factor, or the fee and payment will be structured according to the Schedule.

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT.M b/INT. J.J.B.
PAGE 7 OF 33

FINDER'S FEE SCHEDULE:

| MONTHLY BILLING: | | DOWN | MONTHLY | |
| OVER | UP TO | PAYMENT | PAYMENT | MONTHS |
|---|---|---|---|---|
| 50 | 3,000 | 30% | 5% | 72 |
| 3,000 | 6,000 | 15% | 5% | 72 |
| 6,000 | unlimited | 5% | 5% | 72 |

3. **SEASONAL ACCOUNT:** An account that will be serviced for a limited period of time but may recur on a seasonal basis. This account may have a constant or fluctuating monthly billing amount. A Down Payment is due only for the initial season. Monthly Payments are due each month until the total paid as Monthly Payments is equal to 300% of the average gross monthly billing for the first twelve months service is performed under the account contract, which may occur over several seasons.

FINDER'S FEE SCHEDULE:

| MONTHLY BILLING: | DOWN PAYMENT | MONTHLY PAYMENT | MONTHS |
|---|---|---|---|
| Any Amount | 20% | 10% | Varies* |

*Until Payments equal 300% of Average Gross Monthly Billing for first twelve months.

4. **PUBLIC EVENT FACILITIES:** An account involving a public facility that houses special events for a limited duration, but similar events recur on a regularly scheduled basis. The monthly billing will fluctuate, depending on the type of event or use of the facility, where the billing is based on the labor-hours required to service the property, and has a term of one year or longer. Monthly Payments are due each month until the total paid as Monthly Payments is equal to 300% of the average gross monthly billing for the first twelve months service is performed under the account contract.

FINDER'S FEE SCHEDULE:

| MONTHLY BILLING: | DOWN PAYMENT | MONTHLY PAYMENT | MONTHS |
|---|---|---|---|
| Any Amount | 20% | 10% | Varies* |

*Until Payments equal 300% of Average Gross Monthly Billing for first twelve months.

5. **APARTMENT TURNAROUND:** An account where one or more apartments or other facilities are serviced on a recurring basis as a make ready between occupancies or other uses. The monthly billing will fluctuate depending on the number of units serviced, but the account contract has a term of one year or more.

THIS SPACE INTENTIONALLY LEFT BLANK

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT _A b_ INT _L.J.B._
PAGE 8 OF 33

FINDER'S FEE SCHEDULE:

| MONTHLY BILLING: | DOWN PAYMENT | MONTHLY PAYMENT | MONTHS |
|---|---|---|---|
| Any Amount | 20% | 10% | All* |

*Each month service is performed.

6.  OTHER NON-STANDARD ACCOUNTS:  The Franchisor will establish the Finder's Fee on any other account that does not fall within one of the above definitions, prior to the account being offered to the Franchisee for designation of service.  The Finder's Fee on nonrecurring contracts, initial cleaning or one time cleaning contracts will vary but do not currently exceed twenty-five percent (25%) of the total invoiced amount.

(4)    Policies and Procedures will be established by Franchisor from time to time which regulate the amount and calculation, terms of payment, credits on termination or transfers of accounts, and other issues concerning Finder's Fees.

4.7.  Franchisee agrees that Franchisor shall have the exclusive right to perform all billing and accounting functions for the services provided by Franchisee.  Each month, Franchisee agrees to pay Franchisor five percent (5%) of Franchisee's Gross Revenues, as defined herein, as an Accounting Fee, to cover Franchisor's administrative costs and expenses for this service (see Section Five).  Depending on Franchisee's monthly Gross Revenue, Franchisee may be eligible for a rebate on the accounting fees paid by the Franchise.  This rebate will be a percentage reduction of the accounting fee for the month(s) in which Franchisee is eligible and will be calculated each month using the following table.  Franchisee's eligibility for the rebate shall be determined solely by Franchisor, and the calculation of the rebate shall be performed solely by Franchisor.  Any rebate Franchisor determines Franchisee is eligible for will be issued to Franchisee twice per year at a time determined solely by Franchisor.

| Monthly Gross Revenue (Dollars) | Accounting Rebate (Percent) |
|---|---|
| 0-25,000 | 0 |
| 25,001-45,000 | 0.5 |
| 45.001-65,000 | 1.0 |
| 65,001-85,000 | 1.5 |
| 85,001-Over | 2.0 |

4.7.1.  Franchisor each month will invoice clients serviced by Franchisee for the services rendered and supplies provided.  All monies received from clients are the property of Franchisor.  Each month, after deduction of all appropriate fees and charges including, but not limited to, all royalty fee, accounting fees, any note payments, the Initial Franchise Fee and Initial Finder's Fee Monthly Payments, Finder's Fees, advertising fees, transfer fees, chargebacks on past due invoices, any advances made to the franchisee by Franchisor, Non-Reported Business Fees, as defined hereinafter, or attorneys fees and court costs incurred by Franchisor in enforcing payment of accounts by clients, Franchisor will disburse money to Franchisee.  On the fifth (5th) day of each month, Franchisor will disburse to Franchisee the amount of money appearing in the Due Franchisee Column of the Franchisee Report for the preceding month.  In the event the fifth (5th) day of the month falls on a Saturday, Sunday or recognized holiday, then all such amounts due to Franchisee will be disbursed before the end of the next business day.

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT _MG_ INT _L.J.B._
PAGE 9 OF 33

4.8. Franchisee agrees to make all payments due Franchisor promptly in accordance with the terms of this Agreement, and recognizes that any failure on the part of the Franchisee to do so shall be deemed a substantial breach of this Agreement, and shall give Franchisor the right to terminate this Agreement immediately and retain all sums previously paid to Franchisor by Franchisee.

4.9.1. During the term of this Agreement, Franchisee shall maintain and preserve full, complete and accurate books, records and accounts regarding the Franchise business.

4.9.2. Upon request by Franchisor, Franchisee shall, at its sole cost and expense, prepare and submit to Franchisor within thirty (30) days after said request, a complete financial statement for the preceding twelve month period or any other calendar year, or a financial statement compiled and reviewed by a certified accountant or public accounting firm, together with such other information as Franchisor may reasonably require in order for Franchisor to determine that Franchisee is properly reporting and accounting for all Gross Revenue.

4.9.3. Franchisor reserves the right to inspect or examine the accounts, books, records and tax returns of Franchisee, at any reasonable time, so far as the same pertain to determination of Franchisee's Gross Revenue or the business of operating a Jani-King Franchise. Franchisor shall also have the right, at any time, to have an independent audit made of the books or financial records of Franchisee. Any such inspection, examination or independent audit shall be performed at the cost or expense of Franchisor unless the same is necessitated by the failure of Franchisee to provide the reports requested or to preserve records as provided herein, or unless the inspection, examination or independent audit discloses that any statement or report made by Franchisee is in error to an extent of five percent (5%) or more, in which case Franchisee shall immediately pay to Franchisor the amount in error and shall reimburse Franchisor for any and all costs and expenses connected with the inspection or audit (including, without limitation, reasonable accounting and attorneys' fees).

4.10. Franchisee agrees to be solely responsible for the services and results of services performed at locations where cleaning and maintenance services are performed by Franchisee, and to hold harmless and indemnify Franchisor from any and all claims arising from actions by Franchisee or its employees.

4.11. Franchisee agrees to maintain a clean and safe place of business in compliance with OSHA and other governmental and industry standards and to conduct its business in a manner that would bring goodwill and public approval to itself and Jani-King.

4.11.1. Franchisee is solely responsible for any leases of real or personal property in connection with the operation of its business, but agrees that Franchisor must approve office location, furniture and decor thereof to protect the image and reputation of Jani-King. Franchisee must at all times during the term of this Agreement maintain such office and all fixtures, furnishings, signs and equipment located thereon in good order and condition, and in a manner which will portray the goodwill and a positive image of the Jani-King name and reputation as such may be prescribed by Franchisor from time to time. Franchisee must, within a reasonable time specified by Franchisor, make all necessary additions, alterations, repairs and replacements to the office as required by Franchisor, but no others without Franchisor's prior written consent, including, but not limited to, periodic repainting or replacement of signs, furnishings, equipment or decor. No other business venture shall operate out of the premises utilized by Franchisee for its office without the prior written consent of Franchisor.

4.12.1. Franchisee agrees to be solely responsible for and indemnify and hold harmless Franchisor, Jani-King International, Inc., and their officers, directors, and employees for all loss or damage originating from, in connection with, or relating to the operation of Franchisee's business and for all claims or demands for damages to property or for injury or death of persons directly or indirectly resulting from or related to the operation of Franchisee's business. Franchisee also agrees that before Franchisee will be authorized to begin operating its franchise, Franchisee is required to obtain and carry the insurance listed below with the limits listed, naming Franchisor, Jani-King International, Inc., and their officers and directors as Additional Insureds from an insurer

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT MONT _R.J.B_ .
PAGE 10 OF 33

carrying an A.M. Bests' Rating of A or better.  Franchisee shall provide Franchisor with proof of such required coverage.

| TYPE | LIMITS |
|------|--------|
| Comprehensive General Liability | $1,000,000 (per occurrence) $ 2,000,000 (Aggregate) |
| Hired and Non-Owned Automobile Insurance | $1,000,000 (combined single limit) |
| Excess or Umbrella Insurance | $20,000,000 (Aggregate) |
| Workers' Compensation | Statutory Limits |

4.12.2.  The various limits of the required insurance may be increased or have new types of coverage added as circumstances dictate.  Franchisee shall provide Franchisor with proof of the required insurance coverage and is required to notify their insurance carrier that the insurance carrier will provide any cancellation notice directly to Franchisor no less than thirty (30) days prior to cancellation.

4.12.3.  If Franchisee fails to secure the above listed insurance to the satisfaction of Franchisor, Franchisor may, in addition to other remedies, purchase such insurance for the benefit of Franchisee and seek prompt reimbursement from Franchisee for all premiums and other costs incurred.  Franchisee shall be responsible for all premiums and other costs incurred by Franchisor up to and including the date Franchisor grants Franchisee written approval of Franchisee's insurance.  Franchisee agrees to indemnify and hold Franchisor harmless from any claims, loss or damage.

4.12.4.  As an alternative to the requirement of purchasing the above insurance, Franchisor may offer to Franchisee, and Franchisee may participate in Franchisor's Business Protection Plan ("BPP") to the extent offered.  Participation in the BPP is voluntary, and Franchisee is not obligated or required to participate.  If Franchisee does not participate in the BPP, Franchisee must provide Franchisor with a certificate of insurance showing that Franchisee has obtained the equivalent amount of insurance coverage with limits as shown above or as established in the Jani-King Policies and Procedures Manual.

4.12.5.  Participation in the BPP includes an initial membership in the Guardian Risk Purchasing Group ("GRPG"), a Texas non-profit corporation organized for the purpose of purchasing liability insurance on a group basis for persons or entities engaged in the janitorial industry.  Membership in the GRPG is restricted to individuals and entities who are engaged in the janitorial industry.  Members in the GRPG participate in GRPG's group insurance policies. GRPG's group insurance policies are not individual insurance policies and the policy limits are shared between all GRPG members. If Franchisee does participate in the BPP, Franchisee is not required to purchase the required liability insurance listed above.  Insurance provided by GRPG does not include coverage any personal or business use automobile(s) or Franchisee's equipment, supplies, or building if Franchisee's building is different from Franchisor's.  Franchisee is required to purchase this insurance and supply proof of insurance to Franchisor before Franchisee will be authorized to begin operations of the franchise.  You are also required to keep accurate payroll records.  In the event Franchisee does not purchase this insurance, Franchisor reserves the right to purchase the insurance for Franchisee and charge Franchisee for the cost of the insurance.

The BPP also includes risk management, claims management assistance, periodic safety training, and regulatory compliance assistance.  For these services, you will be required to pay an administration fee which may include a profit to us. We will be solely responsible for administering the BPP.

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT MG INT L.J.B.
PAGE 11 OF 33

4.12.6. Franchisee's membership in GRPG can be terminated if Franchisee: (1) fails to pay any amount owed for Franchisee's participation in the BPP or (2) if Franchisee fails to report all revenue generated by Franchisee's participation in the janitorial industry or (3) if Franchisee files a fraudulent insurance claim under any of the insurance coverage obtained by Franchisee from GRPG, (4) if Franchisee has excessive losses or (5) if Franchisee does not participate in the janitorial industry for 12 consecutive months.

4.13.    In connection with its agreement to indemnify and hold harmless Franchisor, Jani-King International, Inc., their officers, directors, and employees (the "Jani-King Parties") for all loss or damage as set forth in Section 4.12.1 of this Agreement, Franchisee agrees to defend the Jani-King Parties and any of their subsidiaries named in any lawsuit based on such loss or damage and to pay all costs and reasonable attorneys' fees associated with such defense. If any of the Jani-King parties wishes to retain their own counsel to defend any such action, Franchisee agrees to reimburse the Jani-King parties for all reasonable costs and legal fees incurred by the Jani-King parties for such defense. Said reimbursement shall be made to Franchisor in a timely manner as such fees are incurred by Franchisor and billed to Franchisee.

4.14.1  Franchisee, including officers and directors of Franchisee (where Franchisee is a corporation), agrees during the term of this Agreement not to engage in or have any financial interest in, either as an officer, agent, stockholder, employee, director, owner or partner, any other business which performs cleaning, cleaning management services, franchising or contracting cleaning management sales or any related business, except as otherwise approved in writing by Franchisor.

4.14.2  In the event this Agreement is sold, assigned, terminated or transferred, for any reason whatsoever, Franchisee, including officers and directors of Franchisee (where Franchisee is a corporation), agrees not to engage in or have any financial interest in, either as an officer, agent, stockholder, employee, director, owner or partner, any other business which performs cleaning, cleaning management services, franchising or contract cleaning management sales or any related business: (a) within the Territory covered by this Agreement for a period of two (2) years from the effective date of such sale, assignment, termination, or transfer; and (b) in any other territory covered by a Jani-King Franchise Agreement for a period of one (1) year from the effective date of such sale, assignment, termination or transfer.  Franchisee, including officers and directors of Franchisee (where Franchisee is a corporation), during the periods referred to in this subsection, further agrees not to divert or attempt to divert from Jani-King or its Franchisees, by soliciting clients previously serviced by Franchisee or other Jani-King franchisees to perform any business in which Jani-King or its franchisees were engaged in at any time during the twelve (12) months preceding such sale, assignment, termination or transfer.

4.15.   Franchisee agrees to pay all personal property, sales, excise, use and other taxes, regardless of type or nature, which may be imposed, levied, assessed or charged, on, against or in connection with any services sold or furnished hereunder, whether from any state, municipality, county or parish, or other governmental unit or agency, which may have jurisdiction over such products, service and equipment. Franchisee must also pay all personnel performing services for Franchisee in full compliance with all Federal, state, local, and municipal laws, statutes, and regulations.

4.16.  Franchisee agrees to timely pay all debts, obligations, and encumbrances that might arise as a result of its operation of a Jani-King Franchise.  Franchisee understands that in the event it be adjudicated bankrupt, or becomes insolvent, or a receiver (whether permanent or temporary) of Franchisee's property, or any part thereof, shall be appointed by a court of competent jurisdiction, or if Franchisee shall make a general assignment for the benefit of creditors, or if any judgment against Franchisee remains unsatisfied for thirty (30) days or longer, or if Franchisee defaults on any payments or obligations due Franchisor or its suppliers or others arising out of the purchase of supplies or the purchase or lease of equipment for use in the operation of a Jani-King Franchise, or if Franchisee infringes, abuses or misuses any of the Jani-King trademarks or trade names, or if the Franchisee fails to comply with any of the provisions of this Agreement except as to performance on customer accounts as set forth below, and has failed to take appropriate corrective action to the satisfaction of Franchisor within thirty (30)

JANI-KING OF CALIFORNIA, INC.                    INT. _M G_ NT _J.J.B._
FRANCHISE AGREEMENT: 5/08                         PAGE 12 OF 33

days after written notice by Franchisor of such failure or default, then Franchisor may terminate this Agreement and all rights of Franchisee hereunder shall cease at the end of said thirty (30) day period or such longer period as required by law.

4.17.  Franchisee agrees to be solely responsible for the services, and results of such services, performed at locations where cleaning and/or maintenance services are performed by. Franchisee and Franchisee's representatives and agrees to provide all labor, materials, tools and supplies necessary to service such premises. All of such services will be performed in a good and workmanlike manner, to the satisfaction of the customer for whom such services are performed and in accordance with the cleaning schedule or instructions associated with the contract between Franchisor and the client and to the performance standards of Jani-King. Franchisee understands and agrees that Franchisee is required to maintain a good relationship with each customer serviced by Franchisee, and that Franchisor may inspect any premises serviced by Franchisee at any time to ensure that the quality of service being rendered is in accordance with Jani-King standards.

The following procedures apply if any account we previously offered the right to you to provide services as part of the Initial Finder's Fee Business requests a transfer to another franchisee or cancels the cleaning contract:

(1)  If an account cancels or is transferred to a new franchisee due to non-performance, theft, your failure to service the account properly, your failure to maintain good customer relations, or your failure to comply with the Policies and Procedures, we will not replace the account.

(2)  If an account cancels at no fault of yours before you service the account for 12 full months, the full gross monthly billing value of that account will be replaced within a reasonable period of time by another account or a combination of accounts, at no additional cost to you. This provision applies until the cumulative time Franchisee has provided service to the original account and all replacement account(s) equals 12 months. If any replacement account or combination of accounts has a greater billing rate than the original account, the billing rate in excess of the original account will be applied to the obligation of other Initial Finder's Fee Business, or if the Initial Finder's Fee Business obligation has been fulfilled, Finder's Fees will be charged. Franchisor is not otherwise obligated to replace the accounts that are serviced by Franchisee if the account(s) cancel before the full term of the account.

EXAMPLE:  An account with a monthly gross billing of $1,000 per month cancels after 7 months through no fault of yours. We will replace the account with one or more accounts having cumulative gross monthly billing of at least $1,000 per month. If any of the replacement accounts also happen to cancel at no fault of yours at any time during the next 5 months you service the account(s), we will replace the replacement account(s) with other account(s). If the cumulative gross monthly billings of the replacement accounts exceed $1,000, the monthly billing in excess of $1,000 would apply against other Initial Finder's Fee Business obligation, or Finder's Fees will be charged.

4.17.1.  Franchisee and each of its employees must be in an approved, neat and clean uniform at any time they are performing services at a client's facility.  A personal identifying name tag shall be considered a part of the uniform and is required for all personnel while on the premises of an account.

4.17.2.  Failure of the Franchisee to comply with any provisions of this Agreement or established Jani-King Policies and Procedures within seventy-two (72) hours after Franchisor has given notice to the Franchisee of non-compliance will be sufficient cause for Franchisor to suspend the authority of Franchisee to perform services for any or all accounts serviced by Franchisee, until such time as Franchisor is satisfied that Franchisee has complied with the provisions, or, at the option of Franchisor, to transfer the right to provide service to the account to another Franchisee, without notice or delay.

JANI-KING OF CALIFORNIA, INC.                    INT. _MG_ INT _LGB_
FRANCHISE AGREEMENT: 5/08                         PAGE 13 OF 33

4.17.3. A representative of Franchisor will inspect the accounts from time to time in order to ins\_ the service is performed in accordance with the cleaning schedule or instructions associated with the co\_ between Franchisor and the client and to the performance standards of Jani-King. If at any time, whether throu\_ complaint or inspection, a deficiency in performance is discovered, Franchisor can elect to dispatch its own staff to the account and correct all deficiencies in performance. Franchisor has sole discretion in determining urgency and the time frame when dispatching its staff to an account.

4.17.4. Franchisee must cooperate fully with Franchisor's staff, and pay a hourly rate ("Service Fee"), plus expenses and travel time, on each occasion Franchisor dispatches its staff to an account in order to correct a deficiency in performance. The Service Fee will be established exclusively by Franchisor from time to time, but will not exceed the rate of $50.00 per "labor hour". In order to promote full compliance with all Jani-King performance standards and policies, a Complaint Fee may also be charged to Franchisee as provided in Section 4.23.

4.17.5. If the deficiency in performance requires immediate action to meet the client's demand for a visit or performance of services at the client's premises in less than four (4) hours, and Franchisor is not able to reach the Franchisee, or the Franchisee is not available for an immediate visit or performance of services, the Franchisee will be assessed the Service Fee, plus expenses, for the operations representative's time and effort to satisfy the needs of the customer.

4.17.6. In the event Franchisee fails to perform the cleaning services as required by this Section, pursuant to the spirit and intent of this Agreement, and such deficiency shall continue for five (5) days cumulative within a ninety (90) day period, Franchisor may suspend the authority of Franchisee to perform services for any or all accounts serviced by Franchisee, until such time as Franchisor is satisfied that Franchisee will comply with all performance standards and policies, or, at the option of Franchisor, to transfer the account. In the event Franchisee's right to perform services is suspended, any reinstatement of the right to perform services may not include the right to perform services to the same Jani-King accounts to which Franchisee provided services prior to suspension.

4.17.7. Franchisor may also exercise the option to transfer Franchisee's right to provide service to an account immediately upon receiving a request for transfer or cancellation from the customer or if Franchisee provides any services to any customer and does not report and include such services in their Gross Revenue.

4.17.8. Franchisee shall waive any and all payments for services which may become due and payable after Franchisor has exercised the option to transfer an account under any of the Sections 4.17.1 through 4.17.7, and shall not be entitled to any refund, rebate or reduction of any fees previously paid or pledged in connection with that customer's contract. If Franchisor does not exercise any option hereunder, either in part or in full, with regard to any deficiency or default, the election not to exercise any option shall not constitute a waiver of such rights with regard to any subsequent deficiency or default.

4.18. At Franchisor's request, Franchisee will provide to Franchisor a list of all clients to which Franchisee is providing service and copies of the contracts under which service is being performed. Franchisee is prohibited, without Franchisor's prior written approval, from disclosing to anyone other than Franchisee's employees the names of the clients or any list of clients to whom Franchisee is providing service.

4.18.1. Neither Franchisee nor any officer, director or controlling principal of Franchisee shall communicate, divulge or use for the benefit of any other person, persons, partnership, association or corporation during the term of this Agreement and following the expiration or termination of this Agreement, any Confidential Information, as defined herein, knowledge or know-how concerning the methods of operation of the franchised business which may be communicated to them or of which they may be apprised in connection with the operation of the Franchise under the terms of this Agreement. Franchisee and Controlling Principals shall

JANI-KING OF CALIFORNIA, INC.                          INT _MB_ INT _R.J.B._
FRANCHISE AGREEMENT: 5/08                              PAGE 14 OF 33

divulge such Confidential Information only to such of Franchisee's employees as must have access to it in order to operate the Franchise. Any and all information, knowledge, know-how, techniques and any materials used in or related to the Jani-King System which Franchisor provides to Franchisee in connection with this Agreement, whether or not expressly marked or labeled confidential, shall be deemed confidential for purposes of this Agreement. Neither Franchisee nor the Controlling Principals shall at any time, without Franchisor's prior written consent, copy, duplicate, record or otherwise make the same available to any unauthorized person. The covenant in this Section shall survive the expiration, termination or transfer of this Agreement or any interest herein and shall be perpetually binding upon Franchisee and each of the Controlling Principals.

4.19.1.   In the event Franchisee voluntarily wishes to discontinue providing service to an account, Franchisee must notify Franchisor, in writing. If the account's monthly billing amount is less than $10,000, the written request must be made at least ten (10) days prior to the desired date of transfer. If the account's monthly billing is $10,000 or more, the written request must be made at least thirty (30) days prior to the desired date of transfer. Upon Franchisor's receipt of Franchisee's request to discontinue providing service or in the event Franchisee fails to provide service to an account for a period of two (2) days, for any reason, Franchisor reserves the right to service the account or to offer the right to provide service to another franchisee. In either event, Franchisee agrees that any and all payments (regardless of when services were rendered) which paid after Franchisee no longer services the account will be waived by Franchisee, and Franchisee shall not be entitled to any refund or rebate of any fees paid or pledged previously to Franchisor for such business.

4.19.2.   All contracts under which terms services are provided by any Jani-King franchisee are the sole property of Jani-King. The Franchisee may solicit potential clients to provide cleaning and maintenance services through their franchise. However, all contracts for the provision of services by Franchisee must be drafted by Jani-King and must name Jani-King as the sole party to the contract (other than the client). Jani-King reserves the right, at its sole discretion, to suspend or cancel service of any contract serviced by Franchisee in the event the contract becomes delinquent in payment for services.

4.20.   Upon termination or non-renewal of this Agreement for any reason, Franchisee shall immediately and permanently cease all use of the Proprietary Marks, Confidential Information, and all aspects of the System, and shall cease indicating verbally or in writing to clients and any other franchisee that it is still a Jani-King franchisee. Franchisee shall immediately return to Jani-King all advertising matter, products or writings that contain Jani-King's trade name, logo or copyright, as well as any Confidential Information. All such lists, files and the information contained therein shall remain the exclusive property of Franchisor. Any keys to buildings, security passes, and codes shall be delivered by Franchisee to Franchisor at the time the Franchisee ceases providing service. In the event Franchisee fails to deliver all keys, security passes, and codes to Franchisor, Franchisee hereby agrees to pay all costs and expenses incurred by Franchisor resulting from Franchisees failure to return these items.

4.21.   If this Agreement is terminated or not renewed for any reason, such termination or non-renewal shall not be effective until Franchisee surrenders to Franchisor all property belonging to Franchisor including, but not limited to, keys to all clients' buildings and all contracts between Franchisor and Client. Franchisee agrees that the above-named items are the property of Franchisor. Franchisee must also pay, in full, all amounts owed to Franchisor at the date of termination or non-renewal and surrender any and all equipment belonging to Jani-King. Until Franchisee complies with each obligation hereunder, this Agreement shall be deemed effective and not terminated. Once Franchisee has, in Franchisor's sole opinion, complied with this paragraph, this Agreement shall be deemed terminated.

4.22.   If Franchisee has proclaimed to have terminated or not renewed the Agreement and refused to surrender the items described herein, Franchisee agrees to pay Franchisor One Thousand dollars ($1,000.00) per day for each day that it has not complied with the foregoing paragraph. The parties acknowledge that damages for

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT. _Mont_ _L.L.B._
PAGE 15 OF 33

Franchisee's failure to adhere to the foregoing paragraph are difficult to ascertain and therefore agree that this amount shall be payable as liquidated damages and not as a penalty.

4.23.  In order to promote full compliance with all Jani-King performance standards and policies, a Fifty dollar ($50.00) complaint fee ("Complaint Fee") will be charged to any Franchisee who does not respond to or who has not serviced a customer complaint within the time frames allotted for initial response or corrective action and which require Franchisor's representatives to respond to the complaint.  "Serviced" or "respond to" the complaint in this case means communicating with the client to determine the nature of the complaint and what needs to be done to resolve the situation, and to provide the customer relations necessary to try to protect the account from cancellation or damages to Jani-King's goodwill and does not mean providing cleaning or maintenance services to the customer to resolve a complaint.  An additional Service Fee, as stated in Section 4.17.4 above, will be assessed, plus expenses (i.e., labor, materials, supplies, equipment, etc.), for all Franchisor's representatives' time required to resolve a complaint.  A Complaint Fee will be charged under the following circumstances:

If at any time, whether through complaint or inspection, a deficiency in performance is discovered concerning the services provided by Franchisee, Franchisor will attempt to contact Franchisee during the four (4) hour period immediately following the discovery of the deficiency (attempting a contact a minimum of once each hour) and report the complaint to Franchisee.

The Complaint Fee, plus the Service Fee and expenses, will be charged under either of the following conditions:

(a)  Franchisor cannot locate the Franchisee during the above described four (4) hour period and Franchisor must respond to the complaint; or,

(b)  if the complaint was made known to Franchisee, and after two (2) hours following the opening of the client's business the following morning, the deficiency in performance has not been corrected to the satisfaction of the client and Franchisor resulting in Franchisor responding to the complaint.

4.23.1.  The Fifty Dollar ($50.00) Complaint Fee, plus the Service Fee and expenses, will be charged to the Franchisee responsible for the complaint even if the account must be transferred to save it or if the account terminates for non-performance.  The fees will be payable in the month they are incurred.

4.24.  Franchisor reserves the right to establish company policies and/or procedures pertaining to the operation of Franchisee's franchised business or this Agreement.  Franchisee agrees to be bound by the policies and/or procedures upon receipt of same by Franchisee.  Franchisor shall keep a current, updated manual of all such policies and procedures at Franchisor's corporate office.  In the event that policies and procedures kept by Franchisor differ from those kept by Franchisee, the policies and procedures maintained in Franchisor's corporate office manual shall be controlling.

4.25.  Franchisee acknowledges that the System must continue to evolve in order to reflect the changing market and to meet new and changing customer demands, and that accordingly, variations and additions to the System may be required from time to time in order to preserve and enhance the public image of the System and to ensure the continuing operational efficiency of franchisees operating within the System.  Accordingly, Franchisee agrees that Franchisor may, from time to time, hereafter or otherwise change the System, including, without limitation, the adoption and use of new or modified Proprietary Marks, Confidential Information, Products, Services, equipment and furnishings and new techniques and methodologies relating to the preparation, sale, promotion and marketing of service and supplies.

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INITIAL _M_ JOINT _L.S.B._
PAGE 16 OF 33

Franchisee agrees to promptly accept, implement, use, and display in the operation of the business all such additions, modifications and changes at its sole cost and expense.

4.26.   Franchisee agrees that if it or any of its employees develop any new concept, process or improvement in the System or the Confidential Information, it will promptly notify Franchisor and provide Franchisor with all necessary information concerning same, without compensation.  Franchisee acknowledges that any such concept, process or improvement shall become the property of Franchisor, and Franchisor may utilize or disclose such information to other franchisees as it determines to be appropriate.

## SECTION 5

## NONCOMPETITION

5.1.   Franchisor agrees to provide Franchisee with valuable initial and ongoing specialized training, the Confidential Information, and the Proprietary Marks.  The initial specialized training provides training in Jani-King methods and practices of professional cleaning services, management, sales and promotional techniques, and includes information about production procedures and rates, marketing, and management matters.  The ongoing specialized training includes updated information of the type provided in the initial training, as well as additional training and information compiled and developed over time as the System evolves.  Franchisee acknowledges that, whether or not the initial and ongoing specialized training or Confidential Information is denoted, labeled or marked as confidential, Franchisor considers such training and Confidential Information to be, and treats it as, confidential.

5.2.   In consideration for the valuable initial and ongoing specialized training and Confidential Information described above, Franchisee (including officers and directors of Franchisee, if Franchisee is a corporation) agrees as follows:

5.2.1. Franchisee (including officers and directors of Franchisee, if Franchisee is a corporation) agrees that Franchisee, the officers or directors of Franchisee (if any), and Franchisee's employees shall not at any time, both during and after,  the term of this Agreement, communicate or disclose to any person or entity (other than Franchisor or a person or entity expressly designated by Franchisor in writing), or use outside the scope of the business governed by this Agreement, any of the initial or ongoing specialized training or Confidential Information acquired by Franchisee (including the officers and directors of Franchisee, if Franchisee is a corporation) or Franchisee's employees during the term of this Agreement.

5.2.2   Franchisee (including officers and directors of Franchisee, if Franchisee is a corporation) agrees to use all reasonable efforts to maintain as confidential the initial and ongoing specialized training and Confidential Information.  Accordingly, Franchisee (including officers and director of Franchisee, if Franchisee is a corporation) agrees that Franchisee, the officers or directors of Franchisee (if any), and Franchisee's employees shall not at any time duplicate, copy, record, or otherwise reproduce, in whole or in part, materials containing Confidential Information and/or information imparted through initial and/or ongoing specialized training, except as expressly authorized in writing by Franchisor.

5.2.3.   Franchisee (including officers and directors of Franchisee, if Franchisee is a corporation) agrees that, during the term of this Agreement and for a continuous uninterrupted period of (2) years thereafter (unless otherwise specified in this Section 5) commencing upon expiration or termination of this Agreement, regardless of the cause for termination, except as otherwise approved in writing by Franchisor, Franchisee, the officers or directors of Franchisee (if any), and Franchisee's employees shall not, directly or indirectly, for itself/themselves or through, on behalf of, or in conjunction with any person, persons, partnership or corporation:

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT _____INT _____

PAGE 17 OF 33

(a)  Divert or attempt to divert to any competitor, by direct or indirect inducement or otherwise, any business or customer of the business franchised hereunder or any Jani-King franchisee anywhere;

(b)  Do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with Franchisor's trademarks or trade names or the Jani-King franchise program;

(c)  Employ, seek to employ, or otherwise directly or indirectly induce to leave his/her employment any person who is employed by or has been employed within the previous twelve (12) months by Franchisor or by any of Franchisor's affiliated companies or by any other franchisee of Franchisor;

(d)  Own, maintain, operate, engage in or have any interest in any business (hereinafter referred to as "Competing Business") which is the same as or similar to the business franchised under the terms of this Agreement, which Competing Business operates, solicits business, or is intended to operate or solicit business: (i) within the Territory of this Agreement; and (ii) for a period of one (1) year commencing upon expiration or termination of this Agreement (regardless of the cause for termination), in any other territory in which a Jani-King franchise operates.

5.3.  The parties agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement.  If all or any portion of a covenant in this section is held unreasonable or unenforceable by a court or agency having valid jurisdiction in any unappealed final decision to which Franchisor is a party, Franchisee (including Franchisee's officers and directors, if Franchisee is a corporation) expressly agrees that Franchisee, Franchisee's officers and directors (if any), and Franchisee's employees will be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Section.

5.4  Franchisee understands and acknowledges that Franchisor shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Section, or any portion thereof, without its consent, effective immediately upon written notice to Franchisee; and Franchisee agrees that it shall comply forthwith with any covenant as so modified, which modified covenant shall be fully enforceable notwithstanding the provisions of any other Sections hereof.

5.5.  Franchisee acknowledges that any materials and information provided to Franchisee (including Franchisee's officers and directors, if Franchisee is a corporation) and/or to Franchisee's employees by Franchisor will at all times be and remain the property of Franchisor.  Franchisee also acknowledges that any materials, concept, process, or improvement developed in the operation or promotion of the business governed by this Agreement by Franchisee (including its officers and directors, if Franchisee is a corporation) and/or Franchisee's employees will at all times be and remain the property of Franchisor.  Franchisee agrees to give Franchisor notice of and all necessary information related to such development(s).  Upon sale, assignment, termination, expiration, or transfer of this Agreement, Franchisee shall deliver to Franchisor all property belonging to Franchisor (including but not limited to the materials described above) and/or relating to Franchisor's business.  In addition, upon sale, assignment, termination, expiration, or transfer to this Agreement, Franchisee agrees to provide Franchisor, upon Franchisor's request, with a list of all customers that Franchisee is servicing or has serviced on or at any time during the twelve (12) months preceding the date of such sale, assignment, termination, expiration, or transfer, and a copy of any contracts under which the service is or was provided.

5.6.  Franchisee expressly agrees that the existence of any claims that Franchisee, Franchisee's officers and directors (if any), or Franchisee's employees may have against Franchisor, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by Franchisor of the covenants in this Section.  Franchisee agrees to pay all costs and expenses (including reasonable attorneys' fees and all costs of court) incurred by Franchisor in connection with the enforcement of this Section of this Agreement.

5.7.   Franchisee acknowledges that a violation of any of the terms of this Section would result in irreparable injury to Franchisor for which no adequate remedy at law may be available. Franchisee acknowledges that the initial and ongoing specialized training and Confidential Information described herein have been developed and compiled through Jani-King's time and effort in the industry and provide a blueprint for Jani-King's business. Accordingly, Franchisee acknowledges that, in addition to Franchisor's remedies at law, Franchisor may seek and obtain preliminary and permanent injunctive relief restraining the breach or threatened breach by Franchisee; and Franchisee consents to the issuance of an injunction prohibiting any conduct by Franchisee in violation of this Section.

5.8.   Franchisee shall require and obtain execution of covenants similar to those set forth in this Section (including covenants applicable upon and after the termination of a person's relationship with Franchisee) from any or all officers, directors, managers and other employees of Franchisee who have received or will receive initial and/or ongoing specialized training or Confidential Information directly or indirectly from Franchisor. Every covenant required by this Paragraph shall be in a form satisfactory to Franchisor, including, without limitation, specific and express identification of Franchisor as a third party beneficiary of such covenants with the independent right to enforce them. Failure by Franchisee to obtain execution of a covenant required herein shall constitute a material event of default under the terms of this Agreement.

## SECTION 6

## FRANCHISOR PLEDGES

6.1.1.   To offer Franchisee the opportunity to provide service to Franchisor's contracts located within the Territory, as defined herein, which have minimum cumulative gross monthly billings in an amount at least equal to the amount defined as the "Initial Finder's Fee Business" in the Franchise Summary. The contracts under which Franchisee will provide service are and will remain the property of Franchisor. The right to provide service to the Initial Finder's Fee Business will be offered within the number of days identified in the Franchise Summary as the "Initial Offering Period." The Initial Offering Period will begin on the date after (i) all required equipment and supplies have been obtained by Franchisee, (ii) Franchisee has successfully completed training as indicated by Franchisee's signing and returning to Franchisor the Acknowledgment of Completion of Training and (iii) Franchisee's delivery to Franchisor of written proof that Franchisee has obtain the insurance required under this Agreement. Notwithstanding, the Initial Offering Period may begin at a later date if requested by Franchisee and agreed to by Franchisor, or as provided below. As a condition to Franchisee being eligible to provide service to certain Jani-King clients, Franchisee and Franchisee's employees may be required to undergo background checks.

6.1.2.   The actual time to secure and offer, as described above, the Initial Finder's Fee Business to the Franchisee may, at Franchisor's sole discretion, be automatically extended under the following conditions: (1) if Franchisee requests a delay in the offering of the Initial Finder's Fee Business; (2) if Franchisee is in default under the terms and conditions of the Franchise Agreement or any other agreements between Franchisee and Franchisor; or (3) if any of the Initial Finder's Fee Business previously provided to Franchisee requests a transfer to another Franchisee or requests to be cancelled due to non-performance in which case Franchisee is required to repeat and complete to Franchisor's satisfaction all training classes required by Franchisor. In the event of the occurrence of any of the above conditions, Franchisor will have the remainder of the Initial Offering Period or a minimum of 120 days, which ever is longer, from the date: (1) Franchisee notifies Franchisor that they are ready to accept the right to service other business and has provided any documentation required under the Policies and Procedures; (2) Franchisee has cured any default; or (3) the acknowledgment of retraining is signed, to offer the balance of Initial Finder's Fee Business to Franchisee. Franchisor does not guaranty that the Initial Finder's Fee Business will reach or remain at the level stated on the Franchise Summary throughout the term of the Franchise Agreement.

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT _Mb_ INT _X.K.B._
PAGE 19 OF 33

41

6.2. To provide Franchisee with the Office Supply and Advertising Package outlined in Schedule One of this Agreement.

6.3. To make available to Franchisee applicable confidential manuals, training aids and other pertinent information concerning Jani-King methods and practices.

6.4. To provide an initial local training program to include Jani-King cleaning methods, systems and programs using established Jani-King procedures and forms. Franchisee agrees to successfully complete the training within six (6) months after the date of this Agreement.

6.5. To offer Franchisee the right to provide service to Jani-King clients until Franchisee has been offered the right to provide service to Jani-King clients with cumulative gross monthly billings in an amount equal to or greater than the Initial Finder's Fee Business.

6.6. To provide additional training and support for Franchisee at reasonable rates as established by Jani-King policies and procedures, currently at a rate of Fifty Dollars ($50.00) per hour, plus expenses.

6.7. To allow Franchisee the non-exclusive right to use the Jani-King marks, insignia, logo, design and color scheme in the Territory subject to limitations and restrictions herein, and to allow Franchisee to utilize the processes, methods, materials, equipment and promotional plans developed by Jani-King.

6.8. To permit Franchisee the right to profit from its efforts, commensurate with its status as owner of its business, and correspondingly, to bear the risk of loss or failure that is characteristic of this status.

6.9. To make available to Franchisee the System and to provide Franchisee with new developments in the cleaning services industry at the discretion of and as determined by Franchisor.

6.10. To make available for Franchisee, at Franchisor's discretion and at a reasonable cost, promotional materials, sales and service manuals, equipment and other materials relevant to the operation of a Jani-King franchise.

## SECTION 7

## ADDITIONAL SERVICES

7.1. There are no additional services provided by Franchisor to Franchisee except as explicitly set out in this Agreement.

## SECTION 8

## DEFAULT AND TERMINATION

8.1. Franchisee shall be deemed to be in default, and Franchisor may, at its option, terminate this Agreement and all rights granted hereunder, without affording Franchisee any opportunity to cure the default, effective immediately upon the provision of notice to Franchisee, either by mailing or hand delivery, upon the occurrence of any of the following events:

(a) If Franchisee or any of its Principals is convicted of, pleads guilty or no contest to, or receives deferred adjudication for a felony, a crime involving theft, a crime involving moral turpitude, or any other crime or offense that is reasonably likely, in the sole opinion of Franchisor, to adversely affect the Jani-King franchise

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT _MH_ INT _LSLB._
PAGE 20 OF 33

42

transact business in the Territory, where the licensed business is located.

(d)  If Franchisee or any of its Principals purport to transfer any rights or obligations under this Agreement to any third party without the Franchisor's prior written consent.

(e)  If Franchisee makes any material misrepresentations or untrue or false statements on the franchise application or in other correspondence relating to the acquisition of the franchise business.

(f)  If the Franchisee repeatedly fails to comply with one or more requirements of the Agreement, any operations procedure, or Jani-King Policies and Procedures, whether or not corrected after notice;

(g)  If Franchisee fails to comply with any provision of this Agreement, any other agreement between Franchisor and Franchisee, and thereafter fails to cure such default to the satisfaction of the Franchisor within thirty (30) days after written notice has been given thereof.  Defaults by the Franchisee shall include, without limitation, the occurrence of any of the following events:

(i)  If Franchisee fails, refuses, or neglects promptly to pay any monies owing to Franchisor or its subsidiaries or affiliates when due, or to submit the financial information required by Franchisor under this Agreement, or makes any false statements in connection therewith.

(ii)  If Franchisee fails to maintain the standards that Franchisor requires in this Agreement or any other standards contained in Jani-King manuals, including the Jani-King Policies and Procedures manual.

(iii)  If Franchisee engages in conduct which reflects unfavorably upon the operation or reputation of the Jani-King franchise business or System.

(iv)  If Franchisee fails, refuses, or neglects to obtain the Franchisor's prior written approval or consent as required by this Agreement, other than as provided in Section 8.1(d).

(v)  If Franchisee or any of its Principals misuses or makes any unauthorized use of the Jani-King proprietary trademarks, trade names, service marks or other materials, including any forms of advertising, or otherwise materially impairs the goodwill associated with the Jani-King name or Franchisor's rights.

(vi)  If Franchisee is declared insolvent or bankrupt, or makes any assignment or trust mortgage for the benefit of creditors, or if a receiver, guardian, conservator, trustee in bankruptcy or similar officer shall be appointed to take charge of all or a part of Franchisee's property by a court of competent jurisdiction.  This provision may not be enforceable under federal bankruptcy law (11 U.S.C.A., Sec. 101 et seq.)

8.2.  The termination of this Agreement shall be without prejudice to any remedy or cause of action which Jani-King may have against Franchisee for the recovery of any monies due Jani-King or any equipment or property of Jani-King, or to any other right of Jani-King to recover damages for any breach hereof.

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT 46 INT L.L.B.
PAGE 21 OF 33

43

# TERM AND EXTENSION

9.1.  Subject to Section 9.2 herein, this Agreement and the franchise and license granted hereunder, unless sooner terminated, shall be and remain in full force and effect for a period of twenty (20) years from and after the Effective Date of this Agreement which is the date identified in the Franchise Summary.  This Agreement shall expire 20 years after the Effective Date unless extended pursuant to the terms contained herein.

9.2.  Provided Franchisee is not in default of this Agreement and provided Franchisee has delivered to Franchisor the required notice, Franchisee shall have the option to renew this Agreement for an additional period of twenty (20) years and for three (3) subsequent, additional twenty (20) year periods following the first extension (a total of one hundred (100) years when initial periods and renewal terms are combined).  Prior to the expiration of each 20 year term, Franchisee must notify Franchisor, in writing, of its intention to renew the Agreement not less than seven (7) months nor more than twelve (12) months prior to the end of the then current term.

9.3.  As a condition to and at the time of any renewal, Franchisee is required to execute a general release, in a form prescribed by Franchisor, of any and all claims against Franchisor and its subsidiaries, and their respective officers, directors, agents and employees in their corporate and individual capacities, including without limitation, claims arising under this Agreement and any federal, state and local laws, rules and ordinances.

9.4.  As a further condition to and at the time of any renewal, Franchisee agrees to execute Franchisor's most recent standard franchise agreement being used by Franchisor which may differ substantially from the agreement under which the Franchisee has operated and any other ancillary agreements and documents as Franchisor may require.  Franchisee understands that the most current, executed agreement between Franchisee and Franchisor will govern relations between Franchisor and Franchisee for the following Twenty (20) years.  However, no additional Initial Franchise Fee or renewal fee shall be paid by Franchisee at the time of renewal, nor shall Franchisor be obligated to provide any additional Initial Finder's Fee Business or training.

## SECTION 10

## TRANSFER

10.1.  This Agreement shall inure to the benefit of the successors and assigns of Franchisee.  The interests of Franchisee in this Agreement are personal and may not be sold, assigned, transferred, shared or divided in any manner by Franchisee without the written consent of Franchisor, which consent shall not be unreasonably withheld.  Franchisee shall provide to Franchisor prior to the sale or transfer, a copy of any written agreements relating to the proposed sale or transfer, or any additional information which Franchisor may require in order to determine if it will grant its consent to the proposed sale or transfer.  For purposes of this Agreement, any change in stock ownership, voting or other control whatsoever of a corporation or partnership which acts as a Franchisee under this Agreement constitutes a transfer.  For all purposes herein, a beneficiary of a trust which owns a beneficial interest in a Franchisee which is an entity shall be deemed to have an interest in the Franchise Agreement.  Provided further, for all purposes herein, in the event that a trust owns a beneficial interest in Franchisee which is an entity, any change in the beneficial interest of a beneficiary shall constitute a "transfer" hereunder.  Any transaction or series of transactions which would have such an effect must be approved by Franchisor on the same basis as any other sale or transfer as set forth herein. Franchisee hereby covenants and

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT _Mb_ INT _L.L.B._
PAGE 22 OF 33

warrants (i)   that its certificate or articles of incorporation, corporate charter, by-laws and/or partnership agreement limit transfers as described in this Section 11, and (ii) if Franchisee is a corporation, that each security shall bear a legend (in a form to which Franchisor consents) indicating that any transfer is subject to this Section 11, or if Franchisee is a partnership, that its partnership agreement shall provide (in a form to which Franchisor consents) that all transfers are subject to this Section 10.

10.2.   Franchisee agrees to pay to Franchisor the greater of Two Thousand Dollars ($2,000.00) or ten percent (10%) of the sales price or exchanged value as a transfer fee (the "Transfer Fee").   This Transfer Fee must be paid before Franchisor will grant consent to the sale or transfer.   If no monetary consideration or other exchange of value is made for the transfer of a franchise, no Transfer Fee will be charged for a transfer to: (1) any party currently holding an interest in the franchise at the time of the transfer; (2) a controlled corporation in which the current owners of the Franchise retain ninety (90%) percent or greater of the outstanding shares of stock; or (3) if the transfer is to an immediate family member of the current owner (for the purposes of this Section 10.2, family members include Franchisee's mother, father, brother, sister, and children only), whether a life time transfer or upon death.   An administrative fee will be charged to cover necessary and reasonable costs and preparation of the documents associated with the transfer if no Transfer Fee is assessed.   The current administrative fee is $250.00, but may be increased by Franchisor in the future.

10.3.   Prior to the sale or transfer of the franchise, Franchisee will provide to Franchisor a copy of any written agreements relating to the proposed sale or transfer or any additional information which Franchisor may require in order to determine if it will grant consent to the proposed sale or transfer.   It is agreed that consent for sale, transfer or assignment will be granted only when: (a) all obligations under the terms of this Agreement have been fulfilled, (b) all money owed by Franchisee to Franchisor and Franchisor's affiliates have been paid in full, (c) the purchaser of the franchise agrees to undergo the training required of a new Jani-King franchisee and (d) the purchaser of the franchise agrees to execute Franchisor's most current franchise agreement which may differ substantially from this Agreement.

10.4.   Franchisee also agrees to provide, as a condition of Franchisor's consent to the sale, transfer, or assignment, a personal covenant to the purchaser not to compete in the cleaning and/or maintenance services industry, nor to seek to divert business from Franchisor or its franchisees for a period of two (2) years after transfer or sale.   This covenant is in addition to the non-compete covenants contained in this Agreement.   The transferor must also execute a general release, in a form satisfactory to Franchisor, of any and all claims against Franchisor, Franchisor's parent corporation and affiliated corporations, and the officers, directors, shareholders and employees of Franchisor and each parent and affiliate corporation in their corporate and individual capacities including, without limitation, claims arising under this Agreement and federal, state and local laws, rules and ordinances.

10.5.   This Agreement is fully assignable by Franchisor and shall inure to the benefit of any assignee or other legal successor to the interest of Franchisor.

## SECTION 11

### RIGHT OF FIRST REFUSAL

11.1.   In the event Franchisee receives a bona fide arms-length offer to purchase Franchisee's interest in this Agreement (or in the business conducted hereunder) from any third party, or in the event Franchisee proposes to convert, assign, or otherwise transfer Franchisee's interest in this Agreement (or in the business conducted hereunder), in whole or in part, to any third party, Franchisee hereby agrees to offer to Franchisor a first right to purchase or otherwise receive Franchisee's interest under the same terms and conditions offered to or accepted from the third party (the "Right of First Refusal").   Franchisee's failure to offer to Franchisor the Right of First

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT _MG_ INT _L.J.B._
PAGE 23 OF 33

Refusal will be an act of default of the terms of this Agreement. Notwithstanding anything contained herein to the contrary, Franchisee shall not be obligated to offer Franchisor the Right of First Refusal sale, assignment, or transfer is solely between Franchisee and either (a) a corporation whose original sole shareholders are individuals who comprise the original Franchisee and/or (b) the immediate family of Franchisee or the immediate family of the individuals described in (a) herein. For the purpose of this section, immediate family shall mean the spouse, children, siblings, or parents of Franchisee only.

11.2. Franchisee shall make available to Franchisor in a written statement verified by Franchisee the terms of the offer received or made by Franchisee, and Franchisor shall have thirty (30) days from the receipt of said statement to either accept or refuse such offer. Written notice of Franchisor's decision to accept or refuse said offer shall be delivered to Franchisee. Acceptance by Franchisor shall be at the same price and on the same terms set forth in the written statement submitted by Franchisee.

11.3. In the event Franchisor fails to accept the offer within the thirty-day (30) period, Franchisee shall be free to effect the disposition described in the statement upon the exact terms set forth in the statement delivered to Franchisor, provided that nothing in this paragraph shall be interpreted as limiting the requirements of Section 10 hereof relating to transfer of the Agreement.

11.4. Furthermore, in the event Franchisee is insolvent, or upon the filing of any petition by or against Franchisee under any provisions of any bankruptcy law, Franchisor shall have the first right to purchase the business conducted by Franchisee, for an amount and pursuant to terms established by an independent appraiser selected by Franchisor.

## SECTION 12

### GENERAL

12.1. Nothing in this Agreement shall be construed to prevent Franchisee from freely setting its own prices and discounts for services and products which it may render or sell provided such actions do not affect the business of Franchisor.

12.2.1. Should any part of this Agreement for any reason be declared invalid or unenforceable, such decision shall not affect the validity of the remaining portion, which remaining portion shall remain in full force and effect as if this Agreement had been executed with the invalid or unenforceable portion eliminated, and the parties to this Agreement agree that they would have executed the remaining portion of this Agreement without including any such part, parts, or portion which may, for any reason, hereafter be declared invalid or unenforceable.

12.2.2. If any applicable and binding law or rule of any jurisdiction requires a greater prior notice of the termination of or refusal to renew this Agreement than is required hereunder, or the taking of some other action not required hereunder, or if under any applicable and binding law or rule of any jurisdiction, any provision of the Agreement or any specification, standard or operating procedure prescribed by Franchisor is invalid or unenforceable, the prior notice and/or other action required by such law or rule shall be substituted for the comparable provisions hereof, and Franchisor shall have the right, in its sole discretion, to modify such invalid or unenforceable provision, specification, standard or operating procedure to the extent required to be valid and enforceable. Franchisee agrees to be bound by any promise or covenant imposing the maximum duty permitted by law which is comprehended within the terms of any provision hereof, as though it were separately articulated in and made a part of this Agreement, that may result from striking from any of the provisions hereof, or any specification, standard or operating procedure prescribed by Franchisor, any portion or portions which a court may hold to be unenforceable in a final decision to which Franchisor is a party, or from reducing the scope of any promise or covenant to the extent required to comply with such a court order. Such modifications to this

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT _MG_ INT _S.S.B._
PAGE 24 OF 33

Agreement shall be effective only in such jurisdiction, unless Franchisor elects to give them greater applicability, and shall be enforced as originally made and entered into in all the jurisdictions.

12.3. This Agreement and the Attachments and Exhibits hereto constitute the entire Agreement between us and you concerning the subject matter hereof and supersede all prior agreements, negotiations, representations, and correspondence concerning the same subject matter; provided, however, that nothing in this Agreement or any related agreement is intended to disclaim the representations we made in the Franchise Disclosure Document that we furnished to you. All transactions between Franchisee and Franchisor regarding any operation of a Jani-King franchise business granted under any franchise agreement dated prior to this Agreement shall be controlled by this Agreement and the most current publication of the Jani-King Policies and Procedures Manual. Any amendment or modification to this Agreement is invalid unless made in writing and signed by all the parties.

12.4. Franchisee acknowledges that neither Franchisor nor anyone on its behalf has made any representations, promises or agreements, orally or otherwise, respecting the subject matter of this Agreement which are not embodied herein.

12.4.1. Franchisee acknowledges that it has carefully read this Agreement, that ample opportunity has been provided for Franchisee to obtain the services of an independent legal or financial advisor, and that Franchisee has had the opportunity to have this Agreement and all supporting disclosure documentation, as well as any other information gathered by the Franchisee, reviewed by an attorney or financial advisor of its own choice.

12.4.2. Franchisee further acknowledges that Franchisor does not authorize any representative of Franchisor to make any oral, written, visual or other claim or representation that are not contained in the Franchise Disclosure Document provided to Franchisee by Franchisor and does not permit any promises, agreements, contracts, commitments or representations to be made to Franchisee except those stated in this Agreement.

12.5. Franchisor may also conduct the type of business operated by the Franchisee.

12.6. Franchisee acknowledges that the franchised business and all documents and information Franchisee receives from Franchisor relating to the operation of the franchise, including the manuals and communication tools and the training will be presented to Franchisee in the English language. Franchisee acknowledges that Franchisee is required to have a representative that is fluent in the English language present during any training provided by Jani-King and available for any translating necessary during the operation of my franchise.

12.7. It is agreed and understood that Franchisee will act at all times as an independent contractor and will not, at any time, directly or indirectly, hold itself out as an agent, servant or employee of Franchisor.

12.8. No waiver by Franchisor of any default in performance on the part of Franchisee, time being of the essence, or like waiver by Franchisor of any breach or series of breaches, of any of the terms, covenants and conditions of this Agreement shall constitute a waiver of any subsequent breach or waiver of said terms, conditions or covenants.

12.9. Any notice required or permitted under this Agreement must be in writing and delivered by personal delivery service or by deposit in the U.S. mail, certified, return receipt requested or by a recognized express delivery service providing written receipt of delivery at the address listed for the Franchisee in the Franchise Summary or to Franchisor at the following address:

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT. _MH_ INT _L.T.B._
PAGE 25 OF 33

Case 3:14-cv-00367-BAS-JMA   Document 1-2   Filed 02/17/14   Page 49 of 149

to the notice requirements stated above, and such change shall be effective as to each other party on the tenth (10th) day after delivery to such other party.

12.10.   THE PARTIES AGREE AND INTEND THIS INSTRUMENT TO BE EXECUTED, INTERPRETED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT REFERENCE TO CONFLICT OF LAWS PRINCIPLES.   TEXAS LAW SHALL APPLY TO ALL CLAIMS, DISPUTES, AND DISAGREEMENTS BETWEEN THE PARTIES, WHETHER ARISING FROM ALLEGED BREACHES OF THE CONTRACT OR AGREEMENT OR OTHER CLAIMS ARISING IN ANY WAY FROM THE PARTIES' DEALINGS.   JURISDICTION AND VENUE IS DECLARED TO BE EXCLUSIVELY IN DALLAS COUNTY, IN THE STATE OF TEXAS.

12.11.   The submission of this Agreement does not constitute an offer to license, and this Agreement shall become effective only upon execution thereof by Franchisor and Franchisee and the compliance with section 12.13.

12.12.   THE PARTIES AGREE THAT ANY DAMAGES SOUGHT BY OR AWARDED TO FRANCHISEE SHALL BE LIMITED TO FRANCHISEE'S TOTAL INVESTMENT WITH FRANCHISOR, AND NO PUNITIVE OR EXEMPLARY DAMAGES WILL BE AWARDED TO FRANCHISEE.

12.13.   This Agreement shall not be binding on Franchisor unless and until it has been accepted and signed by an officer or director of Franchisor at Franchisor's home office in Addison, Dallas County, Texas.

12.14.   The numbers and headings of paragraphs used herein are for convenience only and do not affect the substance of the paragraphs themselves.

12.15.   Franchisee certifies and warrants that all owners and spouses of owners or partners, if the franchise is a sole proprietorship or partnership; and all persons who are a shareholder, officer or director of any corporation who holds the franchise: (1) are listed in the attached SCHEDULE OF PRINCIPALS; and (2) that all such parties will execute all Guarantees or other documents required by Jani-King.

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT _MG_ INT _A.J.B._
PAGE 26 OF 33

IN WITNESS WHEREOF, the parties hereto have set their hands this __21__ day of __NOVEMBER__ , 2008____ .

JANI-KING OF CALIFORNIA, INC.

BY: _~signature~_

TITLE:  LYNDA L. BOHNSTEHN DIRECTOR OF FRANCHISE SALES

FRANCHISEE

_____
(Signature of Owner, Partner or Authorized
Officer)

MARIO GUTIRREZ
(Print Name)
Social Security # ▮▮▮▮▮

_~signature~_
By:  (Signature of Partner or Spouse)

_____
(Print Name)
Social Security #_____

_____
By:  (Signature of Partner or Spouse)

_____
(Print Name)
Social Security #_____

COMPLETE IF FOR CORPORATION:

_____
(Corporate Name)

_____
(Title of Authorized Officer)
Federal Tax ID#:_____

ACCEPTED by the Home Office of Franchisor on this _17th_ day of _December_ , _2008_

BY: _~signature~_
       Authorized Representative



JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT _MG_ INT _L.L.B._
PAGE 27 OF 33

## SCHEDULE OF PRINCIPALS

ANY OTHER PERSON NOT LISTED IN THIS AGREEMENT WHO IS A SPOUSE, PARTNER, OR
AN OFFICER, DIRECTOR OR SHAREHOLDER OF FRANCHISEE:

Name: _Kenia Gutierrez_
Relationship: _Spouse_
Taxpayer ID:
Address: _602 W 9th Ave Escondido CA 92025_

Telephone: _(760)_ ▮▮▮▮▮▮

Name:
Relationship:
Taxpayer ID:
Address:

Telephone:

Name:
Relationship:
Taxpayer ID:
Address:

Telephone:

Name:
Relationship:
Taxpayer ID:
Address:

Telephone:

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT _MG_ INT _L.L.B._
PAGE 28 OF 33

**SCHEDULE ONE**
**"OFFICE SUPPLY AND ADVERTISING PACKAGE"**

LIST OF MATERIALS PROVIDED TO FRANCHISEE
PURSUANT TO THE FRANCHISE AGREEMENT

| ITEM | AMOUNT |
|------|--------|
| Business Cards (imprinted logo) | 1,000 |
| JANI-KING Logo/Border Paper (matching envelopes) | 100 |
| Color Tri-Fold | 50 |
| JANI-KING Tunics | 3 |
| JANI-KING Golf Shirt | 1 |
| JANI-KING Polo Shirts | 4 |
| Inspection Pads | 5 |
| Memo Pads | 5 |
| Past Performance Pads | 5 |
| Account Bid Sheet Pad | 1 pad |
| Contact Evaluation Pad (replace as needed) | 1 pad |
| Discover JANI-KING Media | 1 |
| JANI-KING Logo Binders | 2 |
| JANI-KING Executive Pad Holder | 1 |
| JANI-KING Tri-fold Pad Holder | 1 |
| JANI-KING Training Videos | 1 set |
| JANI-KING Customer Relations Handbook | 1 |
| Account Follow-up Sheets (replace as needed) | 5 |
| New Account Start-Up (replace as needed) | 5 |
| Initial Clean Sign-Off Sheets (replace as needed) | 5 |
| Franchisee Request Cards (replace as needed) | 5 |
| Authorization for Extra Work Forms (replace as needed) | 5 |
| JANI-KING Business Card Order Forms | As Needed |

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT. _Mb_ INT _L.S.B._
PAGE 29 OF 33

51

## "SUPPLY AND EQUIPMENT PACKAGE"

### THE FOLLOWING SUPPLIES AND EQUIPMENT MUST BE PURCHASED BY EACH FRANCHISEE PURSUANT TO THE FRANCHISE AGREEMENT AND PRIOR TO FRANCHISOR OFFERING ANY OF THE INITIAL FINDER'S FEE BUSINESS

The products listed may be purchased from Franchisor, subject to shipping restrictions, or any other source. Prices currently charged by Franchisor may be changed or modified in the future.

| ITEM | AMOUNT |
|------|--------|
| All Purpose Cleaner (Biodegradable for use on walls, formica, etc. | 1 - one gallon container (or equivalent) |
| Glass Cleaner | 1 - one gallon container (or equivalent) |
| Restroom Disinfectant | 1 - one gallon container (or equivalent) |
| Cream Cleanser | 2 - one quart containers (or equivalent) |
| Neutral Floor Cleaner | 1 - one gallon container (or equivalent) |
| Carpet Cleaning Concentrate (Bonnet Method) | 1 gallon |
| Carpet Spot Remover | 1 can (or equivalent) |
| Floor Finish Stripper | 1 gallon |
| High Gloss Floor Finish | 1 gallon |
| Stainless Steel Cleaner | 1 can |
| Dust Mop Treatment | 1 can |
| Small Trash Liners (10-12 gallon capacity) | 1 case |
| Large Trash Liners (40-45 gallon capacity) | 1 case |

| ITEM | AMOUNT |
|------|--------|
| Mop Bucket (26 quart minimum with wet floor caution inlayed) | 2 |
| Mop Wringer; Down Press | 2 |
| Wet Mop Handle | 2 |
| Wet Mop Head (24 oz.) | 4 |
| Dust Mop Head (24 inch) | 1 |
| Dust Mop Frame (24 inch) | 1 |
| Swivel Dust Mop Handle | 1 |
| Metal-Tipped Handle for Doodle Bug | 1 |
| Doodle Bug Holder and Pads (3) | 1 |
| Plastic Angler Broom | 1 |
| Corner Brush | 1 |
| Toy Broom | 1 |
| Janitor Dust Pan | 1 |

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT. _M/int_ _L.R.B._
PAGE 30 OF 33

## "SUPPLY AND EQUIPMENT PACKAGE" – Continued

| ITEM | AMOUNT |
|---|---|
| 17" Black Stripping Pad | 5 |
| 17" Red Buffing Pad | 5 |
| 17" Bonnet Pad | 1 |
| Window Squeegee Handle | 1 |
| 14" Window Stripwasher with Sleeve | 1 |
| 12" Squeegee Channel | 1 |
| Commercial Sponge with Scrubber | 1 |
| Commercial Sponge | 1 |
| Roll-around Trash Container (32 gallon) | 1 |
| Brute Container Caddy | 1 |
| Lambswool Duster (Telescoping) | 1 |

| ITEM | AMOUNT |
|---|---|
| Disposal Wipes | 1 package |
| Disposal Gloves | 1 box |
| Putty Knife | 1 |
| Sanitary Bowl Swab | 2 |
| Rubber Door Stop | 1 |
| Wet Floor Caution Sign | 4 |
| One Quart Spray Bottle | 6 |
| Trigger Sprayer | 6 |
| 8 oz. Measuring Cup | 1 |
| Electronic Pager (not Available through Franchisor) | 1 |

Franchisor may adjust the items included in the Supply and Equipment Package as industry standards change.

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT _MG_ INT _L.J.B._

PAGE 31 OF 33

## "ADDITIONAL ELECTRIC EQUIPMENT"

THE FOLLOWING EQUIPMENT MUST BE PURCHASED BY EACH
FRANCHISEE PURSUANT TO THE FRANCHISE AGREEMENT AND PRIOR
TO FRANCHISOR OFFERING ANY OF THE INITIAL BUSINESS

The products listed may be purchased from Franchisor or any other source.
Prices currently charged by Franchisor may be changed or modified in the future.

| QUANTITY | DESCRIPTION | UNIT PRICE |
|----------|-------------|------------|
| 1 | 17" Heavy Duty Floor Machine with 1.5 HP electric motor, triple planetary gearing, includes pad driver, 175 rpm, with easy adjusting handle | $833.61 each |
| | Or | |
| 1 | 17" Heavy Duty Floor Machine with 1.5 HP electric motor, triple planetary gearing includes pad driver, 175 rpm | $798.57 each |
| | Or | |
| 1 | 17" Low Speed Floor Machine with 1.5 HP electric motor, triple planetary gearing, includes pad driver, 175 rpm | $620.00 each |
| 1 | Wet/Dry vacuum with 15 gallon tank, 92" of waterlift, includes tool package | $609.11 each |
| | Or | |
| 1 | Wet/Dry vacuum with 15 gallon tank, 95" of waterlift, includes tool package | $470.00 each |
| | Or | |
| 1 | Wet/Dry vacuum with 15 gallon tank, 85" of waterlift, includes tool package | $441.43 each |

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT _MH_ INT _L.L.B._
PAGE 32 OF 33

-54-

In addition to the above equipment, Franchisee must purchase one of the following equipment packages:

Equipment Package #1

| QUANTITY | DESCRIPTION | UNIT PRICE |
|---|---|---|
| 1 | 12" Upright commercial 7 amp vacuum, 50' cord, with cloth bag | $164.29 each |
| 1 | Or<br><br>12" Upright commercial 7 amp vacuum, 50' cord, cloth bag with paper bag inserts | $250.00 each |
| 1 | Compact Portable Vacuum Cleaner (Canister Type) w/ shoulder strap and cloth bag | $126.00 each (CASH ONLY) |
| 1 | Or<br><br>Backpack Vacuum Cleaner, 10 qt. including tool package | $382.14 each |

or Equipment Package #2

| QUANTITY | DESCRIPTION | UNIT PRICE |
|---|---|---|
| 1 | 14"Upright commercial vacuum complete with the following:<br>• 750 watt vacuum motor<br>• 40 foot cord<br>• paper filter collection system<br>• crevice tool<br>• upholstery and drapery tool<br>• attachment hose | $428.57 each |

# JANI-KING OF CALIFORNIA, INC.

## FRANCHISE AGREEMENT

AN AGREEMENT made and entered into in Addison, Dallas County, Texas by and between JANI-KING OF CALIFORNIA, INC., a Texas Corporation, hereinafter referred as either "JANI-KING" or "Franchisor", and

SUNYATA K. LITTLE & ELEANOR E. LITTLE

hereinafter referred to, singularly or collectively, as "Franchisee", doing business as a:

[  ] Corporation,          [ X ] Partnership          [  ] Sole Proprietorship
incorporated under the
laws of _____,

for the purposes of allowing Franchisee to operate a business as a Franchisee of JANI-KING.

## FRANCHISE SUMMARY

EFFECTIVE DATE: OCTOBER 30 _____, 2008 ____.    PLAN: D-V ____

INITIAL FRANCHISE FEE DOWN PAYMENT AND INITIAL FINDER'S FEE DOWN PAYMENT:

($6,412.50 ____) SIX THOUSAND FOUR HUNDRED TWELVE & 50/100 _____ Dollars

PROJECTED INITIAL FRANCHISE FEE AND INITIAL FINDER'S FEE MONTHLY PAYMENT:

$ 133.59 __ PER MONTH FOR _48__ MONTHS

INITIAL FINDER'S FEE BUSINESS:

($ 3,000.00 ) THREE _____ (Thousand)

INITIAL OFFERING PERIOD: ONE HUNDRED TWENTY _____ ( 120 ) Days

TERRITORY: Counties:

San Diego in the State of California.

FRANCHISEE ADDRESS:

2025 VAN NESS AVENUE #A

CITY: NATIONAL CITY          STATE: CA          ZIP CODE: 91950

COUNTY: SAN DIEGO          TELEPHONE NUMBER: ( 619 ) ████

JANI-KING OF CALIFORNIA, INC.          INT SKL INT EEL
FRANCHISE AGREEMENT: 5/08          PAGE 1 OF 33

## SECTION 4

## FRANCHISEE PLEDGES

4.1. To operate a Jani-King Franchise cleaning and maintenance services company in the Territory described herein, using the trade name "Jani-King" in conjunction with its business name, as "John Doe, d/b/a Jani-King", or "ABC Inc., d/b/a Jani-King". Franchisee agrees not to use as part of a corporate name or other legal name, (i) the name "Jani-King of (any city, state, or other region)", (ii) any other janitorial, maintenance or cleaning service name in conjunction with their formal name, i.e. such as "ABC Custodials", "ABC Maintenance", "ABC Cleaning Services" etc., (iii) a name prefix of "Jani-", or any other similarly spelled or sounding prefix, (iv) the words "Services", "Cleaning", and "Maintenance" or (v) any other trademarks, trade names or service marks or any name that has not been granted prior written approval by Jani-King's Corporate Office. All names of the entity operating as Franchisee, including corporate names, business names, trade or assumed names, or other legal names shall be approved in writing by Franchisor prior to adoption for use by Franchisee. All directory listings, advertising, letterhead, or any other visual or printed matter used by Franchisee to communicate to anyone shall conform to Franchisor's established Jani-King policies and shall be subject to review and approval by Franchisor prior to use by Franchisee.

4.1.1. Franchisor has developed and used and continues to develop, use and control in connection with its System certain Proprietary Marks that have become associated with its System so as to impart to the public superior standards of quality and service. The "Proprietary Marks" as used in this Agreement shall mean all trademarks, trade names, trade dress, service marks, slogans and logos, including, but not limited to, the mark Jani-King, or any other trademark or service mark which may be authorized in writing by an officer of Franchisor now or at any time in the future.

4.1.2. Franchisor has developed and used, and continues to develop, use and control in connection with its System, certain confidential information, programs, devices, methods, techniques and processes which are not generally known to the public pertaining to franchising, promotion, marketing, operation and management of a business, including, but not limited to, the System, as defined herein, which includes but is not limited to information regarding the operational, sales, promotional methods and techniques, and marketing methods and techniques of Franchisor and the Jani-King program. Such information includes but is not limited to (a) Jani-King's manuals and forms, the information contained and compiled therein, and the updates and memoranda thereto; (b) names of Jani-King's agents, suppliers, and customers, and their requirements, specifications, and preferences; (c) the contractual arrangements between Jani-King and its agents, suppliers, and customers; (d) the financial details (including but not limited to credit and discount terms) of Jani-King's relationship with its agents, suppliers, or customers; (e) the names of prospective Jani-King customers and their requirements, specifications, and preferences; (f) information concerning the remuneration paid by Jani-King to its employees; (g) Jani-King's accounting software and forms; (h) information concerning and presented at Jani-King meetings; (i) security and access information; (j) information provided through initial and ongoing specialized training; and (k) Jani-King's business plans and strategies (collectively, the "Confidential Information").

4.1.3. All use of the Proprietary Marks and Confidential Information by Franchisee shall be in accordance with the terms of this Agreement and shall inure to the benefit of Franchisor and all such Proprietary Marks and Confidential Information shall remain the sole property of Franchisor.

4.1.4. Franchisee agrees to submit to Franchisor, prior to use by Franchisee, samples of any and all advertising and promotional plans and materials of any type which contain in any manner any of the Proprietary Marks, including without limitation the trade names, trademarks, service marks, slogans and logos as are now or which in the future may be approved for use by Franchisee.

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT _SL_ INT _EGL_
PAGE 3 OF 33



4.2.1.  Franchisee agrees to devote sufficient time and effort to its business pursuant to this Agreement and that all work and services performed under this Agreement will be performed and/or supervised by Franchisee or authorized agents/employees of Franchisee that comply with all terms of this Agreement.

4.2.2.  Franchisee, its agents, and employees will follow current established Jani-King policies, practices and procedures, and as they may be amended from time to time, and agrees not to deviate therefrom without prior written consent of Franchisor.

4.2.3.  Franchisee and officers and directors (if Franchisee is a corporation) who will actively participate in the operations of the franchise business agree to successfully complete the initial training program within six (6) months of the signing of this Agreement.

4.3.  In consideration of the franchise herein granted under the plan identified in the Franchise Summary (the "Plan"), and the initial services to be performed by Franchisor in connection with Franchisee's use in the Territory of the System, Proprietary Marks and Confidential Information as pledged herein, Franchisee shall pay to the Franchisor, upon execution of this instrument, the INITIAL FRANCHISE FEE DOWN PAYMENT and INITIAL FINDER'S FEE DOWN PAYMENT, as stated in the Franchise Summary herein ("the Initial Franchise Fee Down Payment and Initial Finder's Fee Down Payment" or the "Initial Franchise Fee and Initial Finder's Fee Down Payment"). Franchisee authorizes Franchisor's deduction of Initial Franchise Fee Monthly Payments and Initial Finder's Fee Monthly Payments, as stated in the Franchise Summary herein, (the "Initial Franchise Fee Monthly Payments and Initial Finder's Fee Monthly Payments" or the "Initial Franchise Fee and Initial Finder's Fee Monthly Payments) from the Gross Revenue, as defined herein, in the amount and number of payments stated in the Franchise Summary, provided Franchisee's franchise produces Gross Revenue in an amount equal to or greater than the Initial Franchise Fee Monthly Payments and Initial Finder's Fee Monthly Payments.

4.3.1.  Payment of this sum shall entitle Franchisee to the non-exclusive right to operate a Jani-King franchised business in the Territory described herein.  Franchisor will secure commercial cleaning and maintenance contracts and offer to Franchisee the opportunity to perform services in accordance with those commercial cleaning and maintenance contracts which contracts will have cumulative initial gross monthly billings in the amount equal to the amount stated as the "INITIAL FINDER'S FEE BUSINESS" in the Franchise Summary (the "Initial Finder's Fee Business"). The Initial Finder's Fee Business may also be referred to as the "Initial Business." All commercial cleaning and maintenance contracts will remain the sole property of Jani-King.

4.3.2.  Except as otherwise noted herein, the Initial Franchise Fee Down Payment and the Initial Finder's Fee Down Payment is non-refundable and is in addition to royalties and other payments set out herein.

4.3.3.  In the event that Franchisor is unable to secure and offer to the Franchisee the right to provide services to commercial cleaning and maintenance contracts with a cumulative total of initial gross monthly billings equal to or greater than the Initial Finder's Fee Business within the time period stated as the Initial Offering Period in the Franchise Summary (the "Initial Offering Period"), a portion of the Initial Franchisee Fee Down Payment and the Initial Finder's Fee Down Payment may be refundable. If the Franchisor fails to offer the full amount of Initial Finder's Fee Business, an amount equal to the lesser of (i) three (3) times the amount of Initial Finder's Fee Business not offered to the Franchisee or (ii) the total Initial Franchise Fee Down Payment and the Initial Finder's Fee Down Payment paid by Franchisee to Franchisor may be refunded.  Any refund will be first applied to any money owed to Franchisor, Jani-King Leasing Corporation, or an affiliate of Franchisor, any unpaid fees or charges that would result in a negative due Franchisee Report.  Any remaining portion of the refund will be credited to the Franchisee, unless agreed to otherwise, in writing, by Franchisor and Franchisee. A refund, or other written agreement between the parties, under this provision will fulfill Franchisor's obligation to offer any remaining portion of the Initial Finder's Fee Business used to calculate the refund.

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT _SKL_ INT _EEL_
PAGE 4 OF 33

4.4.  In addition to the Office Supply and Advertising Package provided to Franchisee by Franchisor as described in Schedule One of this Agreement, Franchisee is required to purchase the Professional Products and Equipment listed in Schedule One as the "Supply and Equipment Package", and also purchase, lease or provide proof of ownership to Franchisor of the following:

A commercial vacuum cleaner, a commercial floor polisher, a commercial wet/dry vacuum and a compact portable vacuum cleaner (canister type) w/shoulder strap and cloth bag, identified as "Additional Electric Equipment" in Schedule One.  These items are not included in the Office Supply and Advertising Package furnished by Franchisor.

The Supply and Equipment Package and the Additional Electric Equipment must be obtained by the Franchisee before any Initial Finder's Fee Business will be offered.

4.5.1  Franchisee agrees to pay to Franchisor or its designee, by the fifth (5th) day of each month a royalty fee equal to ten percent (10%) of the monthly Gross Revenue.  Gross Revenue is defined as all revenue invoiced by anyone for any contract services, one time cleans, extra work, sales of supplies, equipment or goods and any other revenue related to or derived from the provision of any cleaning and maintenance services including, but not limited to, commercial, industrial, institutional and residential, as well as the sale, leasing or distribution of related supplies and equipment in connection with the conduct and operation of Franchisee's business or otherwise directly or indirectly, in whole or in part, performed or sold by, or for the benefit of Franchisee, Franchisee's principals, guarantors, spouse(s), officers, directors, shareholders, agents, or employees, regardless of the entity or business name used.  The minimum royalty shall be Fifty Dollars ($50.00) monthly during the first twelve (12) months of operation and One Hundred Dollars ($100.00) per month thereafter.  Such minimum royalty is subject to annual adjustment for increases in the Consumer Price Index.

A fee of $25 per day (the "Non-Reported Business Fee") will be charged to Franchisee for each day Franchisee fails to report all Gross Revenue, in addition to any and all fees, payments, charges, chargebacks, or other amounts due and owing Franchisor under the terms of this agreement as a result of such Gross Revenue, whether or not collected by Franchisee.  Such amounts shall be immediately due and payable.  The payment of the Non-Reported Business Fee shall constitute liquidated damages and not a penalty, and shall be in addition to any other remedies available to Franchisor at law or in equity.

4.5.2.  Franchisee agrees to pay Franchisor an advertising fee (the "Fee") equal to one percent (1%) of Franchisee's Gross Revenue as defined above.  Franchisee agrees to pay the Fee, in addition to the royalty payment, commencing on the fifth (5th) day of the month and continuing on the fifth (5th) day of every month thereafter for the remainder of the term.  Franchisee agrees that the Fee shall be maintained and administered by Franchisor or its designee as follows:

The Fee will be used by us or our designee as follows:

1.  We will direct all advertising programs and will have sole discretion to approve or disapprove the creative concepts, materials and media used in the programs.  The Fee is intended to be used to maximize general public recognition and acceptance of the registered trademarks and enhance the collective success of all franchises operating under the Jani-King system.  None of the Fee is specifically or principally used for advertising that is principally a solicitation for the sale of franchises.  In using the Fee, we and our designees are not required to make expenditures for you which are equivalent or proportionate to your payment or to ensure that any particular franchisee benefits directly or pro rata from the placement of advertising.  We or our designees are also not required to advertise in the area where you are located.

2.  The Fee may be used to satisfy any and all costs of maintaining, administering, directing and preparing advertising (including, without limitation, the cost of preparing and conducting television, radio,

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT SKL INT ___ EEL
PAGE 5 OF 33



magazine and newspaper advertising campaigns; direct mail and outdoor billboard advertising; vehicle decaling, public relations activities; employing advertising agencies to assist therein; travel and associated expenses of personnel dispatched to assist in account start ups and account bidding; and costs of our personnel and other departmental costs for advertising that is internally administered or prepared by us). Sums paid by you relating to the Fee will also be used to defray any of our administrative costs incurred in activities reasonably related to advertising programs. This Fee is a payment to us for advertising and related costs and we do not have any duty to you related to the use of the Fee.

3. The Fee may also be used in our National Vehicle Program ("NVP") which is a voluntary program through which you can purchase a select number of vehicles from a national vehicle manufacturer. In the event Franchisee participates in the NVP, Franchisee is required to have a decal installed on any vehicle purchased through the NVP. The cost and installation of the vehicle decal will be paid out of the Fee.

4.6. Franchisee further agrees to pay to Franchisor a Finder's Fee on any additional business in excess of the Initial Finder's Fee Business of which Franchisee accepts the designation, from Franchisor, as authorized franchisee to provide service to such business, whether or not that additional business or contract resulted from an increase in the contract price for an existing business being serviced by Franchisee, an expansion of service for existing business being serviced by Franchisee at the same or other locations, or completely new business. Finder's Fees are in addition to royalties, Initial Franchise Fee and Initial Finder's Fee Monthly Payments, and other payments set out in this Agreement, and are calculated on the gross monthly billing for an account according to the formulas listed below. Franchisor has no obligation to offer Franchisee for the right to provide service to additional business or contracts beyond the Initial Finder's Fee Business. Should Franchisor, in its sole opinion, decide to offer Franchisee the right to service any additional business or contracts, Franchisee may either decline or accept the offer at the time it is made.

Following Franchisor's offer and Franchisee's acceptance of the right to provide service to any additional business or contract, the Franchisee agrees to pay an amount as a Finder's Fee according to the guidelines established by the Franchisor. Franchisor will, from time to time, establish such guidelines, policies and procedures as necessary to calculate the applicable Finder's Fee, taking into consideration industry standards and increases in costs and expenses of soliciting new accounts, and Franchisor reserves the right to increase or decrease the Finder's Fee in all categories. Currently, the following guidelines will apply, but any guideline or policy regarding the calculation of a Finder's Fee or the payment thereof, for any account, may be changed by the Franchisor at any time prior to the offering of the account:

(1) Upon acceptance of the right to perform services on any additional business, the Franchisee will sign an Account Acceptance/Finder's Fee Agreement that will include the Finder's Fee payment calculations, if any, according to the provisions set out in the Finder's Fee Schedules below.

(2) For each of the Finder's Fee Schedules set out below, the following terms apply to calculate the Finder's Fee for the additional business:

"OVER" / "UP TO": To determine the proper formula for a Finder's Fee payment structure within the appropriate Schedule, the Monthly Billing categories are listed by ranges, where the monthly billing will exceed the amount listed as "OVER", but less than the amount listed as "UP TO". If the monthly billing may fluctuate, the proper category of Monthly Billing will be determined by the maximum gross monthly billing allowed by the account contract.

DOWN PAYMENT: The initial payment due at the time of acceptance of the right to provide services to the account, or as otherwise established under these guidelines, calculated by multiplying the percentage stated in the appropriate category of Monthly Billing under Down Payment, times the appropriate gross monthly billing. All Down Payments will be calculated using the gross billing for the First Full Month of Service. "First Full

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT SKLJNT  EEL
PAGE 6 OF 33



Month of Service", for purposes of calculating the Down Payment, is defined as the first month in which the service is performed on or before the 15th day of the month. If a partial month is the First Full Month of Service, the gross monthly billing, for purposes of calculating the Down Payment, is determined as though the account had been serviced for the entire month. If the account begins service after the 15th, the following month will be used for purposes of the Down Payment, and no payment is due for the initial period. The Down Payment is due along with the monthly franchisee report for the First Full Month of Service (and second month as required) and may be payable as a deduction from the account billing on the franchisee report.

MONTHLY PAYMENT: The payment made each month for the designated number of months, calculated by multiplying the percentage stated in the appropriate schedule under Monthly Payment, times the gross monthly billing for the current accounting month. However, the total of the amounts paid as Monthly Payments (exclusive of the Down Payment) shall not exceed a sum greater than 300% of: (a) for Variable Rate Accounts, the maximum gross monthly billing that would be generated in a month in which the building was at a one hundred percent (100%) occupancy factor, exclusive of any down payment; or (b) for Public Event or Seasonal Accounts, the average gross monthly billing for the first twelve months service is performed under the account contract, exclusive of any down payment. Monthly Payments will begin the month following any scheduled Down Payment.

MONTHS: The number of months a Monthly Payment must be made under the terms of the Account Acceptance/Finder's Fee Agreement, subject to the maximum sum described in the definition of Monthly Payment.

(3) Accounts will be identified according to the following definitions and the Finder's Fee will be calculated using the formula set out in the appropriate Finder's Fee Schedule for the type of account:

1. FIXED RATE ACCOUNT: An account that has a constant monthly billing established by the account contract, and has a term of one year or longer. The Finder's Fee may be paid in full at the time of acceptance of the account, in which event, Franchisee will pay three (3) times the amount of the maximum gross monthly billing allowed under the contract, or the fee and payment will be structured according to the Schedule.

### FINDER'S FEE SCHEDULE:

| MONTHLY BILLING: | | DOWN | MONTHLY | |
| OVER | UP TO | PAYMENT | PAYMENT | MONTHS |
|---|---|---|---|---|
| 50 | 1,500 | 60% | 20% | 13 |
| 1,500 | 3,000 | 40% | 15% | 20 |
| 3,000 | 6,000 | 30% | 10% | 30 |
| 6,000 | 10,000 | 15% | 10% | 32 |
| 10,000 | unlimited | 5% | 5% | 65 |

2. VARIABLE RATE ACCOUNT: An account with a monthly billing that may fluctuate, depending on the occupancy of the property, where the billing is based on a set price per square foot of service area, and has a term of one year or longer. Any city, State or Federal account or Public School will be bid as a Multi-Tenant account. The Finder's Fee may be paid in full at the time of acceptance of the account, in which event, Franchisee will pay three (3) times the amount of the maximum gross monthly billing that would be generated in a month in which the building was at a one hundred percent (100%) occupancy factor, or the fee and payment will be structured according to the Schedule.

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT SKC INT EEC
PAGE 7 OF 33

FINDER'S FEE SCHEDULE:

| MONTHLY BILLING: | | DOWN | MONTHLY | |
|---|---|---|---|---|
| OVER | UP TO | PAYMENT | PAYMENT | MONTHS |
| 50 | 3,000 | 30% | 5% | 72 |
| 3,000 | 6,000 | 15% | 5% | 72 |
| 6,000 | unlimited | 5% | 5% | 72 |

3.  SEASONAL ACCOUNT: An account that will be serviced for a limited period of time but may recur on a seasonal basis. This account may have a constant or fluctuating monthly billing amount. A Down Payment is due only for the initial season. Monthly Payments are due each month until the total paid as Monthly Payments is equal to 300% of the average gross monthly billing for the first twelve months service is performed under the account contract, which may occur over several seasons.

FINDER'S FEE SCHEDULE:

| MONTHLY BILLING: | DOWN PAYMENT | MONTHLY PAYMENT | MONTHS |
|---|---|---|---|
| Any Amount | 20% | 10% | Varies* |

*Until Payments equal 300% of Average Gross Monthly Billing for first twelve months.

4.  PUBLIC EVENT FACILITIES: An account involving a public facility that houses special events for a limited duration, but similar events recur on a regularly scheduled basis. The monthly billing will fluctuate, depending on the type of event or use of the facility, where the billing is based on the labor-hours required to service the property, and has a term of one year or longer. Monthly Payments are due each month until the total paid as Monthly Payments is equal to 300% of the average gross monthly billing for the first twelve months service is performed under the account contract.

FINDER'S FEE SCHEDULE:

| MONTHLY BILLING: | DOWN PAYMENT | MONTHLY PAYMENT | MONTHS |
|---|---|---|---|
| Any Amount | 20% | 10% | Varies* |

*Until Payments equal 300% of Average Gross Monthly Billing for first twelve months.

5.  APARTMENT TURNAROUND: An account where one or more apartments or other facilities are serviced on a recurring basis as a make ready between occupancies or other uses. The monthly billing will fluctuate depending on the number of units serviced, but the account contract has a term of one year or more.

THIS SPACE INTENTIONALLY LEFT BLANK

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT:  5/08

INT SEC INT EEC
PAGE 8 OF 33



### FINDER'S FEE SCHEDULE:

| MONTHLY BILLING: | DOWN PAYMENT | MONTHLY PAYMENT | MONTHS |
|---|---|---|---|
| Any Amount | 20% | 10% | All* |

*Each month service is performed.

6. OTHER NON-STANDARD ACCOUNTS: The Franchisor will establish the Finder's Fee on any other account that does not fall within one of the above definitions, prior to the account being offered to the Franchisee for designation of service. The Finder's Fee on nonrecurring contracts, initial cleaning or one time cleaning contracts will vary but do not currently exceed twenty-five percent (25%) of the total invoiced amount.

(4) Policies and Procedures will be established by Franchisor from time to time which regulate the amount and calculation, terms of payment, credits on termination or transfers of accounts, and other issues concerning Finder's Fees.

4.7. Franchisee agrees that Franchisor shall have the exclusive right to perform all billing and accounting functions for the services provided by Franchisee. Each month, Franchisee agrees to pay Franchisor five percent (5%) of Franchisee's Gross Revenues, as defined herein, as an Accounting Fee, to cover Franchisor's administrative costs and expenses for this service (see Section Five). Depending on Franchisee's monthly Gross Revenue, Franchisee may be eligible for a rebate on the accounting fees paid by the Franchise. This rebate will be a percentage reduction of the accounting fee for the month(s) in which Franchisee is eligible and will be calculated each month using the following table. Franchisee's eligibility for the rebate shall be determined solely by Franchisor, and the calculation of the rebate shall be performed solely by Franchisor. Any rebate Franchisor determines Franchisee is eligible for will be issued to Franchisee twice per year at a time determined solely by Franchisor.

| Monthly Gross Revenue (Dollars) | Accounting Rebate (Percent) |
|---|---|
| 0-25,000 | 0 |
| 25,001-45,000 | 0.5 |
| 45,001-65,000 | 1.0 |
| 65,001-85,000 | 1.5 |
| 85,001-Over | 2.0 |

4.7.1. Franchisor each month will invoice clients serviced by Franchisee for the services rendered and supplies provided. All monies received from clients are the property of Franchisor. Each month, after deduction of all appropriate fees and charges including, but not limited to, all royalty fee, accounting fees, any note payments, the Initial Franchise Fee and Initial Finder's Fee Monthly Payments, Finder's Fees, advertising fees, transfer fees, chargebacks on past due invoices, any advances made to the franchisee by Franchisor, Non-Reported Business Fees, as defined hereinafter, or attorneys fees and court costs incurred by Franchisor in enforcing payment of accounts by clients, Franchisor will disburse money to Franchisee. On the fifth (5th) day of each month, Franchisor will disburse to Franchisee the amount of money appearing in the Due Franchisee Column of the Franchisee Report for the preceding month. In the event the fifth (5th) day of the month falls on a Saturday, Sunday or recognized holiday, then all such amounts due to Franchisee will be disbursed before the end of the next business day.

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT SHI INT EEL
PAGE 9 OF 33



4.8. Franchisee agrees to make all payments due Franchisor promptly in accordance with the terms of this Agreement, and recognizes that any failure on the part of the Franchisee to do so shall be deemed a substantial breach of this Agreement, and shall give Franchisor the right to terminate this Agreement immediately and retain all sums previously paid to Franchisor by Franchisee.

4.9.1. During the term of this Agreement, Franchisee shall maintain and preserve full, complete and accurate books, records and accounts regarding the Franchise business.

4.9.2. Upon request by Franchisor, Franchisee shall, at its sole cost and expense, prepare and submit to Franchisor within thirty (30) days after said request, a complete financial statement for the preceding twelve month period or any other calendar year, or a financial statement compiled and reviewed by a certified accountant or public accounting firm, together with such other information as Franchisor may reasonably require in order for Franchisor to determine that Franchisee is properly reporting and accounting for all Gross Revenue.

4.9.3. Franchisor reserves the right to inspect or examine the accounts, books, records and tax returns of Franchisee, at any reasonable time, so far as the same pertain to determination of Franchisee's Gross Revenue or the business of operating a Jani-King Franchise. Franchisor shall also have the right, at any time, to have an independent audit made of the books or financial records of Franchisee. Any such inspection, examination or independent audit shall be performed at the cost or expense of Franchisor unless the same is necessitated by the failure of Franchisee to provide the reports requested or to preserve records as provided herein, or unless the inspection, examination or independent audit discloses that any statement or report made by Franchisee is in error to an extent of five percent (5%) or more, in which case Franchisee shall immediately pay to Franchisor the amount in error and shall reimburse Franchisor for any and all costs and expenses connected with the inspection or audit (including, without limitation, reasonable accounting and attorneys' fees).

4.10. Franchisee agrees to be solely responsible for the services and results of services performed at locations where cleaning and maintenance services are performed by Franchisee, and to hold harmless and indemnify Franchisor from any and all claims arising from actions by Franchisee or its employees.

4.11. Franchisee agrees to maintain a clean and safe place of business in compliance with OSHA and other governmental and industry standards and to conduct its business in a manner that would bring goodwill and public approval to itself and Jani-King.

4.11.1. Franchisee is solely responsible for any leases of real or personal property in connection with the operation of its business, but agrees that Franchisor must approve office location, furniture and decor thereof to protect the image and reputation of Jani-King. Franchisee must at all times during the term of this Agreement maintain such office and all fixtures, furnishings, signs and equipment located thereon in good order and condition, and in a manner which will portray the goodwill and a positive image of the Jani-King name and reputation as such may be prescribed by Franchisor from time to time. Franchisee must, within a reasonable time specified by Franchisor, make all necessary additions, alterations, repairs and replacements to the office as required by Franchisor, but no others without Franchisor's prior written consent, including, but not limited to, periodic repainting or replacement of signs, furnishings, equipment or decor. No other business venture shall operate out of the premises utilized by Franchisee for its office without the prior written consent of Franchisor.

4.12.1. Franchisee agrees to be solely responsible for and indemnify and hold harmless Franchisor, Jani-King International, Inc., and their officers, directors, and employees for all loss or damage originating from, in connection with, or relating to the operation of Franchisee's business and for all claims or demands for damages to property or for injury or death of persons directly or indirectly resulting from or related to the operation of Franchisee's business. Franchisee also agrees that before Franchisee will be authorized to begin operating its franchise, Franchisee is required to obtain and carry the insurance listed below with the limits listed, naming Franchisor, Jani-King International, Inc., and their officers and directors as Additional Insureds from an insurer

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT SH int EEL
PAGE 10 OF 33



carrying an A.M. Bests' Rating of A or better. Franchisee shall provide Franchisor with proof of such required coverage.

| TYPE | LIMITS |
|------|--------|
| Comprehensive General Liability | $1,000,000 (per occurrence) $2,000,000 (Aggregate) |
| Hired and Non-Owned Automobile Insurance | $1,000,000 (combined single limit) |
| Excess or Umbrella Insurance | $20,000,000 (Aggregate) |
| Workers' Compensation | Statutory Limits |

4.12.2. The various limits of the required insurance may be increased or have new types of coverage added as circumstances dictate. Franchisee shall provide Franchisor with proof of the required insurance coverage and is required to notify their insurance carrier that the insurance carrier will provide any cancellation notice directly to Franchisor no less than thirty (30) days prior to cancellation.

4.12.3. If Franchisee fails to secure the above listed insurance to the satisfaction of Franchisor, Franchisor may, in addition to other remedies, purchase such insurance for the benefit of Franchisee and seek prompt reimbursement from Franchisee for all premiums and other costs incurred. Franchisee shall be responsible for all premiums and other costs incurred by Franchisor up to and including the date Franchisor grants Franchisee written approval of Franchisee's insurance. Franchisee agrees to indemnify and hold Franchisor harmless from any claims, loss or damage.

4.12.4. As an alternative to the requirement of purchasing the above insurance, Franchisor may offer to Franchisee, and Franchisee may participate in Franchisor's Business Protection Plan ("BPP") to the extent offered. Participation in the BPP is voluntary, and Franchisee is not obligated or required to participate. If Franchisee does not participate in the BPP, Franchisee must provide Franchisor with a certificate of insurance showing that Franchisee has obtained the equivalent amount of insurance coverage with limits as shown above or as established in the Jani-King Policies and Procedures Manual.

4.12.5. Participation in the BPP includes an initial membership in the Guardian Risk Purchasing Group ("GRPG"), a Texas non-profit corporation organized for the purpose of purchasing liability insurance on a group basis for persons or entities engaged in the janitorial industry. Membership in the GRPG is restricted to individuals and entities who are engaged in the janitorial industry. Members in the GRPG participate in GRPG's group insurance policies. GRPG's group insurance policies are not individual insurance policies and the policy limits are shared between all GRPG members. If Franchisee does not participate in the BPP, Franchisee is not required to purchase the required liability insurance listed above. Insurance provided by GRPG does not include coverage any personal or business use automobile(s) or Franchisee's equipment, supplies, or building if Franchisee's building is different from Franchisor's. Franchisee is required to purchase this insurance and supply proof of insurance to Franchisor before Franchisee will be authorized to begin operations of the franchise. You are also required to keep accurate payroll records. In the event Franchisee does not purchase this insurance, Franchisor reserves the right to purchase the insurance for Franchisee and charge Franchisee for the cost of the insurance.

The BPP also includes risk management, claims management assistance, periodic safety training, and regulatory compliance assistance. For these services, you will be required to pay an administration fee which may include a profit to us. We will be solely responsible for administering the BPP.

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT SKL INT EEL
PAGE 11 OF 33



4.12.6. Franchisee's membership in GRPG can be terminated if Franchisee: (1) fails to pay any amount owed for Franchisee's participation in the BPP or (2) if Franchisee fails to report all revenue generated by Franchisee's participation in the janitorial industry or (3) if Franchisee files a fraudulent insurance claim under any of the insurance coverage obtained by Franchisee from GRPG, (4) if Franchisee has excessive losses or (5) if Franchisee does not participate in the janitorial industry for 12 consecutive months.

4.13.   In connection with its agreement to indemnify and hold harmless Franchisor, Jani-King International, Inc., their officers, directors, and employees (the "Jani-King Parties") for all loss or damage as set forth in Section 4.12.1 of this Agreement, Franchisee agrees to defend the Jani-King Parties and any of their subsidiaries named in any lawsuit based on such loss or damage and to pay all costs and reasonable attorneys' fees associated with such defense. If any of the Jani-King parties wishes to retain their own counsel to defend any such action. Franchisee agrees to reimburse the Jani-King parties for all reasonable costs and legal fees incurred by the Jani-King parties for such defense. Said reimbursement shall be made to Franchisor in a timely manner as such fees are incurred by Franchisor and billed to Franchisee.

4.14.1  Franchisee, including officers and directors of Franchisee (where Franchisee is a corporation), agrees during the term of this Agreement not to engage in or have any financial interest in, either as an officer, agent, stockholder, employee, director, owner or partner, any other business which performs cleaning, cleaning management services, franchising or contracting cleaning management sales or any related business, except as otherwise approved in writing by Franchisor.

4.14.2  In the event this Agreement is sold, assigned, terminated or transferred, for any reason whatsoever, Franchisee, including officers and directors of Franchisee (where Franchisee is a corporation), agrees not to engage in or have any financial interest in, either as an officer, agent, stockholder, employee, director, owner or partner, any other business which performs cleaning, cleaning management services, franchising or contract cleaning management sales or any related business: (a) within the Territory covered by this Agreement for a period of two (2) years from the effective date of such sale, assignment, termination, or transfer; and (b) in any other territory covered by a Jani-King Franchise Agreement for a period of one (1) year from the effective date of such sale, assignment, termination or transfer. Franchisee, including officers and directors of Franchisee (where Franchisee is a corporation), during the periods referred to in this subsection, further agrees not to divert or attempt to divert from Jani-King or its Franchisees, by soliciting clients previously serviced by Franchisee or other Jani-King franchisees to perform any business in which Jani-King or its franchisees were engaged in at any time during the twelve (12) months preceding such sale, assignment, termination or transfer.

4.15.   Franchisee agrees to pay all personal property, sales, excise, use and other taxes, regardless of type or nature, which may be imposed, levied, assessed or charged, on, against or in connection with any services sold or furnished hereunder, whether from any state, municipality, county or parish, or other governmental unit or agency, which may have jurisdiction over such products, service and equipment. Franchisee must also pay all personnel performing services for Franchisee in full compliance with all Federal, state, local, and municipal laws, statutes, and regulations.

4.16.   Franchisee agrees to timely pay all debts, obligations, and encumbrances that might arise as a result of its operation of a Jani-King Franchise. Franchisee understands that in the event it be adjudicated bankrupt, or becomes insolvent, or a receiver (whether permanent or temporary) of Franchisee's property, or any part thereof, shall be appointed by a court of competent jurisdiction, or if Franchisee shall make a general assignment for the benefit of creditors, or if any judgment against Franchisee remains unsatisfied for thirty (30) days or longer, or if Franchisee defaults on any payments or obligations due Franchisor or its suppliers or others arising out of the purchase of supplies or the purchase or lease of equipment for use in the operation of a Jani-King Franchise, or if Franchisee infringes, abuses or misuses any of the Jani-King trademarks or trade names, or if the Franchisee fails to comply with any of the provisions of this Agreement except as to performance on customer accounts as set forth below, and has failed to take appropriate corrective action to the satisfaction of Franchisor within thirty (30)

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT SKL INT ETL
PAGE 12 OF 33


days after written notice by Franchisor of such failure or default, then Franchisor may terminate this Agreement and all rights of Franchisee hereunder shall cease at the end of said thirty (30) day period or such longer period as required by law.

4.17. Franchisee agrees to be solely responsible for the services, and results of such services, performed at locations where cleaning and/or maintenance services are performed by Franchisee and Franchisee's representatives and agrees to provide all labor, materials, tools and supplies necessary to service such premises. All of such services will be performed in a good and workmanlike manner, to the satisfaction of the customer for whom such services are performed and in accordance with the cleaning schedule or instructions associated with the contract between Franchisor and the client and to the performance standards of Jani-King. Franchisee understands and agrees that Franchisee is required to maintain a good relationship with each customer serviced by Franchisee, and that Franchisor may inspect any premises serviced by Franchisee at any time to ensure that the quality of service being rendered is in accordance with Jani-King standards.

The following procedures apply if any account we previously offered the right to you to provide services as part of the Initial Finder's Fee Business requests a transfer to another franchisee or cancels the cleaning contract:

(1) If an account cancels or is transferred to a new franchisee due to non-performance, theft, your failure to service the account properly, your failure to maintain good customer relations, or your failure to comply with the Policies and Procedures, we will not replace the account.

(2) If an account cancels at no fault of yours before you service the account for 12 full months, the full gross monthly billing value of that account will be replaced within a reasonable period of time by another account or a combination of accounts, at no additional cost to you. This provision applies until the cumulative time Franchisee has provided service to the original account and all replacement account(s) equals 12 months. If any replacement account or combination of accounts has a greater billing rate than the original account, the billing rate in excess of the original account will be applied to the obligation of other Initial Finder's Fee Business, or if the Initial Finder's Fee Business obligation has been fulfilled, Finder's Fees will be charged. Franchisor is not otherwise obligated to replace the accounts that are serviced by Franchisee if the account(s) cancel before the full term of the account.

EXAMPLE: An account with a monthly gross billing of $1,000 per month cancels after 7 months through no fault of yours. We will replace the account with one or more accounts having cumulative gross monthly billing of at least $1,000 per month. If any of the replacement accounts also happen to cancel at no fault of yours at any time during the next 5 months you service the account(s), we will replace the replacement account(s) with other account(s). If the cumulative gross monthly billings of the replacement accounts exceed $1,000, the monthly billing in excess of $1,000 would apply against other Initial Finder's Fee Business obligation, or Finder's Fees will be charged.

4.17.1. Franchisee and each of its employees must be in an approved, neat and clean uniform at any time they are performing services at a client's facility. A personal identifying name tag shall be considered a part of the uniform and is required for all personnel while on the premises of an account.

4.17.2. Failure of the Franchisee to comply with any provisions of this Agreement or established Jani-King Policies and Procedures within seventy-two (72) hours after Franchisor has given notice to the Franchisee of non-compliance will be sufficient cause for Franchisor to suspend the authority of Franchisee to perform services for any or all accounts serviced by Franchisee, until such time as Franchisor is satisfied that Franchisee has complied with the provisions, or, at the option of Franchisor, to transfer the right to provide service to the account to another Franchisee, without notice or delay.



4.17.3.  A representative of Franchisor will inspect the accounts from time to time in order to insure that the service is performed in accordance with the cleaning schedule or instructions associated with the contract between Franchisor and the client and to the performance standards of Jani-King.  If at any time, whether through complaint or inspection, a deficiency in performance is discovered, Franchisor can elect to dispatch its own staff to the account and correct all deficiencies in performance.  Franchisor has sole discretion in determining urgency and the time frame when dispatching its staff to an account.

4.17.4.  Franchisee must cooperate fully with Franchisor's staff, and pay a hourly rate ("Service Fee"), plus expenses and travel time, on each occasion Franchisor dispatches its staff to an account in order to correct a deficiency in performance.  The Service Fee will be established exclusively by Franchisor from time to time, but will not exceed the rate of $50.00 per "labor hour".  In order to promote full compliance with all Jani-King performance standards and policies, a Complaint Fee may also be charged to Franchisee as provided in Section 4.23.

4.17.5.  If the deficiency in performance requires immediate action to meet the client's demand for a visit or performance of services at the client's premises in less than four (4) hours, and Franchisor is not able to reach the Franchisee, or the Franchisee is not available for an immediate visit or performance of services, the Franchisee will be assessed the Service Fee, plus expenses, for the operations representative's time and effort to satisfy the needs of the customer.

4.17.6.  In the event Franchisee fails to perform the cleaning services as required by this Section, pursuant to the spirit and intent of this Agreement, and such deficiency shall continue for five (5) days cumulative within a ninety (90) day period, Franchisor may suspend the authority of Franchisee to perform services for any or all accounts serviced by Franchisee, until such time as Franchisor is satisfied that Franchisee will comply with all performance standards and policies, or, at the option of Franchisor, to transfer the account.  In the event Franchisee's right to perform services is suspended, any reinstatement of the right to perform services may not include the right to perform services to the same Jani-King accounts to which Franchisee provided services prior to suspension.

4.17.7.  Franchisor may also exercise the option to transfer Franchisee's right to provide service to an account immediately upon receiving a request for transfer or cancellation from the customer or if Franchisee provides any services to any customer and does not report and include such services in their Gross Revenue.

4.17.8.  Franchisee shall waive any and all payments for services which may become due and payable after Franchisor has exercised the option to transfer an account under any of the Sections 4.17.1 through 4.17.7, and shall not be entitled to any refund, rebate or reduction of any fees previously paid or pledged in connection with that customer's contract.  If Franchisor does not exercise any option hereunder, either in part or in full, with regard to any deficiency or default, the election not to exercise any option shall not constitute a waiver of such rights with regard to any subsequent deficiency or default.

4.18.  At Franchisor's request, Franchisee will provide to Franchisor a list of all clients to which Franchisee is providing service and copies of the contracts under which service is being performed.  Franchisee is prohibited, without Franchisor's prior written approval, from disclosing to anyone other than Franchisee's employees the names of the clients or any list of clients to whom Franchisee is providing service.

4.18.1.  Neither Franchisee nor any officer, director or controlling principal of Franchisee shall communicate, divulge or use for the benefit of any other person, persons, partnership, association or corporation during the term of this Agreement and following the expiration or termination of this Agreement, any Confidential Information, as defined herein, knowledge or know-how concerning the methods of operation of the franchised business which may be communicated to them or of which they may be apprised in connection with the operation of the Franchise under the terms of this Agreement.  Franchisee and Controlling Principals shall

JANI-KING OF CALIFORNIA, INC.                    INT _SKL_ INT _EEL_
FRANCHISE AGREEMENT: 5/08                        PAGE 14 OF 33



divulge such Confidential Information only to such of Franchisee's employees as must have access to it in order to operate the Franchise. Any and all information, knowledge, know-how, techniques and any materials used in or related to the Jani-King System which Franchisor provides to Franchisee in connection with this Agreement, whether or not expressly marked or labeled confidential, shall be deemed confidential for purposes of this Agreement. Neither Franchisee nor the Controlling Principals shall at any time, without Franchisor's prior written consent, copy, duplicate, record or otherwise make the same available to any unauthorized person. The covenant in this Section shall survive the expiration, termination or transfer of this Agreement or any interest herein and shall be perpetually binding upon Franchisee and each of the Controlling Principals.

4.19.1. In the event Franchisee voluntarily wishes to discontinue providing service to an account, Franchisee must notify Franchisor, in writing. If the account's monthly billing amount is less than $10,000, the written request must be made at least ten (10) days prior to the desired date of transfer. If the account's monthly billing is $10,000 or more, the written request must be made at least thirty (30) days prior to the desired date of transfer. Upon Franchisor's receipt of Franchisee's request to discontinue providing service or in the event Franchisee fails to provide service to an account for a period of two (2) days, for any reason, Franchisor reserves the right to service the account or to offer the right to provide service to another franchisee. In either event, Franchisee agrees that any and all payments (regardless of when services were rendered) which paid after Franchisee no longer services the account will be waived by Franchisee, and Franchisee shall not be entitled to any refund or rebate of any fees paid or pledged previously to Franchisor for such business.

4.19.2. All contracts under which terms services are provided by any Jani-King franchisee are the sole property of Jani-King. The Franchisee may solicit potential clients to provide cleaning and maintenance services through their franchise. However, all contracts for the provision of services by Franchisee must be drafted by Jani-King and must name Jani-King as the sole party to the contract (other than the client). Jani-King reserves the right, at its sole discretion, to suspend or cancel service of any contract serviced by Franchisee in the event the contract becomes delinquent in payment for services.

4.20. Upon termination or non-renewal of this Agreement for any reason, Franchisee shall immediately and permanently cease all use of the Proprietary Marks, Confidential Information, and all aspects of the System, and shall cease indicating verbally or in writing to clients and any other franchisee that it is still a Jani-King franchisee. Franchisee shall immediately return to Jani-King all advertising matter, products or writings that contain Jani-King's trade name, logo or copyright, as well as any Confidential Information. All such lists, files and the information contained therein shall remain the exclusive property of Franchisor. Any keys to buildings, security passes, and codes shall be delivered by Franchisee to Franchisor at the time the Franchisee ceases providing service. In the event Franchisee fails to deliver all keys, security passes, and codes to Franchisor, Franchisee hereby agrees to pay all costs and expenses incurred by Franchisor resulting from Franchisees failure to return these items.

4.21. If this Agreement is terminated or not renewed for any reason, such termination or non-renewal shall not be effective until Franchisee surrenders to Franchisor all property belonging to Franchisor including, but not limited to, keys to all clients' buildings and all contracts between Franchisor and Client. Franchisee agrees that the above-named items are the property of Franchisor. Franchisee must also pay, in full, all amounts owed to Franchisor at the date of termination or non-renewal and surrender any and all equipment belonging to Jani-King. Until Franchisee complies with each obligation hereunder, this Agreement shall be deemed effective and not terminated. Once Franchisee has, in Franchisor's sole opinion, complied with this paragraph, this Agreement shall be deemed terminated.

4.22. If Franchisee has proclaimed to have terminated or not renewed the Agreement and refused to surrender the items described herein, Franchisee agrees to pay Franchisor One Thousand dollars ($1,000.00) per day for each day that it has not complied with the foregoing paragraph. The parties acknowledge that damages for

JANI-KING OF CALIFORNIA, INC.                    INT SKL INT  EEL
FRANCHISE AGREEMENT: 5/08                         PAGE 15 OF 33



Franchisee's failure to adhere to the foregoing paragraph are difficult to ascertain and therefore agree that this amount shall be payable as liquidated damages and not as a penalty.

4.23.   In order to promote full compliance with all Jani-King performance standards and policies, a Fifty dollar ($50.00) complaint fee ("Complaint Fee") will be charged to any Franchisee who does not respond to or who has not serviced a customer complaint within the time frames allotted for initial response or corrective action and which require Franchisor's representatives to respond to the complaint.   "Serviced" or "respond to" the complaint in this case means communicating with the client to determine the nature of the complaint and what needs to be done to resolve the situation, and to provide the customer relations necessary to try to protect the account from cancellation or damages to Jani-King's goodwill and does not mean providing cleaning or maintenance services to the customer to resolve a complaint.   An additional Service Fee, as stated in Section 4.17.4 above, will be assessed, plus expenses (i.e., labor, materials, supplies, equipment, etc.), for all Franchisor's representatives' time required to resolve a complaint.   A Complaint Fee will be charged under the following circumstances:

If at any time, whether through complaint or inspection, a deficiency in performance is discovered concerning the services provided by Franchisee, Franchisor will attempt to contact Franchisee during the four (4) hour period immediately following the discovery of the deficiency (attempting a contact a minimum of once each hour) and report the complaint to Franchisee.

The Complaint Fee, plus the Service Fee and expenses, will be charged under either of the following conditions:

(a)   Franchisor cannot locate the Franchisee during the above described four (4) hour period and Franchisor must respond to the complaint; or,

(b)   if the complaint was made known to Franchisee, and after two (2) hours following the opening of the client's business the following morning, the deficiency in performance has not been corrected to the satisfaction of the client and Franchisor resulting in Franchisor responding to the complaint.

4.23.1.   The Fifty Dollar ($50.00) Complaint Fee, plus the Service Fee and expenses, will be charged to the Franchisee responsible for the complaint even if the account must be transferred to save it or if the account terminates for non-performance.   The fees will be payable in the month they are incurred.

4.24.   Franchisor reserves the right to establish company policies and/or procedures pertaining to the operation of Franchisee's franchised business or this Agreement.   Franchisee agrees to be bound by the policies and/or procedures upon receipt of same by Franchisee.   Franchisor shall keep a current, updated manual of all such policies and procedures at Franchisor's corporate office.   In the event that policies and procedures kept by Franchisor differ from those kept by Franchisee, the policies and procedures maintained in Franchisor's corporate office manual shall be controlling.

4.25.   Franchisee acknowledges that the System must continue to evolve in order to reflect the changing market and to meet new and changing customer demands, and that accordingly, variations and additions to the System may be required from time to time in order to preserve and enhance the public image of the System and to ensure the continuing operational efficiency of franchisees operating within the System.   Accordingly, Franchisee agrees that Franchisor may, from time to time, hereafter or otherwise change the System, including, without limitation, the adoption and use of new or modified Proprietary Marks, Confidential Information, Products, Services, equipment and furnishings and new techniques and methodologies relating to the preparation, sale, promotion and marketing of service and supplies.

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT SKL INT EEL
PAGE 16 OF 33



Franchisee agrees to promptly accept, implement, use, and display in the operation of the business all such additions, modifications and changes at its sole cost and expense.

4.26. Franchisee agrees that if it or any of its employees develop any new concept, process or improvement in the System or the Confidential Information, it will promptly notify Franchisor and provide Franchisor with all necessary information concerning same, without compensation. Franchisee acknowledges that any such concept, process or improvement shall become the property of Franchisor, and Franchisor may utilize or disclose such information to other franchisees as it determines to be appropriate.

## SECTION 5

## NONCOMPETITION

5.1. Franchisor agrees to provide Franchisee with valuable initial and ongoing specialized training, the Confidential Information, and the Proprietary Marks. The initial specialized training provides training in Jani-King methods and practices of professional cleaning services, management, sales and promotional techniques, and includes information about production procedures and rates, marketing, and management matters. The ongoing specialized training includes updated information of the type provided in the initial training, as well as additional training and information compiled and developed over time as the System evolves. Franchisee acknowledges that, whether or not the initial and ongoing specialized training or Confidential Information is denoted, labeled or marked as confidential, Franchisor considers such training and Confidential Information to be, and treats it as, confidential.

5.2. In consideration for the valuable initial and ongoing specialized training and Confidential Information described above, Franchisee (including officers and directors of Franchisee, if Franchisee is a corporation) agrees as follows:

5.2.1. Franchisee (including officers and directors of Franchisee, if Franchisee is a corporation) agrees that Franchisee, the officers or directors of Franchisee (if any), and Franchisee's employees shall not at any time, both during and after, the term of this Agreement, communicate or disclose to any person or entity (other than Franchisor or a person or entity expressly designated by Franchisor in writing), or use outside the scope of the business governed by this Agreement, any of the initial or ongoing specialized training or Confidential Information acquired by Franchisee (including the officers and directors of Franchisee, if Franchisee is a corporation) or Franchisee's employees during the term of this Agreement.

5.2.2 Franchisee (including officers and directors of Franchisee, if Franchisee is a corporation) agrees to use all reasonable efforts to maintain as confidential the initial and ongoing specialized training and Confidential Information. Accordingly, Franchisee (including officers and director of Franchisee, if Franchisee is a corporation) agrees that Franchisee, the officers or directors of Franchisee (if any), and Franchisee's employees shall not at any time duplicate, copy, record, or otherwise reproduce, in whole or in part, materials containing Confidential Information and/or information imparted through initial and/or ongoing specialized training, except as expressly authorized in writing by Franchisor.

5.2.3. Franchisee (including officers and directors of Franchisee, if Franchisee is a corporation) agrees that, during the term of this Agreement and for a continuous uninterrupted period of (2) years thereafter (unless otherwise specified in this Section 5) commencing upon expiration or termination of this Agreement, regardless of the cause for termination, except as otherwise approved in writing by Franchisor, Franchisee, the officers or directors of Franchisee (if any), and Franchisee's employees shall not, directly or indirectly, for itself/themselves or through, on behalf of, or in conjunction with any person, persons, partnership or corporation:

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT SkL Int _EEL_
PAGE 17 OF 33

(a)  Divert or attempt to divert to any competitor, by direct or indirect inducement or otherwise, any business or customer of the business franchised hereunder or any Jani-King franchisee anywhere;

(b)  Do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with Franchisor's trademarks or trade names or the Jani-King franchise program;

(c)  Employ, seek to employ, or otherwise directly or indirectly induce to leave his/her employment any person who is employed by or has been employed within the previous twelve (12) months by Franchisor or by any of Franchisor's affiliated companies or by any other franchisee of Franchisor;

(d)  Own, maintain, operate, engage in or have any interest in any business (hereinafter referred to as "Competing Business") which is the same as or similar to the business franchised under the terms of this Agreement, which Competing Business operates, solicits business, or is intended to operate or solicit business: (i) within the Territory of this Agreement; and (ii) for a period of one (1) year commencing upon expiration or termination of this Agreement (regardless of the cause for termination), in any other territory in which a Jani-King franchise operates.

5.3.  The parties agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement.  If all or any portion of a covenant in this section is held unreasonable or unenforceable by a court or agency having valid jurisdiction in any unappealed final decision to which Franchisor is a party, Franchisee (including Franchisee's officers and directors, if Franchisee is a corporation) expressly agrees that Franchisee, Franchisee's officers and directors (if any), and Franchisee's employees will be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Section.

5.4  Franchisee understands and acknowledges that Franchisor shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Section, or any portion thereof, without its consent, effective immediately upon written notice to Franchisee; and Franchisee agrees that it shall comply forthwith with any covenant as so modified, which modified covenant shall be fully enforceable notwithstanding the provisions of any other Sections hereof.

5.5.  Franchisee acknowledges that any materials and information provided to Franchisee (including Franchisee's officers and directors, if Franchisee is a corporation) and/or to Franchisee's employees by Franchisor will at all times be and remain the property of Franchisor.  Franchisee also acknowledges that any materials, concept, process, or improvement developed in the operation or promotion of the business governed by this Agreement by Franchisee (including its officers and directors, if Franchisee is a corporation) and/or Franchisee's employees will at all times be and remain the property of Franchisor.  Franchisee agrees to give Franchisor notice of and all necessary information related to such development(s).  Upon sale, assignment, termination, expiration, or transfer of this Agreement, Franchisee shall deliver to Franchisor all property belonging to Franchisor (including but not limited to the materials described above) and/or relating to Franchisor's business.  In addition, upon sale, assignment, termination, expiration, or transfer to this Agreement, Franchisee agrees to provide Franchisor, upon Franchisor's request, with a list of all customers that Franchisee is servicing or has serviced on or at any time during the twelve (12) months preceding the date of such sale, assignment, termination, expiration, or transfer, and a copy of any contracts under which the service is or was provided.

5.6.  Franchisee expressly agrees that the existence of any claims that Franchisee, Franchisee's officers and directors (if any), or Franchisee's employees may have against Franchisor, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by Franchisor of the covenants in this Section.  Franchisee agrees to pay all costs and expenses (including reasonable attorneys' fees and all costs of court) incurred by Franchisor in connection with the enforcement of this Section of this Agreement.

JANI-KING OF CALIFORNIA, INC.  
FRANCHISE AGREEMENT: 5/08

INT SK Int EEL  
PAGE 18 OF 33



5.7.    Franchisee acknowledges that a violation of any of the terms of this Section would result in irreparable injury to Franchisor for which no adequate remedy at law may be available. Franchisee acknowledges that the initial and ongoing specialized training and Confidential Information described herein have been developed and compiled through Jani-King's time and effort in the industry and provide a blueprint for Jani-King's business. Accordingly, Franchisee acknowledges that, in addition to Franchisor's remedies at law, Franchisor may seek and obtain preliminary and permanent injunctive relief restraining the breach or threatened breach by Franchisee; and Franchisee consents to the issuance of an injunction prohibiting any conduct by Franchisee in violation of this Section.

5.8.    Franchisee shall require and obtain execution of covenants similar to those set forth in this Section (including covenants applicable upon and after the termination of a person's relationship with Franchisee) from any or all officers, directors, managers and other  employees of Franchisee who have received or will receive initial and/or ongoing specialized training or Confidential Information directly or indirectly from Franchisor. Every covenant required by this Paragraph shall be in a form satisfactory to Franchisor, including, without limitation, specific and express identification of Franchisor as a third party beneficiary of such covenants with the independent right to enforce them. Failure by Franchisee to obtain execution of a covenant required herein shall constitute a material event of default under the terms of this Agreement.

## SECTION 6

## FRANCHISOR PLEDGES

6.1.1.   To offer Franchisee the opportunity to provide service to Franchisor's contracts located within the Territory, as defined herein, which have minimum cumulative gross monthly billings in an amount at least equal to the amount defined as the "Initial Finder's Fee Business" in the Franchise Summary. The contracts under which Franchisee will provide service are and will remain the property of Franchisor. The right to provide service to the Initial Finder's Fee Business will be offered within the number of days identified in the Franchise Summary as the "Initial Offering Period." The Initial Offering Period will begin on the date after (i) all required equipment and supplies have been obtained by Franchisee, (ii) Franchisee has successfully completed training as indicated by Franchisee's signing and returning to Franchisor the Acknowledgment of Completion of Training and (iii) Franchisee's delivery to Franchisor of written proof that Franchisee has obtain the insurance required under this Agreement. Notwithstanding, the Initial Offering Period may begin at a later date if requested by Franchisee and agreed to by Franchisor, or as provided below. As a condition to Franchisee being eligible to provide service to certain Jani-King clients, Franchisee and Franchisee's employees may be required to undergo background checks.

6.1.2.   The actual time to secure and offer, as described above, the Initial Finder's Fee Business to the Franchisee may, at Franchisor's sole discretion, be automatically extended under the following conditions: (1) if Franchisee requests a delay in the offering of the Initial Finder's Fee Business; (2) if Franchisee is in default under the terms and conditions of the Franchise Agreement or any other agreements between Franchisee and Franchisor; or (3) if any of the Initial Finder's Fee Business previously provided to Franchisee requests a transfer to another Franchisee or requests to be cancelled due to non-performance in which case Franchisee is required to repeat and complete to Franchisor's satisfaction all training classes required by Franchisor. In the event of the occurrence of any of the above conditions, Franchisor will have the remainder of the Initial Offering Period or a minimum of 120 days, which ever is longer, from the date: (1) Franchisee notifies Franchisor that they are ready to accept the right to service other business and has provided any documentation required under the Policies and Procedures; (2) Franchisee has cured any default; or (3) the acknowledgment of retraining is signed, to offer the balance of Initial Finder's Fee Business to Franchisee. Franchisor does not guaranty that the Initial Finder's Fee Business will reach or remain at the level stated on the Franchise Summary throughout the term of the Franchise Agreement.

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT _SK_ INT _EEL_
PAGE 19 OF 33



6.2. To provide Franchisee with the Office Supply and Advertising Package outlined in Schedule One of this Agreement.

6.3. To make available to Franchisee applicable confidential manuals, training aids and other pertinent information concerning Jani-King methods and practices.

6.4. To provide an initial local training program to include Jani-King cleaning methods, systems and programs using established Jani-King procedures and forms. Franchisee agrees to successfully complete the training within six (6) months after the date of this Agreement.

6.5. To offer Franchisee the right to provide service to Jani-King clients until Franchisee has been offered the right to provide service to Jani-King clients with cumulative gross monthly billings in an amount equal to or greater than the Initial Finder's Fee Business.

6.6. To provide additional training and support for Franchisee at reasonable rates as established by Jani-King policies and procedures, currently at a rate of Fifty Dollars ($50.00) per hour, plus expenses.

6.7. To allow Franchisee the non-exclusive right to use the Jani-King marks, insignia, logo, design and color scheme in the Territory subject to limitations and restrictions herein, and to allow Franchisee to utilize the processes, methods, materials, equipment and promotional plans developed by Jani-King.

6.8. To permit Franchisee the right to profit from its efforts, commensurate with its status as owner of its business, and correspondingly, to bear the risk of loss or failure that is characteristic of this status.

6.9. To make available to Franchisee the System and to provide Franchisee with new developments in the cleaning services industry at the discretion of and as determined by Franchisor.

6.10. To make available for Franchisee, at Franchisor's discretion and at a reasonable cost, promotional materials, sales and service manuals, equipment and other materials relevant to the operation of a Jani-King franchise.

## SECTION 7

## ADDITIONAL SERVICES

7.1. There are no additional services provided by Franchisor to Franchisee except as explicitly set out in this Agreement.

## SECTION 8

## DEFAULT AND TERMINATION

8.1. Franchisee shall be deemed to be in default, and Franchisor may, at its option, terminate this Agreement and all rights granted hereunder, without affording Franchisee any opportunity to cure the default, effective immediately upon the provision of notice to Franchisee, either by mailing or hand delivery, upon the occurrence of any of the following events:

(a) If Franchisee or any of its Principals is convicted of, pleads guilty or no contest to, or receives deferred adjudication for a felony, a crime involving theft, a crime involving moral turpitude, or any other crime or offense that is reasonably likely, in the sole opinion of Franchisor, to adversely affect the Jani-King franchise

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT SKLINT ECL
PAGE 20 OF 33



program, any Jani-King trademarks, trade names or the goodwill associated therewith or Franchisor's interest therein.

(b)  If Franchisee or any of its Principals discloses or divulges the contents of any Confidential Information, or any other trade secrets or confidential information provided to Franchisee by Franchisor in violation of the terms and conditions of this Agreement.

(c)  If Franchisee abandons the Jani-King Franchise business or otherwise forfeits the right to do or transact business in the Territory where the licensed business is located.

(d)  If Franchisee or any of its Principals purport to transfer any rights or obligations under this Agreement to any third party without the Franchisor's prior written consent.

(e)  If Franchisee makes any material misrepresentations or untrue or false statements on the franchise application or in other correspondence relating to the acquisition of the franchise business.

(f)  If the Franchisee repeatedly fails to comply with one or more requirements of the Agreement, any operations procedure, or Jani-King Policies and Procedures, whether or not corrected after notice;

(g)  If Franchisee fails to comply with any provision of this Agreement, any other agreement between Franchisor and Franchisee, and thereafter fails to cure such default to the satisfaction of the Franchisor within thirty (30) days after written notice has been given thereof.  Defaults by the Franchisee shall include, without limitation, the occurrence of any of the following events:

(i)  If Franchisee fails, refuses, or neglects promptly to pay any monies owing to Franchisor or its subsidiaries or affiliates when due, or to submit the financial information required by Franchisor under this Agreement, or makes any false statements in connection therewith.

(ii)  If Franchisee fails to maintain the standards that Franchisor requires in this Agreement or any other standards contained in Jani-King manuals, including the Jani-King Policies and Procedures manual.

(iii)  If Franchisee engages in conduct which reflects unfavorably upon the operation or reputation of the Jani-King franchise business or System.

(iv)  If Franchisee fails, refuses, or neglects to obtain the Franchisor's prior written approval or consent as required by this Agreement, other than as provided in Section 8.1(d).

(v)  If Franchisee or any of its Principals misuses or makes any unauthorized use of the Jani-King proprietary trademarks, trade names, service marks or other materials, including any forms of advertising, or otherwise materially impairs the goodwill associated with the Jani-King name or Franchisor's rights.

(vi)  If Franchisee is declared insolvent or bankrupt, or makes any assignment or trust mortgage for the benefit of creditors, or if a receiver, guardian, conservator, trustee in bankruptcy or similar officer shall be appointed to take charge of all or a part of Franchisee's property by a court of competent jurisdiction.  This provision may not be enforceable under federal bankruptcy law (11 U.S.C.A., Sec. 101 et seq.)

8.2.  The termination of this Agreement shall be without prejudice to any remedy or cause of action which Jani-King may have against Franchisee for the recovery of any monies due Jani-King or any equipment or property of Jani-King, or to any other right of Jani-King to recover damages for any breach hereof.

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT SKL INT EEC
PAGE 21 OF 33

8.3.   If the provisions of this Agreement provide for periods of notice less than those required by applicable state law, or provide for termination, cancellation, non-renewal or the like other than in accordance with applicable state law, Section 12.2.2. of this Franchise Agreement shall apply.

## SECTION 9

### TERM AND EXTENSION

9.1.   Subject to Section 9.2 herein, this Agreement and the franchise and license granted hereunder, unless sooner terminated, shall be and remain in full force and effect for a period of twenty (20) years from and after the Effective Date of this Agreement which is the date identified in the Franchise Summary.  This Agreement shall expire 20 years after the Effective Date unless extended pursuant to the terms contained herein.

9.2.   Provided Franchisee is not in default of this Agreement and provided Franchisee has delivered to Franchisor the required notice, Franchisee shall have the option to renew this Agreement for an additional period of twenty (20) years and for three (3) subsequent, additional twenty (20) year periods following the first extension (a total of one hundred (100) years when initial periods and renewal terms are combined).  Prior to the expiration of each 20 year term, Franchisee must notify Franchisor, in writing, of its intention to renew the Agreement not less than seven (7) months nor more than twelve (12) months prior to the end of the then current term.

9.3.   As a condition to and at the time of any renewal, Franchisee is required to execute a general release, in a form prescribed by Franchisor, of any and all claims against Franchisor and its subsidiaries, and their respective officers, directors, agents and employees in their corporate and individual capacities, including without limitation, claims arising under this Agreement and any federal, state and local laws, rules and ordinances.

9.4.   As a further condition to and at the time of any renewal,  Franchisee agrees to execute Franchisor's most recent standard franchise agreement being used by Franchisor which may differ substantially from the agreement under which the Franchisee has operated and any other ancillary agreements and documents as Franchisor may require.  Franchisee understands that the most current, executed agreement between Franchisee and Franchisor will govern relations between Franchisor and Franchisee for the following Twenty (20) years.  However, no additional Initial Franchise Fee or renewal fee shall be paid by Franchisee at the time of renewal, nor shall Franchisor be obligated to provide any additional Initial Finder's Fee Business or training.

## SECTION 10

### TRANSFER

10.1.   This Agreement shall inure to the benefit of the successors and assigns of Franchisee.  The interests of Franchisee in this Agreement are personal and may not be sold, assigned, transferred, shared or divided in any manner by Franchisee without the written consent of Franchisor, which consent shall not be unreasonably withheld.  Franchisee shall provide to Franchisor prior to the sale or transfer, a copy of any written agreements relating to the proposed sale or transfer, or any additional information which Franchisor may require in order to determine if it will grant its consent to the proposed sale or transfer.  For purposes of this Agreement, any change in stock ownership, voting or other control whatsoever of a corporation or partnership which acts as a Franchisee under this Agreement constitutes a transfer.  For all purposes herein, a beneficiary of a trust which owns a beneficial interest in a Franchisee which is an entity shall be deemed to have an interest in the Franchise Agreement.  Provided further, for all purposes herein, in the event that a trust owns a beneficial interest in Franchisee which is an entity, any change in the beneficial interest of a beneficiary shall constitute a "transfer" hereunder.  Any transaction or series of transactions which would have such an effect must be approved by Franchisor on the same basis as any other sale or transfer as set forth herein.  Franchisee hereby covenants and

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT_SKL_INT _ETA_
PAGE 22 OF 33



warrants (i) that its certificate or articles of incorporation, corporate charter, by-laws and/or partnership agreement limit transfers as described in this Section 11, and (ii) if Franchisee is a corporation, that each security shall bear a legend (in a form to which Franchisor consents) indicating that any transfer is subject to this Section 11, or if Franchisee is a partnership, that its partnership agreement shall provide (in a form to which Franchisor consents) that all transfers are subject to this Section 10.

10.2. Franchisee agrees to pay to Franchisor the greater of Two Thousand Dollars ($2,000.00) or ten percent (10%) of the sales price or exchanged value as a transfer fee (the "Transfer Fee"). This Transfer Fee must be paid before Franchisor will grant consent to the sale or transfer. If no monetary consideration or other exchange of value is made for the transfer of a franchise, no Transfer Fee will be charged for a transfer to: (1) any party currently holding an interest in the franchise at the time of the transfer; (2) a controlled corporation in which the current owners of the Franchise retain ninety (90%) percent or greater of the outstanding shares of stock; or (3) if the transfer is to an immediate family member of the current owner (for the purposes of this Section 10.2, family members include Franchisee's mother, father, brother, sister, and children only), whether a life time transfer or upon death. An administrative fee will be charged to cover necessary and reasonable costs and preparation of the documents associated with the transfer if no Transfer Fee is assessed. The current administrative fee is $250.00, but may be increased by Franchisor in the future.

10.3. Prior to the sale or transfer of the franchise, Franchisee will provide to Franchisor a copy of any written agreements relating to the proposed sale or transfer or any additional information which Franchisor may require in order to determine if it will grant consent to the proposed sale or transfer. It is agreed that consent for sale, transfer or assignment will be granted only when: (a) all obligations under the terms of this Agreement have been fulfilled, (b) all money owed by Franchisee to Franchisor and Franchisor's affiliates have been paid in full, (c) the purchaser of the franchise agrees to undergo the training required of a new Jani-King franchisee and (d) the purchaser of the franchise agrees to execute Franchisor's most current franchise agreement which may differ substantially from this Agreement.

10.4. Franchisee also agrees to provide, as a condition of Franchisor's consent to the sale, transfer, or assignment, a personal covenant to the purchaser not to compete in the cleaning and/or maintenance services industry, nor to seek to divert business from Franchisor or its franchisees for a period of two (2) years after transfer or sale. This covenant is in addition to the non-compete covenants contained in this Agreement. The transferor must also execute a general release, in a form satisfactory to Franchisor, of any and all claims against Franchisor, Franchisor's parent corporation and affiliated corporations, and the officers, directors, shareholders and employees of Franchisor and each parent and affiliate corporation in their corporate and individual capacities including, without limitation, claims arising under this Agreement and federal, state and local laws, rules and ordinances.

10.5. This Agreement is fully assignable by Franchisor and shall inure to the benefit of any assignee or other legal successor to the interest of Franchisor.

## SECTION 11

## RIGHT OF FIRST REFUSAL

11.1. In the event Franchisee receives a bona fide arms-length offer to purchase Franchisee's interest in this Agreement (or in the business conducted hereunder) from any third party, or in the event Franchisee proposes to convert, assign, or otherwise transfer Franchisee's interest in this Agreement (or in the business conducted hereunder), in whole or in part, to any third party, Franchisee hereby agrees to offer to Franchisor a first right to purchase or otherwise receive Franchisee's interest under the same terms and conditions offered to or accepted from the third party (the "Right of First Refusal"). Franchisee's failure to offer to Franchisor the Right of First

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT SKL INT EEZ
PAGE 23 OF 33



Refusal will be an act of default of the terms of this Agreement. Notwithstanding anything contained herein to the contrary, Franchisee shall not be obligated to offer Franchisor the Right of First Refusal sale, assignment, or transfer is solely between Franchisee and either (a) a corporation whose original sole shareholders are individuals who comprise the original Franchisee and/or (b) the immediate family of Franchisee or the immediate family of the individuals described in (a) herein. For the purpose of this section, immediate family shall mean the spouse, children, siblings, or parents of Franchisee only.

11.2. Franchisee shall make available to Franchisor in a written statement verified by Franchisee the terms of the offer received or made by Franchisee, and Franchisor shall have thirty (30) days from the receipt of said statement to either accept or refuse such offer. Written notice of Franchisor's decision to accept or refuse said offer shall be delivered to Franchisee. Acceptance by Franchisor shall be at the same price and on the same terms set forth in the written statement submitted by Franchisee.

11.3. In the event Franchisor fails to accept the offer within the thirty-day (30) period, Franchisee shall be free to effect the disposition described in the statement upon the exact terms set forth in the statement delivered to Franchisor, provided that nothing in this paragraph shall be interpreted as limiting the requirements of Section 10 hereof relating to transfer of the Agreement.

11.4. Furthermore, in the event Franchisee is insolvent, or upon the filing of any petition by or against Franchisee under any provisions of any bankruptcy law, Franchisor shall have the first right to purchase the business conducted by Franchisee, for an amount and pursuant to terms established by an independent appraiser selected by Franchisor.

## SECTION 12

### GENERAL

12.1. Nothing in this Agreement shall be construed to prevent Franchisee from freely setting its own prices and discounts for services and products which it may render or sell provided such actions do not affect the business of Franchisor.

12.2.1. Should any part of this Agreement for any reason be declared invalid or unenforceable, such decision shall not affect the validity of the remaining portion, which remaining portion shall remain in full force and effect as if this Agreement had been executed with the invalid or unenforceable portion eliminated, and the parties to this Agreement agree that they would have executed the remaining portion of this Agreement without including any such part, parts, or portion which may, for any reason, hereafter be declared invalid or unenforceable.

12.2.2. If any applicable and binding law or rule of any jurisdiction requires a greater prior notice of the termination of or refusal to renew this Agreement than is required hereunder, or the taking of some other action not required hereunder, or if under any applicable and binding law or rule of any jurisdiction, any provision of the Agreement or any specification, standard or operating procedure prescribed by Franchisor is invalid or unenforceable, the prior notice and/or other action required by such law or rule shall be substituted for the comparable provisions hereof, and Franchisor shall have the right, in its sole discretion, to modify such invalid or unenforceable provision, specification, standard or operating procedure to the extent required to be valid and enforceable. Franchisee agrees to be bound by any promise or covenant imposing the maximum duty permitted by law which is comprehended within the terms of any provision hereof, as though it were separately articulated in and made a part of this Agreement, that may result from striking from any of the provisions hereof, or any specification, standard or operating procedure prescribed by Franchisor, any portion or portions which a court may hold to be unenforceable in a final decision to which Franchisor is a party, or from reducing the scope of any promise or covenant to the extent required to comply with such a court order. Such modifications to this



Agreement shall be effective only in such jurisdiction, unless Franchisor elects to give them greater applicability, and shall be enforced as originally made and entered into in all the jurisdictions.

12.3. This Agreement and the Attachments and Exhibits hereto constitute the entire Agreement between us and you concerning the subject matter hereof and supersede all prior agreements, negotiations, representations, and correspondence concerning the same subject matter; provided, however, that nothing in this Agreement or any related agreement is intended to disclaim the representations we made in the Franchise Disclosure Document that we furnished to you. All transactions between Franchisee and Franchisor regarding any operation of a Jani-King franchise business granted under any franchise agreement dated prior to this Agreement shall be controlled by this Agreement and the most current publication of the Jani-King Policies and Procedures Manual. Any amendment or modification to this Agreement is invalid unless made in writing and signed by all the parties.

12.4. Franchisee acknowledges that neither Franchisor nor anyone on its behalf has made any representations, promises or agreements, orally or otherwise, respecting the subject matter of this Agreement which are not embodied herein.

12.4.1. Franchisee acknowledges that it has carefully read this Agreement, that ample opportunity has been provided for Franchisee to obtain the services of an independent legal or financial advisor, and that Franchisee has had the opportunity to have this Agreement and all supporting disclosure documentation, as well as any other information gathered by the Franchisee, reviewed by an attorney or financial advisor of its own choice.

12.4.2. Franchisee further acknowledges that Franchisor does not authorize any representative of Franchisor to make any oral, written, visual or other claim or representation that are not contained in the Franchise Disclosure Document provided to Franchisee by Franchisor and does not permit any promises, agreements, contracts, commitments or representations to be made to Franchisee except those stated in this Agreement.

12.5. Franchisor may also conduct the type of business operated by the Franchisee.

12.6. Franchisee acknowledges that the franchised business and all documents and information Franchisee receives from Franchisor relating to the operation of the franchise, including the manuals and communication tools and the training will be presented to Franchisee in the English language. Franchisee acknowledges that Franchisee is required to have a representative that is fluent in the English language present during any training provided by Jani-King and available for any translating necessary during the operation of my franchise.

12.7. It is agreed and understood that Franchisee will act at all times as an independent contractor and will not, at any time, directly or indirectly, hold itself out as an agent, servant or employee of Franchisor.

12.8. No waiver by Franchisor of any default in performance on the part of Franchisee, time being of the essence, or like waiver by Franchisor of any breach or series of breaches, of any of the terms, covenants and conditions of this Agreement shall constitute a waiver of any subsequent breach or waiver of said terms, conditions or covenants.

12.9. Any notice required or permitted under this Agreement must be in writing and delivered by personal delivery service or by deposit in the U.S. mail, certified, return receipt requested or by a recognized express delivery service providing written receipt of delivery at the address listed for the Franchisee in the Franchise Summary or to Franchisor at the following address:

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT _SLC_ INT _EG_
PAGE 25 OF 33



Jani-King of California, Inc.
6170 Cornerstone Court
Suite 330
San Diego, California 92121

A party to this Agreement may change its notice information by providing written notice to the other parties pursuant to the notice requirements stated above, and such change shall be effective as to each other party on the tenth (10th) day after delivery to such other party.

12.10.   THE PARTIES AGREE AND INTEND THIS INSTRUMENT TO BE EXECUTED, INTERPRETED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT REFERENCE TO CONFLICT OF LAWS PRINCIPLES. TEXAS LAW SHALL APPLY TO ALL CLAIMS, DISPUTES, AND DISAGREEMENTS BETWEEN THE PARTIES, WHETHER ARISING FROM ALLEGED BREACHES OF THE CONTRACT OR AGREEMENT OR OTHER CLAIMS ARISING IN ANY WAY FROM THE PARTIES' DEALINGS.   JURISDICTION AND VENUE IS DECLARED TO BE EXCLUSIVELY IN DALLAS COUNTY, IN THE STATE OF TEXAS.

12.11.   The submission of this Agreement does not constitute an offer to license, and this Agreement shall become effective only upon execution thereof by Franchisor and Franchisee and the compliance with section 12.13.

12.12.   THE PARTIES AGREE THAT ANY DAMAGES SOUGHT BY OR AWARDED TO FRANCHISEE SHALL BE LIMITED TO FRANCHISEE'S TOTAL INVESTMENT WITH FRANCHISOR, AND NO PUNITIVE OR EXEMPLARY DAMAGES WILL BE AWARDED TO FRANCHISEE.

12.13.   This Agreement shall not be binding on Franchisor unless and until it has been accepted and signed by an  officer or director of Franchisor at Franchisor's home office in Addison, Dallas County, Texas.

12.14.   The numbers and headings of paragraphs used herein are for convenience only and do not affect the substance of the paragraphs themselves.

12.15.   Franchisee certifies and warrants that all owners and spouses of owners or partners, if the franchise is a sole proprietorship or partnership; and all persons who are a shareholder, officer or director of any corporation who holds the franchise: (1) are listed in the attached SCHEDULE OF PRINCIPALS; and  (2) that all such parties will execute all Guarantees or other documents required by Jani-King.

IN WITNESS WHEREOF, the parties hereto have set their hands this __29__ day of __OCTOBER__ , 2008 .

JANI-KING OF CALIFORNIA, INC.                    FRANCHISEE

BY: _____                 _____
MARCELO A. ARCE                                  (Signature of Owner, Partner or Authorized
TITLE: DIRECTOR OF FRANCHISE SALES               Officer)

                                                 SUNYATA K. LITTLE
                                                 _____
                                                 (Print Name)
                                                 Social Security # ████████

                                                 _____
                                                 By: (Signature of Partner or Spouse)

                                                 ELEANOR E. LITTLE
                                                 _____
                                                 (Print Name)
                                                 Social Security # ████████

                                                 _____
                                                 By: (Signature of Partner or Spouse)

                                                 _____
                                                 (Print Name)
                                                 Social Security #_____

                                                 COMPLETE IF FOR CORPORATION:

                                                 _____
                                                 (Corporate Name)

                                                 _____
                                                 (Title of Authorized Officer)
                                                 Federal Tax ID#: _____

ACCEPTED by the Home Office of Franchisor on this __7th__ day of __November__ , __2008__

BY: _____
Authorized Representative

JANI-KING OF CALIFORNIA, INC.                    INT SKL INT EEL
FRANCHISE AGREEMENT: 5/08                         PAGE 27 OF 33

                                                         MK

## SCHEDULE OF PRINCIPALS

ANY OTHER PERSON NOT LISTED IN THIS AGREEMENT WHO IS A SPOUSE, PARTNER, OR AN OFFICER. DIRECTOR OR SHAREHOLDER OF FRANCHISEE:

Name: _____
Relationship: _____
Taxpayer ID: _____
Address: _____

Telephone: _____


Name: _____
Relationship: _____
Taxpayer ID: _____
Address: _____

Telephone: _____

Name: _____
Relationship: _____
Taxpayer ID: _____
Address: _____

Telephone: _____


Name: _____
Relationship: _____
Taxpayer ID: _____
Address: _____

Telephone: _____

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT _SKC_ INT _EEL_
PAGE 28 OF 33



**SCHEDULE ONE**
**"OFFICE SUPPLY AND ADVERTISING PACKAGE"**

LIST OF MATERIALS PROVIDED TO FRANCHISEE
PURSUANT TO THE FRANCHISE AGREEMENT

| ITEM | AMOUNT |
|---|---|
| Business Cards (imprinted logo) | 1,000 |
| JANI-KING Logo/Border Paper (matching envelopes) | 100 |
| Color Tri-Fold | 50 |
| JANI-KING Tunics | 3 |
| JANI-KING Golf Shirt | 1 |
| JANI-KING Polo Shirts | 4 |
| Inspection Pads | 5 |
| Memo Pads | 5 |
| Past Performance Pads | 5 |
| Account Bid Sheet Pad | 1 pad |
| Contact Evaluation Pad (replace as needed) | 1 pad |
| Discover JANI-KING Media | 1 |
| JANI-KING Logo Binders | 2 |
| JANI-KING Executive Pad Holder | 1 |
| JANI-KING Tri-fold Pad Holder | 1 |
| JANI-KING Training Videos | 1 set |
| JANI-KING Customer Relations Handbook | 1 |
| Account Follow-up Sheets (replace as needed) | 5 |
| New Account Start-Up (replace as needed) | 5 |
| Initial Clean Sign-Off Sheets (replace as needed) | 5 |
| Franchisee Request Cards (replace as needed) | 5 |
| Authorization for Extra Work Forms (replace as needed) | 5 |
| JANI-KING Business Card Order Forms | As Needed |

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT _SKL_ INT _EEL_
PAGE 29 OF 33



## "SUPPLY AND EQUIPMENT PACKAGE"

THE FOLLOWING SUPPLIES AND EQUIPMENT MUST BE PURCHASED
BY EACH FRANCHISEE PURSUANT TO THE FRANCHISE AGREEMENT AND
PRIOR TO FRANCHISOR OFFERING ANY OF THE INITIAL FINDER'S FEE BUSINESS

The products listed may be purchased from Franchisor, subject to shipping restrictions, or any other source. Prices currently charged by Franchisor may be changed or modified in the future.

| ITEM | AMOUNT |
|---|---|
| All Purpose Cleaner (Biodegradable for use on walls, formica, etc. | 1 - one gallon container (or equivalent) |
| Glass Cleaner | 1 - one gallon container (or equivalent) |
| Restroom Disinfectant | 1 - one gallon container (or equivalent) |
| Cream Cleanser | 2 - one quart containers (or equivalent) |
| Neutral Floor Cleaner | 1 - one gallon container (or equivalent) |
| Carpet Cleaning Concentrate (Bonnet Method) | 1 gallon |
| Carpet Spot Remover | 1 can (or equivalent) |
| Floor Finish Stripper | 1 gallon |
| High Gloss Floor Finish | 1 gallon |
| Stainless Steel Cleaner | 1 can |
| Dust Mop Treatment | 1 can |
| Small Trash Liners (10-12 gallon capacity) | 1 case |
| Large Trash Liners (40-45 gallon capacity) | 1 case |

| ITEM | AMOUNT |
|---|---|
| Mop Bucket (26 quart minimum with wet floor caution inlayed) | 2 |
| Mop Wringer; Down Press | 2 |
| Wet Mop Handle | 2 |
| Wet Mop Head (24 oz.) | 4 |
| Dust Mop Head (24 inch) | 1 |
| Dust Mop Frame (24 inch) | 1 |
| Swivel Dust Mop Handle | 1 |
| Metal-Tipped Handle for Doodle Bug | 1 |
| Doodle Bug Holder and Pads (3) | 1 |
| Plastic Angler Broom | 1 |
| Corner Brush | 1 |
| Toy Broom | 1 |
| Janitor Dust Pan | 1 |

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT SKL INT EEL
PAGE 30 OF 33

## "SUPPLY AND EQUIPMENT PACKAGE" – Continued

| ITEM | AMOUNT |
|------|--------|
| 17" Black Stripping Pad | 5 |
| 17" Red Buffing Pad | 5 |
| 17" Bonnet Pad | 1 |
| Window Squeegee Handle | 1 |
| 14" Window Stripwasher with Sleeve | 1 |
| 12" Squeegee Channel | 1 |
| Commercial Sponge with Scrubber | 1 |
| Commercial Sponge | 1 |
| Roll-around Trash Container (32 gallon) | 1 |
| Brute Container Caddy | 1 |
| Lambswool Duster (Telescoping) | 1 |

| ITEM | AMOUNT |
|------|--------|
| Disposal Wipes | 1 package |
| Disposal Gloves | 1 box |
| Putty Knife | 1 |
| Sanitary Bowl Swab | 2 |
| Rubber Door Stop | 1 |
| Wet Floor Caution Sign | 4 |
| One Quart Spray Bottle | 6 |
| Trigger Sprayer | 6 |
| 8 oz. Measuring Cup | 1 |
| Electronic Pager (not Available through Franchisor) | 1 |

Franchisor may adjust the items included in the Supply and Equipment Package as industry standards change.

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT Skl INT EEl
PAGE 31 OF 33



## "ADDITIONAL ELECTRIC EQUIPMENT"

THE FOLLOWING EQUIPMENT MUST BE PURCHASED BY EACH
FRANCHISEE PURSUANT TO THE FRANCHISE AGREEMENT AND PRIOR
TO FRANCHISOR OFFERING ANY OF THE INITIAL BUSINESS

The products listed may be purchased from Franchisor or any other source.
Prices currently charged by Franchisor may be changed or modified in the future.

| QUANTITY | DESCRIPTION | UNIT PRICE |
|---|---|---|
| 1 | 17" Heavy Duty Floor Machine with 1.5 HP electric motor, triple planetary gearing, includes pad driver, 175 rpm, with easy adjusting handle | $833.61 each |
| | Or | |
| 1 | 17" Heavy Duty Floor Machine with 1.5 HP electric motor, triple planetary gearing includes pad driver, 175 rpm | $798.57 each |
| | Or | |
| 1 | 17" Low Speed Floor Machine with 1.5 HP electric motor, triple planetary gearing, includes pad driver, 175 rpm | $620.00 each |
| 1 | Wet/Dry vacuum with 15 gallon tank, 92" of waterlift, includes tool package | $609.11 each |
| | Or | |
| 1 | Wet/Dry vacuum with 15 gallon tank, 95" of waterlift, includes tool package | $470.00 each |
| | Or | |
| 1 | Wet/Dry vacuum with 15 gallon tank, 85" of waterlift, includes tool package | $441.43 each |



In addition to the above equipment, Franchisee must purchase one of the following equipment packages:

Equipment Package #1

| QUANTITY | DESCRIPTION | UNIT PRICE |
|----------|-------------|------------|
| 1 | 12" Upright commercial 7 amp vacuum, 50' cord, with cloth bag | $164.29 each |
| | Or | |
| 1 | 12" Upright commercial 7 amp vacuum, 50' cord, cloth bag with paper bag inserts | $250.00 each |
| 1 | Compact Portable Vacuum Cleaner (Canister Type) w/ shoulder strap and cloth bag | $126.00 each (CASH ONLY) |
| | Or | |
| 1 | Backpack Vacuum Cleaner, 10 qt. including tool package | $382.14 each |

or Equipment Package #2

| QUANTITY | DESCRIPTION | UNIT PRICE |
|----------|-------------|------------|
| 1 | 14"Upright commercial vacuum complete with the following:<br>• 750 watt vacuum motor<br>• 40 foot cord<br>• paper filter collection system<br>• crevice tool<br>• upholstery and drapery tool<br>• attachment hose | $428.57 each |

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/08

INT SKL INT EEL
PAGE 33 OF 33



# JANI-KING OF CALIFORNIA, INC.

## FRANCHISE AGREEMENT

THIS AGREEMENT (this "Agreement") is made and entered into in Addison, Dallas County, Texas by and between JANI-KING OF CALIFORNIA, INC., a Texas Corporation, hereinafter referred as either "JANI-KING" or "Franchisor", and TERVON LLC

hereinafter referred to, singularly or collectively, as "Franchisee", doing business as a:

[ ] Corporation,
incorporated under the
laws of _____,

[X] Limited Liability Company,
formed under the
state of CALIFORNIA

for the purposes of allowing Franchisee to operate a business as a Franchisee of JANI-KING.  Franchisee and Jani-King may be jointly referred to as the "Parties."

## FRANCHISE SUMMARY

EFFECTIVE DATE: OCTOBER 8 , 2010 .    PLAN: E-10V

INITIAL FRANCHISE FEE DOWN PAYMENT:

($ 15,556.25     ) FIFHTEEN THOUSAND FIVE HUNDRED FIFTY SIX AND 25/100      Dollars

PROJECTED INITIAL FRANCHISE FEE MONTHLY PAYMENT:

$ 324.09    PER MONTH FOR 48    MONTHS

INITIAL BUSINESS:

($ 10,000.00 ) TEN 00/100 _____ (Thousand)

INITIAL OFFERING PERIOD: THREE HUNDRED THIRTY     ( 330   ) Days

TERRITORY:  Counties:

Imperial and San Diego in the State of California.

FRANCHISEE ADDRESS:
575 PADRONE PL

CITY:  CHULA VISTA        STATE: CA        ZIP CODE: 91910

COUNTY:  SAN DIEGO        TELEPHONE NUMBER: (619 ) ███████

EMAIL: ████████████

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/10 .

INT ___ INT ___
PAGE 1 OF 34

# RECITALS

## SECTION 1

1.1.   WHEREAS, Franchisor owns a system (the "System") consisting of the Proprietary Marks (as defined herein), and certain proprietary know-how and other Confidential Information (as defined herein) for:

(a)   the franchising of comprehensive cleaning and maintenance businesses using the System and the Confidential Information, and the supply and distribution of complete cleaning and/or maintenance related services, including, but not limited to, commercial, industrial, and institutional cleaning (the "Services"); and

(b)   the supply and distribution of cleaning and maintenance products using the System and the Confidential Information, and the promotion, sale and delivery of the same (the "Products").

1.2.   WHEREAS, Franchisor is authorized to grant a license to use the System, the Proprietary Marks and/or the Confidential Information.

1.3.   WHEREAS, Franchisee desires to use the System in Franchisee's business as a Jani-King Franchisee.

1.4.   WHEREAS, the Parties to this Agreement desire that the Franchisor grant to the Franchisee a license to use the System developed by Jani-King in the Territory for the business, and agree that such business shall be governed by the terms, covenants, and conditions contained in this Agreement and in Franchisor's Policy and Procedures Manual.

1.5.   NOW, THEREFORE, in consideration of the full and faithful performance of each and every one of the covenants, terms and conditions contained herein, the Parties agree as follows:

## SECTION 2

2.1.   Franchisor grants to the Franchisee, upon the terms and conditions herein contained, the right to establish and operate a Jani-King business and a license to use the System developed by Jani-King in connection therewith for its business in the territory described in the Franchise Summary (the "Territory"). The Franchise Summary is defined as all information contained on the first page of this Agreement appearing below the words "Franchise Summary."

## SECTION 3

## GRANT OF FRANCHISE

3.1.   For and in consideration of the full and faithful performance of each and every one of the covenants, terms and conditions herein contained and agreed to by Franchisee, Franchisor grants to the Franchisee the right to establish and operate a Jani-King franchise within the Territory.

3.2.   Franchisee shall operate the business at or from a location of its choosing within the Territory subject to the approval of Franchisor and Franchisee's continued compliance with the terms and conditions set forth herein.

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/10

INT _____ INT _LS_
PAGE 2 OF 34

# SECTION 4

## FRANCHISEE PLEDGES

4.1.  To operate a Jani-King franchise cleaning and maintenance services company in the Territory described herein using the System.

4.1.1.  Franchisee agrees that it will not use any name in the operation of its Jani-King franchise other than those specifically authorized by Jani-King.  Franchisee is authorized to use the title "Authorized Franchisee of Jani-King®" in conjunction with the operation of its Jani-King franchise.  Franchisee is not authorized and agrees not to use the trademark "Jani-King" in any part of a corporate name or other legal name of an entity used to purchase the franchise.  Franchisee is prohibited from using  (i) any other janitorial, maintenance or cleaning service name in conjunction with their formal name (for example, "ABC Custodials", "ABC Maintenance", "ABC Cleaning Services"), (ii) a name prefix of "Jani-", or any other similarly spelled or sounding prefix, (iii) the words "Services", "Cleaning", and "Maintenance" or (iv) any other trademarks, trade names or service marks or any name that has not been granted prior written approval by Jani-King's Corporate Office.  All names of the entity operating as Franchisee, including corporate names, business names, trade or assumed names, or other legal names shall be approved in writing by Franchisor prior to adoption for use by Franchisee.  All directory listings, advertising, letterhead, or any other visual or printed matter used by Franchisee to communicate to anyone shall conform to Franchisor's established Jani-King policies and shall be subject to review and approval by Franchisor prior to use by Franchisee.  Franchisee is prohibited from using the term "dba Jani-King" in conjunction with the operation of its Jani-King franchise.

4.1.2.  Franchisor has developed and used, and continues to develop, use, and control in connection with its System certain Proprietary Marks that have become associated with its System so as to impart to the public superior standards of quality and service.  The "Proprietary Marks" as used in this Agreement shall mean all trademarks, trade names, trade dress, service marks, slogans and logos, including, but not limited to, the mark "Jani-King", the mark "The King of Clean" or any other trademark or service mark which may be authorized in writing by an officer of Franchisor now or at any time in the future.

4.1.3.  Franchisor has developed and used, and continues to develop, use, and control in connection with its System, certain confidential information, programs, devices, methods, techniques and processes which are not generally known to the public pertaining to franchising, promotion, marketing, operation and management of a business, including, but not limited to, the System, as defined herein, which includes but is not limited to information regarding the operational, sales, promotional methods and techniques, and marketing methods and techniques of Franchisor and the Jani-King program.  Such information includes, but is not limited to: (a) Jani-King's DVDs, manuals, forms, the information contained and compiled therein, and the updates and memoranda thereto; (b) names of Jani-King's agents, suppliers, and customers, and their requirements, specifications, and preferences; (c) the contractual arrangements between Jani-King and its agents, suppliers, and customers; (d) the financial details (including but not limited to credit and discount terms) of Jani-King's relationship with its agents, suppliers, or customers; (e) the names of prospective Jani-King customers and their requirements, specifications, and preferences; (f) information concerning the remuneration paid by Jani-King to its employees; (g) Jani-King's accounting software; (h) information concerning and presented at Jani-King meetings; (i) security and access information; (j) information provided through initial and ongoing specialized training; and (k) Jani-King's business plans and strategies (collectively, the "Confidential Information").

4.1.4.  All use of the Proprietary Marks and Confidential Information by Franchisee shall be in accordance with the terms of this Agreement and the Jani-King Policies and Procedures Manual and shall inure

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/10

INT ___ INT ___
PAGE 3 OF 34

to the benefit of Franchisor and all such Proprietary Marks and Confidential Information shall remain the sole property of Franchisor.

4.1.5.   Franchisee agrees to submit to Franchisor, prior to use by Franchisee, samples of any and all advertising and promotional plans and materials of any type which contain in any manner any of the Proprietary Marks, including without limitation the trade names, trademarks, service marks, slogans and logos as are now or which in the future may be approved for use by Franchisee.

4.2.1.   Franchisee agrees to devote sufficient time and effort to its business pursuant to this Agreement and that all work and services performed under this Agreement will be performed and/or supervised by authorized agents and/or employees of Franchisee that comply with all terms of this Agreement.

4.2.2.   Franchisee, its agents, and employees will follow current established Jani-King policies, practices and procedures, and as they may be amended from time to time, and agree not to deviate there from without prior written consent of Franchisor.

4.2.3.   All of Franchisee's owners, shareholders, members, officers, directors, and managers (each, a "Principal" and collectively, the "Principals") who will actively participate in the operations of the franchise business agree to successfully complete the initial training program within six months of the signing of this Agreement.

4.3.   In consideration of the franchise herein granted under the plan identified in the Franchise Summary (the "Plan"), and the initial services to be performed by Franchisor in connection with Franchisee's use in the Territory of the System, Proprietary Marks and Confidential Information as pledged herein, Franchisee shall pay to the Franchisor, upon execution of this instrument, the INITIAL FRANCHISE FEE DOWN PAYMENT, as stated in the Franchise Summary herein (the "Initial Franchise Fee Down Payment"). Franchisee authorizes Franchisor's deduction of Initial Franchise Fee Monthly Payments, as stated in the Franchise Summary herein, (the "Initial Franchise Fee Monthly Payments") from the Gross Revenue, as defined herein, in the amount and number of payments stated in the Franchise Summary, provided Franchisee's franchise produces Gross Revenue in an amount equal to or greater than the Initial Franchise Fee Monthly Payments.

4.3.1.   Payment of this sum shall entitle Franchisee to the non-exclusive right to operate a Jani-King franchised business in the Territory described herein.   Franchisor will secure commercial cleaning and maintenance contracts and offer to Franchisee the opportunity to perform services in accordance with those commercial cleaning and maintenance contracts which contracts will have cumulative initial gross monthly billings in the amount equal to the amount stated as the "INITIAL BUSINESS" in the Franchise Summary (the "Initial Business"). All commercial cleaning and maintenance contracts will remain the sole property of Jani-King.

4.3.2.   Except as otherwise noted herein, the Initial Franchise Fee Down Payment is non-refundable and is in addition to royalties and other payments set out herein.

4.3.3.   In the event that Franchisor is unable to secure and offer to the Franchisee the right to provide services to commercial cleaning and maintenance contracts with a cumulative total of initial gross monthly billings equal to or greater than the Initial Business within the time period stated as the Initial Offering Period in the Franchise Summary (the "Initial Offering Period"), a portion of the Initial Franchise Fee Down Payment may be refundable. If the Franchisor fails to offer the full amount of Initial Business, an amount equal to the lesser of (i) three times the amount of Initial Business not offered to the Franchisee or (ii) the total Initial Franchise Fee Down Payment paid by Franchisee to Franchisor may be refunded. Any refund will be first applied to any money owed to Franchisor, Jani-King Leasing Corporation, an affiliate of Franchisor, and any unpaid fees or charges

JANI-KING OF CALIFORNIA, INC.                                   INT _____ INT _LS_
FRANCHISE AGREEMENT: 5/10                                       PAGE 4 OF 34

that would result in a negative due Franchisee Report (as defined in Section 4.7.1 below). Any remaining portion of the refund will be credited to the Franchisee, unless agreed to otherwise, in writing, by Franchisor and Franchisee. A refund, or other written agreement between the Parties, under this provision will fulfill Franchisor's obligation to offer any remaining portion of the Initial Business used to calculate the refund.

4.4. In addition to the Office Supply and Advertising Package provided to Franchisee by Franchisor as described in Schedule One of this Agreement, Franchisee is required to purchase the Professional Products and Equipment listed in Schedule One as the "Supply and Equipment Package", and also purchase, lease or provide proof of ownership to Franchisor of the following:

A commercial vacuum cleaner, a commercial floor polisher, a commercial wet/dry vacuum and a compact portable vacuum cleaner (canister type) with shoulder strap and cloth bag, identified as "Additional Electric Equipment" in Schedule One. These items are not included in the Office Supply and Advertising Package furnished by Franchisor.

The Supply and Equipment Package and the Additional Electric Equipment must be obtained by the Franchisee before any Initial Business will be offered. Franchisee is also required to possess or obtain a personal digital assistant ("PDA") or smart phone capable of sending and receiving emails, such as a Blackberry device or iPhone.

4.5.1 Franchisee agrees to pay to Franchisor or its designee, by the fifth day of each month a royalty fee equal to 10% of the monthly Gross Revenue. Gross Revenue is defined as all revenue invoiced by anyone for any contract services, one-time cleans, extra work, sales of supplies, equipment or goods and any other revenue related to or derived from the provision of any cleaning and maintenance services including, but not limited to, commercial, industrial, and institutional, as well as the sale, leasing or distribution of related supplies and equipment in connection with the conduct and operation of Franchisee's business or otherwise directly or indirectly, in whole or in part, performed or sold by, or for the benefit of Franchisee, Franchisee's guarantors, agents, representatives, and/or employees, or the Principals or any of the spouses of the Principals, regardless of the entity or business name used. The minimum royalty shall be $100.00 monthly during the first 12 months of operation and $250.00 per month thereafter. Such minimum royalty is subject to annual adjustment for increases in the Consumer Price Index.

A fee of $25 per day (the "Non-Reported Business Fee") will be charged to Franchisee for each day Franchisee fails to report all Gross Revenue, in addition to any and all fees, payments, charges, charge-backs, or other amounts due and owing Franchisor under the terms of this agreement as a result of such Gross Revenue, whether or not collected by Franchisee. Such amounts shall be immediately due and payable. The payment of the Non-Reported Business Fee shall constitute liquidated damages and not a penalty, and shall be in addition to any other remedies available to Franchisor at law or in equity.

4.5.2. Franchisee agrees to pay Franchisor an advertising fee (the "Fee") equal to 1% of Franchisee's Gross Revenue as defined above. Franchisee agrees to pay the Fee, in addition to the royalty payment, commencing on the fifth day of the month and continuing on the fifth day of every month thereafter for the remainder of the term. Franchisee agrees that Franchisor, in Franchisor's sole discretion, may increase the Fee up to 2% of Franchisee's Gross Revenue. Franchisee agrees that the Fee shall be maintained and administered by Franchisor or its designee as follows:

The Fee will be used by us or our designee as follows:

i. We will direct all advertising programs and will have sole discretion to approve or disapprove the creative concepts, materials and media used in the programs. The Fee is intended to be used to maximize

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/10

INT _____ INT _____
PAGE 5 OF 34

general public recognition and acceptance of the registered trademarks and enhance the collective success of all franchises operating under the Jani-King system. None of the Fee is specifically or principally used for advertising that is principally a solicitation for the sale of franchises. In using the Fee, we and our designees are not required to make expenditures for you which are equivalent or proportionate to your payment or to ensure that any particular franchisee benefits directly or pro rata from the placement of advertising. Neither we nor our designees are required to advertise in the area where you are located.

2. The Fee may be used to satisfy any and all costs of maintaining, administering, directing and preparing advertising (including, without limitation, the cost of preparing and conducting television, radio, internet, website, magazine and newspaper advertising campaigns; direct mail and outdoor billboard advertising; vehicle decaling; public relations activities; employing advertising agencies to assist therein; travel and associated expenses of personnel dispatched to assist in account start ups and account bidding; and costs of our personnel and other departmental costs for advertising that is internally administered or prepared by us). Sums paid by Franchisee relating to the Fee will also be used to defray any of our administrative costs incurred in activities reasonably related to advertising programs. This Fee is a payment to us for advertising and related costs and we do not have any duty to you related to the use of the Fee.

3. The Fee may also be used in our National Vehicle Program ("NVP") which is a voluntary program through which you can purchase a select number of vehicles from a national vehicle manufacturer. In the event Franchisee participates in the NVP, Franchisee is required to have a decal installed on any vehicle purchased through the NVP. The cost and installation of the vehicle decal will be paid out of the Fee.

4.6. Franchisee further agrees to pay to Franchisor a Finder's Fee on any additional business in excess of the Initial Business of which Franchisee accepts the designation, from Franchisor, as authorized franchisee to provide service to such business, whether or not that additional business or contract resulted from an increase in the contract price for an existing business being serviced by Franchisee, an expansion of service for existing business being serviced by Franchisee at the same or other locations, or completely new business. Finder's Fees are in addition to royalties, Initial Franchise Fee Monthly Payments, and other payments set out in this Agreement, and are calculated on the gross monthly billing for an account according to the formulas listed below. Franchisor has no obligation to offer Franchisee the right to provide service to additional business or contracts beyond the Initial Business. Should Franchisor, in its sole discretion, decide to offer Franchisee the right to service any additional business or contracts, Franchisee may either decline or accept the offer at the time it is made.

Following Franchisor's offer and Franchisee's acceptance of the right to provide service to any additional business or contract, the Franchisee agrees to pay an amount as a Finder's Fee according to the guidelines established by the Franchisor. Franchisor will, from time to time, establish such guidelines, policies and procedures as necessary to calculate the applicable Finder's Fee, taking into consideration industry standards and increases in costs and expenses of soliciting new accounts, and Franchisor reserves the right to increase or decrease the Finder's Fee in all categories. Currently, the following guidelines will apply, but any guideline or policy regarding the calculation of a Finder's Fee or the payment thereof, for any account, may be changed by the Franchisor at any time prior to the offering of the account:

(1) Upon acceptance of the right to perform services on any additional business, the Franchisee will sign an Account Acceptance/Finder's Fee Agreement, which will include the Finder's Fee payment calculations, if any, according to the provisions set out in the Finder's Fee Schedules below.

(2) For each of the Finder's Fee Schedules set out below, the following terms apply to calculate the Finder's Fee for the additional business:

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/10

INT _____ INT _LS_
PAGE 6 OF 34

"OVER" / "UP TO":  To determine the proper formula for a Finder's Fee payment structure within the appropriate Schedule, the Monthly Billing categories are listed by ranges, where the monthly billing will exceed the amount listed as "OVER", but be less than the amount listed as "UP TO".  If the monthly billing may fluctuate, the proper category of Monthly Billing will be determined by the maximum gross monthly billing allowed by the account contract.

DOWN PAYMENT:  The initial payment due at the time of acceptance of the right to provide services to the account, or as otherwise established under these guidelines, calculated by multiplying the percentage stated in the appropriate category of Monthly Billing under Down Payment, times the appropriate gross monthly billing. All Down Payments will be calculated using the gross billing for the First Full Month of Service.  "First Full Month of Service", for purposes of calculating the Down Payment, is defined as the first month in which the service is performed on or before the 15th day of the month.  If a partial month is the First Full Month of Service, the gross monthly billing, for purposes of calculating the Down Payment, is determined as though the account had been serviced for the entire month.  If the account begins service after the 15th, the following month will be used for purposes of the Down Payment, and no payment is due for the initial period.  The Down Payment is due along with the monthly Franchisee Report for the First Full Month of Service (and second month as required) and may be payable as a deduction from the account billing on the Franchisee Report.

MONTHLY PAYMENT:  The payment made each month for the designated number of months, calculated by multiplying the percentage stated in the appropriate schedule under Monthly Payment, times the gross monthly billing for the current accounting month.  However, the total of the amounts paid as Monthly Payments (exclusive of the Down Payment) shall not exceed a sum greater than 300% of: (a) for Variable Rate Accounts, the maximum gross monthly billing that would be generated in a month in which the building was at a 100% occupancy factor, exclusive of any Down Payment; or (b) for Public Event or Seasonal Accounts, the average gross monthly billing for the first 12 months service is performed under the account contract, exclusive of any Down Payment.  Monthly Payments will begin the month following any scheduled Down Payment.

MONTHS:  The number of months a Monthly Payment must be made under the terms of the Account Acceptance/Finder's Fee Agreement, subject to the maximum sum described in the definition of Monthly Payment.

(3)  Accounts will be identified according to the following definitions and the Finder's Fee will be calculated using the formula set out in the appropriate Finder's Fee Schedule for the type of account:

1. FIXED RATE ACCOUNT:  An account that has a constant monthly billing established by the account contract, and has a term of one year or longer.  The Finder's Fee may be paid in full at the time of acceptance of the account, in which event, Franchisee will pay three times the amount of the maximum gross monthly billing allowed under the contract, or the fee and payment will be structured according to the Schedule.

### FINDER'S FEE SCHEDULE:

| MONTHLY BILLING: | | DOWN | MONTHLY | |
| OVER | UP TO | PAYMENT | PAYMENT | MONTHS |
|---|---|---|---|---|
| 50 | 1,500 | 60% | 20% | 13 |
| 1,500 | 3,000 | 40% | 15% | 20 |
| 3,000 | 6,000 | 30% | 10% | 30 |
| 6,000 | 10,000 | 15% | 10% | 32 |
| 10,000 | unlimited | 5% | 5% | 65 |

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/10

INT _____ INT _LS_
PAGE 7 OF 34

2. **VARIABLE RATE ACCOUNT:** An account with a monthly billing that may fluctuate, depending on the occupancy of the property, where the billing is based on a set price per square foot of service area, and has a term of one year or longer. Any city, State or Federal account, or Public School will be bid as a Variable Rate Account. The Finder's Fee may be paid in full at the time of acceptance of the account, in which event, Franchisee will pay three times the amount of the maximum gross monthly billing that would be generated in a month in which the building was at a 100% occupancy factor, or the fee and payment will be structured according to the Schedule.

### FINDER'S FEE SCHEDULE:

| MONTHLY BILLING: | | DOWN | MONTHLY | |
|---|---|---|---|---|
| OVER | UP TO | PAYMENT | PAYMENT | MONTHS |
| 50 | 3,000 | 30% | 5% | 72 |
| 3,000 | 6,000 | 15% | 5% | 72 |
| 6,000 | unlimited | 5% | 5% | 72 |

3. **SEASONAL ACCOUNT:** An account that will be serviced for a limited period of time but may recur on a seasonal basis. This account may have a constant or fluctuating monthly billing amount. A Down Payment is due only for the initial season. Monthly Payments are due each month until the total paid as Monthly Payments is equal to 300% of the average gross monthly billing for the first 12 months service is performed under the account contract, which may occur over several seasons.

### FINDER'S FEE SCHEDULE:

| MONTHLY BILLING: | DOWN PAYMENT | MONTHLY PAYMENT | MONTHS |
|---|---|---|---|
| Any Amount | 20% | 10% | Varies* |

*Until Payments equal 300% of Average Gross Monthly Billing for first 12 months.

4. **PUBLIC EVENT FACILITIES:** An account involving a public facility that houses special events for a limited duration, but similar events recur on a regularly scheduled basis. The monthly billing will fluctuate, depending on the type of event or use of the facility, where the billing is based on the labor-hours required to service the property, and has a term of one year or longer. Monthly Payments are due each month until the total paid as Monthly Payments is equal to 300% of the average gross monthly billing for the first 12 months service is performed under the account contract.

### FINDER'S FEE SCHEDULE:

| MONTHLY BILLING: | DOWN PAYMENT | MONTHLY PAYMENT | MONTHS |
|---|---|---|---|
| Any Amount | 20% | 10% | Varies* |

*Until Payments equal 300% of Average Gross Monthly Billing for first 12 months.

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/10

INT _____ INT LS
PAGE 8 OF 34

5. **APARTMENT TURNAROUND:** An account where one or more apartments or other facilities are serviced on a recurring basis as a make ready between occupancies or other uses. The monthly billing will fluctuate depending on the number of units serviced, but the account contract has a term of one year or more.

FINDER'S FEE SCHEDULE:

| MONTHLY BILLING: | DOWN PAYMENT | MONTHLY PAYMENT | MONTHS |
|---|---|---|---|
| Any Amount | 20% | 10% | All* |

*Each month service is performed.

6. **OTHER NON-STANDARD ACCOUNTS:** The Franchisor will establish the Finder's Fee on any other account that does not fall within one of the above definitions, prior to the account being offered to the Franchisee for designation of service. The Finder's Fee on nonrecurring contracts, initial cleaning or one time cleaning contracts will vary but do not currently exceed 25% of the total invoiced amount.

(4)     Policies and procedures will be established by Franchisor from time to time which regulate the amount and calculation, terms of payment, credits on termination or transfers of accounts, and other issues concerning Finder's Fees.

4.7. Franchisee agrees that Franchisor shall have the exclusive right to perform all billing and accounting functions for the services provided by Franchisee. Each month, Franchisee agrees to pay Franchisor 5% of Franchisee's Gross Revenues, as defined herein, as an Accounting Fee, to cover Franchisor's administrative costs and expenses for this service. Depending on Franchisee's monthly Gross Revenue, Franchisee may be eligible for a rebate on the accounting fees paid by the Franchisee. This rebate will be a percentage reduction of the accounting fee for the month(s) in which Franchisee is eligible and will be calculated each month using the following table. Franchisee's eligibility for the rebate shall be determined solely by Franchisor, and the calculation of the rebate shall be performed solely by Franchisor. Any rebate Franchisor determines Franchisee is eligible for will be issued to Franchisee twice per year at a time determined solely by Franchisor.

| Monthly Gross Revenue (Dollars) | Accounting Rebate (Percent) |
|---|---|
| 0-25,000 | 0 |
| 25,001-45,000 | 0.5 |
| 45.001-65,000 | 1.0 |
| 65,001-85,000 | 1.5 |
| 85,001-Over | 2.0 |

4.7.1. Franchisor each month will invoice clients serviced by Franchisee for the services rendered and supplies provided. All monies received from clients are the property of Franchisor. Each month, after deduction of all appropriate fees and charges including, but not limited to, all royalty fees, accounting fees, any note payments, the Initial Franchise Fee Monthly Payments, Finder's Fees, advertising fees, transfer fees, charge-backs on past due invoices, any advances made to Franchisee by Franchisor, Non-Reported Business Fees, as defined hereinafter, or attorneys fees and court costs incurred by Franchisor in enforcing payment of accounts by clients, Franchisor will issue a report to Franchisee which will provide an accounting of Franchisee's business during the previous month (the "Franchisee Report"). On the fifth day of each month, Franchisor will disburse to Franchisee

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/10

INT ___ INT LS
PAGE 9 OF 34

the amount of money appearing in the "Due Franchisee Column" of the Franchisee Report for the preceding month. Any money not collected due to Franchisee's performance issues in an account will be charged back to Franchisee. In the event the fifth day of the month falls on a Saturday, Sunday or recognized holiday, then all such amounts due to Franchisee will be disbursed before the end of the next business day.

4.8. Franchisee agrees to make all payments due Franchisor promptly in accordance with the terms of this Agreement, and recognizes that any failure on the part of the Franchisee to do so shall be deemed a substantial breach of this Agreement, and shall give Franchisor the right to terminate this Agreement immediately and retain all sums previously paid to Franchisor by Franchisee.

4.9.1. During the term of this Agreement, Franchisee shall maintain and preserve full, complete and accurate books, records and accounts regarding the Franchisee's business.

4.9.2. Upon request by Franchisor, Franchisee shall, at its sole cost and expense, prepare and submit to Franchisor within 30 days after said request, a complete financial statement for the preceding 12-month period or any other calendar year, or a financial statement compiled and reviewed by a certified accountant or public accounting firm, together with such other information as Franchisor may reasonably require in order for Franchisor to determine that Franchisee is properly reporting and accounting for all Gross Revenue.

4.9.3. Franchisor reserves the right to inspect or examine the accounts, books, records and tax returns of Franchisee, at any reasonable time, so far as the same pertain to determination of Franchisee's Gross Revenue or the business of operating a Jani-King franchise. Franchisor shall also have the right, at any time, to have an independent audit made of the books or financial records of Franchisee. Any such inspection, examination or independent audit shall be performed at the cost or expense of Franchisor unless the same is necessitated by the failure of Franchisee to provide the reports requested or to preserve records as provided herein, or unless the inspection, examination or independent audit discloses that any statement or report made by Franchisee is in error to an extent of 5% or more, in which case Franchisee shall immediately pay to Franchisor the amount in error and shall reimburse Franchisor for any and all costs and expenses connected with the inspection or audit (including, without limitation, reasonable accounting and attorneys' fees). Franchisee is also required to keep accurate and up to date payroll records.

4.10. Franchisee agrees to be solely responsible for the services and results of services performed at locations where cleaning and maintenance services are performed by Franchisee, and to hold harmless and indemnify Franchisor from any and all claims arising from actions by Franchisee or its employees.

4.11. Franchisee agrees to maintain a clean and safe place of business in compliance with OSHA and other governmental and industry standards and to conduct its business in a manner that would bring goodwill and public approval to itself and Jani-King.

4.11.1. Franchisee is solely responsible for any leases of real or personal property in connection with the operation of its business, but agrees that Franchisor must approve office location, furniture and decor thereof to protect the image and reputation of Jani-King. Franchisee must at all times during the term of this Agreement maintain such office and all fixtures, furnishings, signs and equipment located thereon in good order and condition, and in a manner which will portray the goodwill and a positive image of the Jani-King name and reputation as such may be prescribed by Franchisor from time to time. Franchisee must, within a reasonable time specified by Franchisor, make all necessary additions, alterations, repairs and replacements to the office as required by Franchisor, but no others without Franchisor's prior written consent, including, but not limited to, periodic repainting or replacement of signs, furnishings, equipment or decor. No other business venture shall operate out of the premises utilized by Franchisee for its office without the prior written consent of Franchisor.

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/10

INT _____ INT _CS_
PAGE 10 OF 34

4.12.1. Franchisee agrees to be solely responsible for and indemnify and hold harmless Franchisor, Jani-King International, Inc., and their officers, directors, and employees for all loss or damage originating from, in connection with, or relating to the operation of Franchisee's business and for all claims or demands for damages to property or for injury or death of persons directly or indirectly resulting from or related to the operation of Franchisee's business.  Franchisee also agrees that before Franchisee will be authorized to begin operating its franchise, Franchisee is required to obtain and carry the insurance listed below with the limits listed, naming Franchisor, Jani-King International, Inc., and their officers and directors as Additional Insureds from an insurer carrying an A.M. Bests' Rating of A or better.  Franchisee shall provide Franchisor with proof of such required coverage.

| TYPE | LIMITS |
| --- | --- |
| Comprehensive General Liability | $1,000,000 (per occurrence) $ 2,000,000 (Aggregate) |
| Hired and Non-Owned Automobile Insurance | $1,000,000 (combined single limit) |
| Excess or Umbrella Insurance | $20,000,000 (Aggregate) |
| Workers' Compensation | Statutory Limits |

4.12.2. The various limits of the required insurance may be increased or have new types of coverage added as circumstances dictate.  Franchisee shall provide Franchisor with proof of the required insurance coverage and is required to notify their insurance carrier that the insurance carrier will provide any cancellation notice directly to Franchisor no less than 30 days prior to cancellation.

4.12.3.  If Franchisee fails to secure the above listed insurance to the satisfaction of Franchisor, Franchisor may, in addition to other remedies, purchase such insurance for the benefit of Franchisee and seek prompt reimbursement from Franchisee for all premiums and other costs incurred.  Franchisee shall be responsible for all premiums and other costs incurred by Franchisor up to and including the date Franchisor grants Franchisee written approval of Franchisee's insurance.  Franchisee agrees to indemnify and hold Franchisor harmless from any claims, loss or damage.

4.12.4.  As an alternative to the requirement of purchasing the above insurance, Franchisor may offer to Franchisee, and Franchisee may participate in Franchisor's Business Protection Plan ("BPP") to the extent offered.  Participation in the BPP is voluntary, and Franchisee is not obligated or required to participate.  If Franchisee does not participate in the BPP, Franchisee must provide Franchisor with a certificate of insurance showing that Franchisee has obtained the equivalent amount of insurance coverage with limits as shown above or as established in the Jani-King Policies and Procedures Manual.

4.12.5.  Participation in the BPP includes an initial membership in the Guardian Risk Purchasing Group ("GRPG"), a Texas non-profit corporation organized for the purpose of purchasing liability insurance on a group basis for persons or entities engaged in the janitorial industry.  Membership in the GRPG is restricted to individuals and entities who are engaged in the janitorial industry.  Members in the GRPG participate in GRPG's group insurance policies.  GRPG's group insurance policies are not individual insurance policies and the policy limits are shared between all GRPG members.  If Franchisee does participate in the BPP, Franchisee is not required to purchase the required liability insurance listed above.  Insurance provided by GRPG does not include coverage on any personal or business use automobile(s) or Franchisee's equipment, supplies, or building if Franchisee's building is different from Franchisor's.  Franchisee is required to purchase this insurance and supply proof of insurance to Franchisor before Franchisee will be authorized to begin operations of the franchise.  In the

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/10

INT _____ INT _LS_
PAGE 11 OF 34

event Franchisee does not purchase this insurance, Franchisor reserves the right to purchase the insurance for Franchisee and charge Franchisee for the cost of the insurance.

The BPP also includes risk management, claims management assistance, periodic safety training, and regulatory compliance assistance. For these services, you will be required to pay an administration fee which may include a profit to us. We will be solely responsible for administering the BPP.

4.12.6. Franchisee's membership in GRPG can be terminated if Franchisee: (1) fails to pay any amount owed for Franchisee's participation in the BPP, (2) if Franchisee fails to report all revenue generated by Franchisee's participation in the janitorial industry, (3) if Franchisee files a fraudulent insurance claim under any of the insurance coverage obtained by Franchisee from GRPG, (4) if Franchisee has excessive losses, or (5) if Franchisee does not participate in the janitorial industry for 12 consecutive months.

4.13.   In connection with its agreement to indemnify and hold harmless Franchisor, Jani-King International, Inc., their officers, directors, and employees (the "Jani-King Parties") for all loss or damage as set forth in Section 4.12.1 of this Agreement, Franchisee agrees to defend the Jani-King Parties and any of their subsidiaries named in any lawsuit based on such loss or damage and to pay all costs and reasonable attorneys' fees associated with such defense. If any of the Jani-King Parties wishes to retain their own counsel to defend any such action, Franchisee agrees to reimburse the Jani-King Parties for all reasonable costs and legal fees incurred by the Jani-King Parties for such defense. Said reimbursement shall be made to Franchisor in a timely manner as such fees are incurred by Franchisor and billed to Franchisee.

4.14.1   The Principals agree during the term of this Agreement not to engage in or have any financial interest in, either as an officer, agent, stockholder, employee, director, member, owner or partner, any other business which performs cleaning, cleaning management services, franchising or contracting cleaning management sales or any related business, except as otherwise approved in writing by Franchisor.

4.14.2   In the event this Agreement is sold, assigned, terminated or transferred, for any reason whatsoever, the Principals and their spouses agree not to engage in or have any financial interest in, either as an officer, agent, stockholder, employee, director, owner or partner, any other business which performs cleaning, cleaning management services, franchising or contract cleaning management sales or any related business: (a) within the Territory covered by this Agreement for a period of two years from the effective date of such sale, assignment, termination, or transfer; and (b) in any other territory covered by a Jani-King Franchise Agreement for a period of one  year from the effective date of such sale, assignment, termination or transfer. The Principals and their spouses , during the periods referred to in this subsection, further agree not to divert or attempt to divert from Jani-King or its Franchisees, by soliciting clients previously serviced by Franchisee or other Jani-King franchisees to perform any business in which Jani-King or its franchisees were engaged in at any time during the 12 months preceding such sale, assignment, termination or transfer.

4.15   Franchisee represents and warrants that Franchisee is either a corporation or limited liability company (as indicated on page 1 of this Agreement), duly incorporated or formed, validly existing and in good standing under the laws of its state of incorporation or formation (as indicated on page 1 of this Agreement). Franchisee has all the requisite power and authority to own and operate its properties and carry on its business as currently conducted and is duly licensed and qualified to transact business as a foreign entity in all jurisdictions in which the nature of the business conducted by it makes such qualification as a foreign entity necessary.

4.16.   Prior to beginning operation of the franchise and before the Initial Offering Period will begin, Franchisee must submit proof of registration with all taxing authorities to which Franchisee will be responsible for paying taxes, including submitting a Federal tax identification number and any state and municipal taxing

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/10

INT _____ INT CS.
PAGE 12 OF 34

identification numbers. Franchisee agrees to pay all personal property, sales, excise, use and other taxes, regardless of type or nature, which may be imposed, levied, assessed or charged, on, against or in connection with any services sold or furnished hereunder, whether from any state, municipality, county or parish, or other governmental unit or agency, which may have jurisdiction over such products, service and equipment. Franchisee must also pay all personnel performing services for Franchisee in full compliance with all Federal, state, local, and municipal laws, statutes, and regulations. Failure to pay taxes will result in termination of this Agreement.

4.17. Prior to beginning operation of the franchise and before the Initial Offering Period will begin, Franchisee must submit proof of a valid and active business checking account in Franchisee's name, such account being with a reputable banking institution. Franchisee agrees to timely pay all debts, obligations, and encumbrances that might arise as a result of its operation of a Jani-King franchise. Franchisee understands that in the event it be adjudicated bankrupt, or becomes insolvent, or a receiver (whether permanent or temporary) of Franchisee's property, or any part thereof, shall be appointed by a court of competent jurisdiction, or if Franchisee shall make a general assignment for the benefit of creditors, or if any judgment against Franchisee remains unsatisfied for 30 days or longer, or if Franchisee defaults on any payments or obligations due Franchisor or its suppliers or others arising out of the purchase of supplies or the purchase or lease of equipment for use in the operation of a Jani-King franchise, or if Franchisee infringes, abuses or misuses any of the Jani-King trademarks or trade names, or if the Franchisee fails to comply with any of the provisions of this Agreement except as to performance on customer accounts as set forth below, and has failed to take appropriate corrective action to the satisfaction of Franchisor within 30 days after written notice by Franchisor of such failure or default, then Franchisor may terminate this Agreement and all rights of Franchisee hereunder shall cease at the end of said 30-day period or such longer period as required by law.

4.18. Franchisee agrees to be solely responsible for the services, and results of such services, performed at locations where cleaning and/or maintenance services are performed by Franchisee and Franchisee's representatives. Franchisee agrees to provide all labor, materials, tools and supplies necessary to provide the service to such premises. Franchisee is responsible for choosing the times and methods of providing the services in conjunction with the instructions of the client and in accordance with the terms of the contract under which the services are provided. All of such services will be performed in a good and workmanlike manner, to the satisfaction of the customer for whom such services are performed and in accordance with the cleaning schedule or instructions associated with the contract between Franchisor and the client and to the performance standards of Jani-King. Franchisee understands and agrees that Franchisee is required to maintain a good relationship with each customer serviced by Franchisee, and that Franchisor may inspect any premises serviced by Franchisee at any time to ensure that the quality of service being rendered is in accordance with Jani-King standards.

The following procedures apply if any account we previously offered the right to you to provide services as part of the Initial Business requests a transfer to another franchisee or cancels the cleaning contract:

(1) If an account cancels or is transferred to a new franchisee due to non-performance, theft, failure by representatives of Franchisee to service the account to the approval of the client, failure by representatives of Franchisee to maintain good customer relations, or failure by representatives of Franchisee to comply with the Jani-King Policies and Procedures Manual, Franchisee will not be offered the right to service an additional account to replace the cancelled or transferred account.

(2) If an account cancels at no fault of the actions of Franchisee's representatives and before Franchisee has serviced the account for 12 full months, Franchisee will be offered the right to provide service to one or more accounts with cumulative gross monthly billings equal to at least the gross monthly billing of the cancelled account within a reasonable period of time at no additional cost to Franchisee. This provision applies until the cumulative time Franchisee has provided service to the original account and all replacement account(s) equals 12

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/10

INT _____ INT _LS_
PAGE 13 OF 34

months. If any replacement account or combination of accounts has a greater gross monthly billing than the cancelled account being replaced, the amount of gross monthly billing in excess of the cancelled account will be applied to the obligation of other Initial Business, or if the Initial Business obligation has been fulfilled, Finder's Fees will be charged. Franchisor is not otherwise obligated to replace the accounts that are serviced by Franchisee if the account(s) cancel before the full term of the account.

EXAMPLE: An account with a gross monthly billing of $1,000 cancels after seven months through no fault of Franchisee. Franchisor will replace the account with one or more accounts having cumulative gross monthly billing of at least $1,000 per month. If any of the replacement accounts also happen to cancel at no fault of yours at any time during the next five months you service the account(s), we will replace the replacement account(s) with other account(s). If the cumulative gross monthly billings of the replacement accounts exceed $1,000, the gross monthly billing in excess of $1,000 would apply against other Initial Business obligation or Finder's Fees will be charged.

    4.18.1. Each of Franchisee's representatives must be in an approved, neat and clean uniform at any time they are performing services at a client's facility. A personal identifying name tag shall be considered a part of the uniform and is required for all personnel while on the premises of an account.

    4.18.2. Failure of the Franchisee to comply with any provisions of this Agreement or the Jani-King Policies and Procedures Manual within 72 hours after Franchisor has given notice to the Franchisee of non-compliance will be sufficient cause for Franchisor to suspend the authority of Franchisee to perform services for any or all accounts serviced by Franchisee, until such time as Franchisor is satisfied that Franchisee has complied with the provisions, or, at the option of Franchisor, to transfer the right to provide service to the account to another Franchisee, without notice or delay.

    4.18.3. A representative of Franchisor will perform quality control inspections of accounts serviced by Franchisee from time to time in order to insure that the service is performed in accordance with the cleaning schedule or instructions associated with the contract between Franchisor and the client and to the performance standards of Jani-King.

    4.18.4. Franchisee must cooperate fully with Franchisor's staff, and pay an hourly rate ("Service Fee"), plus expenses and travel time, on each occasion Franchisor dispatches its staff to an account in order to correct a deficiency in performance. The Service Fee charged is currently $50 per hour. This fee may be increased at the sole discretion of Jani-King who will provide notice to Franchisee before such fee increase. In order to promote full compliance with all Jani-King performance standards and policies, a Complaint Fee may also be charged to Franchisee as provided in Section 4.24.

    4.18.5. If at any time, whether through complaint or inspection, a deficiency in performance is discovered which requires action to meet the client's demand for a visit or performance of services at the client's premises in less than four hours, and Franchisor is not able to reach the Franchisee, or the Franchisee is not available for an immediate visit or performance of services, Franchisor can elect to dispatch its own staff to the account and correct all deficiencies in performance and Franchisee will be assessed the Service Fee, plus expenses, for Franchisor's representative's time and effort to satisfy the needs of the customer. Notwithstanding the above, Franchisor reserves the right to provide services to the client without contacting, or attempting to contact, Franchisee if Franchisor determines, in Franchisor's sole reasonable discretion that the client's premises has an emergency requiring immediate attention.

    4.18.6. In the event Franchisee fails to perform the cleaning services as required by this Section, pursuant to the spirit and intent of this Agreement, and such deficiency shall continue for five days cumulative within a 90-day period, Franchisor may suspend the authority of Franchisee to perform services for any or all accounts

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/10

INT ⟨⟩ INT _LS_
PAGE 14 OF 34

serviced by Franchisee, until such time as Franchisor is satisfied that Franchisee will comply with all performance standards and policies, or, at the option of Franchisor, to transfer the account. In the event Franchisee's right to perform services is suspended, any reinstatement of the right to perform services may not include the right to perform services to the same Jani-King accounts to which Franchisee provided services prior to suspension.

4.18.7.   Franchisor may also exercise the option to transfer Franchisee's right to provide service to an account immediately upon receiving a request for transfer or cancellation from the customer or if Franchisee provides any services to any customer and does not report and include such services in their Gross Revenue.

4.18.8.   Franchisee shall waive any and all payments for services which may become due and payable after Franchisor has exercised the option to transfer an account under any of the Sections 4.18.1 through 4.18.7, and shall not be entitled to any refund, rebate, or reduction of any fees previously paid or pledged in connection with that customer's contract.   If Franchisor does not exercise any option hereunder, either in part or in full, with regard to any deficiency or default, the election not to exercise any option shall not constitute a waiver of such rights with regard to any subsequent deficiency or default.

4.19.   At Franchisor's request, Franchisee will provide to Franchisor a list of all clients to which Franchisee is providing service and copies of the contracts under which service is being performed.   Franchisee is prohibited, without Franchisor's prior written approval, from disclosing to anyone other than Franchisee's employees the names of the clients or any list of clients to whom Franchisee is providing service.

4.19.1.   The Principals are prohibited from communicating, divulging, or using for the benefit of any other person, persons, partnership, association, corporation, or other entity, except for Franchisee's representatives with a need to know in order to operate the franchised business, during the term of this Agreement and following the expiration or termination of this Agreement, any Confidential Information, as defined herein, knowledge or know-how concerning the methods of operation of the franchised business which may be communicated to them or of which they may be apprised in connection with the operation of the franchise under the terms of this Agreement.   Any and all information, knowledge, know-how, techniques and any materials used in or related to the System which Franchisor provides to Franchisee in connection with this Agreement, whether or not expressly marked or labeled confidential, shall be deemed confidential for purposes of this Agreement. Neither Franchisee nor the Principals shall at any time, without Franchisor's prior written consent, copy, duplicate, record or otherwise make the same available to any unauthorized person.   The covenant in this Section shall survive the expiration, termination, or transfer of this Agreement, or any interest herein, and shall be perpetually binding upon the Principals.

4.20.1.   In the event Franchisee voluntarily wishes to discontinue providing service to an account, Franchisee must notify Franchisor, in writing.   If the account's monthly billing amount is less than $10,000, the written request must be made at least 10 days prior to the desired date of transfer.   If the account's monthly billing is $10,000 or more, the written request must be made at least 30 days prior to the desired date of transfer.   Upon Franchisor's receipt of Franchisee's request to discontinue providing service or in the event Franchisee fails to provide service to an account for a period of two days, for any reason, Franchisor reserves the right to service the account or to offer the right to provide service to another franchisee.   In either event, Franchisee agrees that any and all payments (regardless of when services were rendered) made after Franchisee no longer provided services to the account will be waived by Franchisee, and Franchisee shall not be entitled to any refund or rebate of any fees paid or pledged previously to Franchisor for such business.

4.20.2.   Franchisee may solicit potential clients to provide cleaning and maintenance services through their franchise, but (i) all contracts under which terms services are provided by any Jani-King franchisee are the sole property of Jani-King, (ii) all contracts for the provision of services by Franchisee must be drafted by Jani-King, and (iii) all contracts for the provision of services by Franchisee must name Jani-King as the sole party to

JANI-KING OF CALIFORNIA, INC.                                          INT _____ INT _____
FRANCHISE AGREEMENT: 5/10                                          PAGE 15 OF 34

the contract (other than the client). Jani-King reserves the right, at its sole discretion, to suspend or cancel service of any contract serviced by Franchisee in the event the contract becomes delinquent in payment for services.

4.21.   Upon termination or non-renewal of this Agreement for any reason, Franchisee shall immediately and permanently cease all use of the Proprietary Marks, Confidential Information, and all aspects of the System, and shall cease indicating verbally or in writing to clients and any other franchisee that it is a Jani-King franchisee or associated with Jani-King.  Franchisee shall immediately return to Jani-King all advertising matter, products, and writings that contain Jani-King's trade name, logo or copyright, as well as any Confidential Information.  All such lists, files, and the information contained therein shall remain the exclusive property of Franchisor.  Any access devices to client's premises which have been serviced by Franchisee, including keys, security passes, and codes shall be delivered by Franchisee to Franchisor at the time the Franchisee ceases providing service.  In the event Franchisee fails to deliver all access devices to Franchisor, Franchisee hereby agrees to pay all costs and expenses incurred by Franchisor resulting from Franchisees failure to return these items.

4.22.   If this Agreement is terminated or not renewed for any reason, Franchisee must surrender to Franchisor all property belonging to Franchisor including, but not limited to, keys to all clients' buildings and all contracts between Franchisor and Client.  Franchisee agrees that the above-named items are the property of Franchisor. Franchisee must also pay, in full, all amounts owed to Franchisor at the date of termination or non-renewal and surrender any and all equipment belonging to Jani-King.   If Franchisee has proclaimed to have terminated or not renewed the Agreement and refused to surrender the items described herein, Franchisee agrees to pay Franchisor $500.00 per day for each day that it has not complied with the foregoing paragraph. The parties acknowledge that damages for Franchisee's failure to adhere to the foregoing paragraph are difficult to ascertain and therefore agree that this amount shall be payable as liquidated damages and not as a penalty.

4.23.   In order to promote full compliance with all Jani-King performance standards and policies, a $50.00 complaint fee ("Complaint Fee") will be charged to Franchisee in the event Franchisee does not respond to and provide service to a customer complaint within the time frames allotted for initial response or corrective action and which require Franchisor's representatives to respond to the complaint.  "Serviced" or "respond to" the complaint in this case means communicating with the client to determine the nature of the complaint and what needs to be done to resolve the situation, and to provide the customer relations necessary to try to protect the account from cancellation or damages to Jani-King's goodwill and does not mean providing cleaning or maintenance services to the customer to resolve a complaint.  An additional Service Fee, as stated in Section 4.18.4 above, will be assessed, plus expenses (i.e., labor, materials, supplies, equipment, etc.), for all Franchisor's representatives' time required to resolve a complaint.   A Complaint Fee will be charged under the following circumstances:

If at any time, whether through client complaint or quality control inspection, a deficiency in performance is discovered concerning the services provided by Franchisee and Franchisor is unable to contact Franchisee during the four-hour period immediately following the discovery of the deficiency (attempting a contact a minimum of once each hour) to notify Franchisee of the complaint to Franchisee.

The Complaint Fee, plus the Service Fee and expenses, will be charged under either of the following conditions:

(a)   Franchisor is unable to contact Franchisee during the above described four-hour period and Franchisor must respond to the complaint; or,

(b)   if Franchisee was notified of the complaint; and, after two hours following the opening of the client's business the following day, the deficiency in performance has not been corrected to the satisfaction of the client resulting in Franchisor responding to the complaint.

JANI-KING OF CALIFORNIA, INC.                                    INT _____  INT _____
FRANCHISE AGREEMENT:  5/10                                    PAGE 16 OF 34

4.24.1.  The $50.00 Complaint Fee, plus the Service Fee and expenses, will be charged to the Franchisee responsible for the complaint even if the account must be transferred to save the account or if the account terminates for non-performance.  The fees will be payable in the month they are incurred.

4.25.  Franchisor reserves the right to establish company policies and/or procedures pertaining to the operation of Franchisee's franchised business or this Agreement.  Franchisee agrees to be bound by the policies and/or procedures upon receipt of same by Franchisee.  Franchisor shall keep a current, updated manual of all such policies and procedures at Franchisor's corporate office.  In the event that policies and procedures kept by Franchisor differ from those kept by Franchisee, the policies and procedures maintained in Franchisor's corporate office shall be controlling.

4.26.  Franchisee acknowledges that the System must continue to evolve in order to reflect the changing market and to meet new and changing customer demands, and that accordingly, variations and additions to the System may be required from time to time in order to preserve and enhance the public image of the System and to ensure the continuing operational efficiency of franchisees operating within the System.  Accordingly, Franchisee agrees that Franchisor may, from time to time, hereafter or otherwise change the System, including, without limitation, the adoption and use of new or modified Proprietary Marks, Confidential Information, Products, Services, equipment and furnishings and new techniques and methodologies relating to the preparation, sale, promotion and marketing of service and supplies; and Franchisee agrees to be bound by these changes.

Franchisee agrees to promptly accept, implement, use, and display in the operation of the business all such additions, modifications and changes at its sole cost and expense.

4.27.  Franchisee agrees that if it or any of its employees develop any new concept, process or improvement in the System or the Confidential Information, it will promptly notify Franchisor and provide Franchisor with all necessary information concerning same, without compensation.  Franchisee acknowledges that any such concept, process or improvement shall become the property of Franchisor, and Franchisor may utilize or disclose such information to other franchisees as it determines to be appropriate.

4.28.  Franchisee agrees to maintain a valid and operational email address at which Franchisee may receive communications from Franchisor.  Franchisee agrees to update Franchisor as to any changes to such email address.

## SECTION 5

## NONCOMPETITION

5.1.  Franchisor agrees to provide Franchisee with valuable initial and ongoing specialized training, the Confidential Information, and the Proprietary Marks.  The initial specialized training provides training in Jani-King methods and practices of professional cleaning services, management, sales and promotional techniques, and includes information about production procedures and rates, marketing, and management matters.  The ongoing specialized training includes updated information of the type provided in the initial training, as well as additional training and information compiled and developed over time as the System evolves.  Franchisee acknowledges that, whether or not the initial and ongoing specialized training or Confidential Information is denoted, labeled or marked as confidential, Franchisor considers such training and Confidential Information to be, and treats it as, confidential.

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/10

INT _____ INT _LS_
PAGE 17 OF 34

5.2.    In consideration for the valuable initial and ongoing specialized training and Confidential Information described above, Franchisee and all of the Principals agree as follows:

5.2.1. Franchisee, the Principals, and Franchisee's employees shall not at any time, either during the term of this Agreement or after the termination of this Agreement, communicate or disclose to any person or entity (other than Franchisor or a person or entity expressly designated by Franchisor in writing), or use outside the scope of the business governed by this Agreement, any of the initial or ongoing specialized training or Confidential Information acquired by Franchisee, the Principals, or Franchisee's employees.

5.2.2   Franchisee and the Principals agree to use all reasonable efforts to maintain as confidential the initial and ongoing specialized training and Confidential Information. Accordingly, Franchisee and the Principals agree that each of Franchisee, the Principals, and Franchisee's employees shall not duplicate, copy, record, or otherwise reproduce, in whole or in part, materials containing Confidential Information and/or information imparted through initial and/or ongoing specialized training, except as expressly authorized in writing by Franchisor.

5.2.3. Franchisee and the Principals agree that, during the term of this Agreement and for a continuous uninterrupted period of two years thereafter (unless otherwise specified in this Section 5) commencing upon expiration or termination of this Agreement, regardless of the cause for termination, except as otherwise approved in writing by Franchisor, Franchisee the Principals and Franchisee's employees shall not, directly or indirectly, for itself/themselves or through, on behalf of, or in conjunction with any person, persons, partnership, corporation, or other business entity:

(a)   Divert or attempt to divert to any competitor, by direct or indirect inducement or otherwise, any business or customer of the business franchised hereunder or any Jani-King franchisee;

(b)   Do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with Franchisor's trademarks or trade names or the Jani-King franchise program;

(c)   Employ, seek to employ, or otherwise directly or indirectly induce to leave his/her employment any person who is employed by or has been employed within the previous 12 months by Franchisor or by any of Franchisor's affiliated companies or by any other franchisee of Franchisor;

(d)   Own, maintain, operate, engage in or have any interest in any business (hereinafter referred to as "Competing Business") which is the same as or similar to the business franchised under the terms of this Agreement, which Competing Business operates, solicits business, or is intended to operate or solicit business: (i) within the Territory of this Agreement; and (ii) for a period of one year commencing upon expiration or termination of this Agreement (regardless of the cause for termination), in any other territory in which a Jani-King franchise operates.

5.3.   The Parties agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement. If all or any portion of a covenant in this section is held unreasonable or unenforceable by a court or agency having valid jurisdiction in any final decision which is not appealed to which Franchisor is a party, Franchisee and the Principals expressly agree that Franchisee and the Principals and Franchisee's employees will be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this section.

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/10

INT _____ INT _LS_
PAGE 18 OF 34

5.4  Franchisee understands and acknowledges that Franchisor shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this section, or any portion thereof, without its consent, effective immediately upon written notice to Franchisee; and Franchisee agrees that it shall comply forthwith with any covenant as so modified, which modified covenant shall be fully enforceable notwithstanding the provisions of any other Sections hereof.

5.5.  Franchisee acknowledges that any materials and information provided to Franchisee, the Principals, or Franchisee's employees by Franchisor will at all times be and remain the property of Franchisor.  Franchisee also acknowledges that any materials, concept, process, or improvement developed in the operation or promotion of the business governed by this Agreement by Franchisee, the Principals, or Franchisee's employees  will at all times be and remain the property of Franchisor.  Franchisee agrees to give Franchisor notice of and all necessary information related to such development(s).  Upon sale, assignment, termination, expiration, or transfer of this Agreement, Franchisee shall deliver to Franchisor all property belonging to Franchisor (including, but not limited to, the materials described above) and/or relating to Franchisor's business.  In addition, upon sale, assignment, termination, expiration, or transfer to this Agreement, Franchisee agrees to provide Franchisor, upon Franchisor's request, with a list of all customers that Franchisee is servicing or has serviced on or at any time during the 12 months preceding the date of such sale, assignment, termination, expiration, or transfer, and a copy of any contracts under which the service is or was provided.

5.6.  Franchisee expressly agrees that the existence of any claims that Franchisee, the Principals, or Franchisee's employees may have against Franchisor, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by Franchisor of the covenants in this Section.  Franchisee agrees to pay all costs and expenses (including reasonable attorneys' fees and all costs of court) incurred by Franchisor in connection with the enforcement of this section of this Agreement.

5.7.   Franchisee acknowledges that a violation of any of the terms of this Section would result in irreparable injury to Franchisor for which no adequate remedy at law may be available. Franchisee acknowledges that the initial and ongoing specialized training and Confidential Information described herein have been developed and compiled through Jani-King's time and effort in the industry and provide a blueprint for Jani-King's business.  Accordingly, Franchisee acknowledges that, in addition to Franchisor's remedies at law, Franchisor may seek and obtain preliminary and permanent injunctive relief restraining the breach or threatened breach by Franchisee; and Franchisee consents to the issuance of an injunction prohibiting any conduct by Franchisee in violation of this Section.

5.8.  Franchisee shall require and obtain execution of covenants similar to those set forth in this Section (including covenants applicable upon and after the termination of a person's relationship with Franchisee) from any or all Principals and employees of Franchisee who have received or will receive initial and/or ongoing specialized training or Confidential Information directly or indirectly from Franchisor.  Every covenant required by this paragraph shall be in a form satisfactory to Franchisor, including, without limitation, specific and express identification of Franchisor as a third party beneficiary of such covenants with the independent right to enforce them.  Failure by Franchisee to obtain execution of a covenant required herein shall constitute a material event of default under the terms of this Agreement.

## SECTION 6

## FRANCHISOR PLEDGES

6.1.1.  To offer Franchisee the opportunity to provide service to Franchisor's contracts located within the Territory, as defined herein, which have minimum cumulative gross monthly billings in an amount at least equal

JANI-KING OF CALIFORNIA, INC.                          INT _____ INT _LS_
FRANCHISE AGREEMENT: 5/10                              PAGE 19 OF 34

to the amount defined as the "Initial Business" in the Franchise Summary. The contracts under which Franchisee will provide service are and will remain the property of Franchisor. The right to provide service to the Initial Business will be offered within the number of days identified in the Franchise Summary as the "Initial Offering Period." The Initial Offering Period will begin on the date after:

(i)   all required equipment and supplies (including a PDA or smart phone) have been obtained by Franchisee,

(ii)   Franchisee has successfully completed training as indicated by Franchisee's signing and returning to Franchisor the Acknowledgment of Completion of Training,

(iii)   Franchisee's delivery to Franchisor of written proof that Franchisee has obtained the insurance required under this Agreement,

(iv)   Franchisee's delivery of Articles of Incorporation or Formation and a certificate of good standing from the jurisdiction in which Franchisee was formed,

(v)   Franchisee's delivery of a properly completed Internal Revenue Service Form W-9 Request for Taxpayer Identification Number certifying the Taxpayer Identification Number (Employer Identification Number) assigned by the Internal Revenue Service that will be used for operation of Franchisee's business,

(vi)   Franchisee's delivery of proof of Franchisee's registration with all state and local tax authorities to which Franchisee will be responsible for paying taxes and any other governmental regulatory agencies that require registration of the Franchisee's business activities or business activities in general, including any identification numbers assigned to Franchisee's business by such tax authorities and governmental agencies within the Territory; and

(vii)   Franchisee's delivery of proof of a valid and active business checking account held by Franchisee.

Notwithstanding items (i) through (vii) above, the Initial Offering Period may begin at a later date if requested by Franchisee and agreed to by Franchisor, or as provided below. As a condition to Franchisee being eligible to provide service to certain Jani-King clients, Franchisee and Franchisee's employees may be required to undergo background checks.

6.1.2.   The actual time to secure and offer, as described above, the Initial Business to the Franchisee may, at Franchisor's sole discretion, be automatically extended under the following conditions: (1) if Franchisee requests a delay in the offering of the Initial Business; (2) if Franchisee is in default under the terms and conditions of the Franchise Agreement or any other agreements between Franchisee and Franchisor; or (3) if any of the Initial Business previously provided to Franchisee requests a transfer to another Franchisee or requests to be cancelled due to non-performance in which case Franchisee is required to repeat and complete to Franchisor's satisfaction all training classes required by Franchisor. In the event of the occurrence of any of the above conditions, Franchisor will have the remainder of the Initial Offering Period or a minimum of 120 days, whichever is longer, from the date: (1) Franchisee notifies Franchisor that they are ready to accept the right to service other business and has provided any documentation required under this Agreement or under the Jani-King Policies and Procedures Manual; (2) Franchisee has cured any default; or (3) the acknowledgment of retraining is signed, to offer the balance of Initial Business to Franchisee. Franchisor does not guaranty that the Initial Business will reach or remain at the level stated on the Franchise Summary throughout the term of the Franchise Agreement.

6.2.   To provide Franchisee with the Office Supply and Advertising Package outlined in Schedule One of this Agreement.

6.3.   To make available to Franchisee applicable confidential manuals, training aids, and other pertinent information concerning Jani-King methods and practices.

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/10

INT _____ RNT LS
PAGE 20 OF 34

6.4.  To provide an initial training program to include Jani-King cleaning methods, systems and programs using established Jani-King procedures and forms.  Franchisee agrees to successfully complete the training within six months after the date of this Agreement.

6.5.  To offer Franchisee the right to provide service to Jani-King clients until Franchisee has been offered the right to provide service to Jani-King clients with cumulative gross monthly billings in an amount equal to or greater than the Initial Business.

6.6.  To provide additional training and support for Franchisee at reasonable rates as established by Jani-King policies and procedures, currently at a rate of $50.00 per hour, plus expenses.

6.7.  To allow Franchisee the non-exclusive right to use the Jani-King marks, insignia, logo, design and color scheme in the Territory subject to limitations and restrictions herein, and to allow Franchisee to utilize the processes, methods, materials, equipment and promotional plans developed by Jani-King.

6.8.  To make available for loan to and use by Franchisee, at Franchisor's discretion and at a reasonable cost, promotional materials, sales and service manuals, equipment and other materials relevant to the operation of a Jani-King franchise.

## SECTION 7

## ADDITIONAL SERVICES

7.1. There are no additional services provided by Franchisor to Franchisee except as explicitly set out in this Agreement.

## SECTION 8

## DEFAULT AND TERMINATION

8.1.  Franchisee shall be deemed to be in default, and Franchisor may, at its option, terminate this Agreement and all rights granted hereunder, without affording Franchisee any opportunity to cure the default, effective immediately upon the provision of notice to Franchisee, either by mailing or hand delivery, upon the occurrence of any of the following events:

(a)  If any of the Principals is convicted of, pleads guilty or no contest to, pleas down to a lesser crime, or receives deferred adjudication for a felony, a crime involving theft, a crime involving moral turpitude, or any other crime or offense that is reasonably likely, in the sole opinion of Franchisor, to adversely affect the Jani-King franchise program, any Jani-King trademarks, trade names or the goodwill associated therewith, or Franchisor's interest therein.

(b)  If Franchisee or any of the Principals discloses or divulges the contents of any Confidential Information, or any other trade secrets or confidential information provided to Franchisee by Franchisor in violation of the terms and conditions of this Agreement.

(c)  If Franchisee abandons the Jani-King franchise business or otherwise forfeits the right to do or transact business in the Territory where the licensed business is located.

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/10

INT _____ INT _LS_
PAGE 21 OF 34

(d)   If Franchisee or any of the Principals purport to transfer any rights or obligations under this Agreement to any third party without the Franchisor's prior written consent.

(e)   If Franchisee or any of the Principals makes any material misrepresentations or untrue or false statements on the franchise application or in other correspondence relating to the acquisition of the franchise business.

(f)   If the Franchisee fails three or more times within a 12-month period to comply with one or more requirements of the Agreement, any operations procedure, or the Jani-King Policies and Procedures Manual, whether or not corrected after notice;

(g)   If Franchisee fails to comply with any provision of this Agreement, any other agreement between Franchisor and Franchisee, and thereafter fails to cure such default to the satisfaction of the Franchisor within 30 days after written notice has been given thereof.  Defaults by the Franchisee shall include, without limitation, the occurrence of any of the following events:

(i)   If Franchisee fails, refuses, or neglects promptly to pay any monies owing to Franchisor or its subsidiaries or affiliates when due, or to submit the financial information required by Franchisor under this Agreement, or makes any false statements in connection therewith.

(ii)   If Franchisee fails to maintain the standards that Franchisor requires in this Agreement or any other standards contained in Jani-King manuals, including the Jani-King Policies and Procedures Manual.

(iii)   If Franchisee engages in conduct which reflects unfavorably upon the operation or reputation of the Jani-King franchise business or System.

(iv)   If Franchisee fails, refuses, or neglects to obtain the Franchisor's prior written approval or consent as required by this Agreement, other than as provided in Section 8.1(d).

(v)   If Franchisee or any of the Principals misuses or makes any unauthorized use of the Jani-King proprietary trademarks, trade names, service marks or other materials, including any forms of advertising, or otherwise materially impairs the goodwill associated with the Jani-King name or Franchisor's rights.

(vi)   If Franchisee is declared insolvent or bankrupt, or makes any assignment or trust mortgage for the benefit of creditors, or if a receiver, guardian, conservator, trustee in bankruptcy or similar officer shall be appointed to take charge of all or a part of Franchisee's property by a court of competent jurisdiction.  This provision may not be enforceable under federal bankruptcy law (11 U.S.C.A.; Sec. 101 et seq.)

(vii)   If Franchisee fails, refuses, or neglects to comply with the requirements set forth in Section 4.9.2.

(viii)   If Franchisee ceases to be duly organized, validly existing, and in good standing under the laws of the state of Franchisee's formation or incorporation or to be duly licensed and qualified to transact business as a foreign entity in all jurisdictions in which the nature of the business conducted by it makes such qualification as a foreign entity necessary.

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/10

INT _____ INT _LS_
PAGE 22 OF 34

8.2.  The termination of this Agreement shall be without prejudice to any remedy or cause of action which Jani-King may have against Franchisee for the recovery of any monies due Jani-King or any equipment or property of Jani-King, or to any other right of Jani-King to recover damages for any breach hereof.

8.3.  If the provisions of this Agreement provide for periods of notice less than those required by applicable state law, or provide for termination, cancellation, non-renewal or the like other than in accordance with applicable state law, Section 12.2.2. of this Franchise Agreement shall apply.

## SECTION 9

## TERM AND EXTENSION

9.1.  Subject to Section 9.2 herein, this Agreement and the franchise and license granted hereunder, unless sooner terminated, shall be and remain in full force and effect for a period of 20 years from and after the Effective Date of this Agreement which is the date identified in the Franchise Summary.  This Agreement shall expire 20 years after the Effective Date unless extended pursuant to the terms contained herein.

9.2.  Provided Franchisee is not in default of this Agreement and provided Franchisee has delivered to Franchisor the required notice, Franchisee shall have the option to renew this Agreement for an additional period of 20 years and for three subsequent, additional 20-year periods following the first extension (a total of 100 years when initial periods and renewal terms are combined).  Prior to the expiration of each 20-year term, Franchisee must notify Franchisor, in writing, of its intention to renew the Agreement not less than seven months nor more than 12 months prior to the end of the then current term.

9.3.  As a condition to and at the time of any renewal, Franchisee is required to execute a general release, in a form prescribed by Franchisor, of any and all claims against Franchisor and its subsidiaries, and their respective officers, directors, agents and employees in their corporate and individual capacities, including without limitation, claims arising under this Agreement and any federal, state and local laws, rules and ordinances.

9.4.  As a further condition to and at the time of any renewal, Franchisee agrees to execute Franchisor's most recent standard franchise agreement being used by Franchisor which may differ substantially from the agreement under which the Franchisee has operated and any other ancillary agreements and documents as Franchisor may require.  Franchisee understands that the most current, executed agreement between Franchisee and Franchisor will govern relations between Franchisor and Franchisee for the following 20 years. However, no additional Initial Franchise Fee or renewal fee shall be paid by Franchisee at the time of renewal, nor shall Franchisor be obligated to provide any additional Initial Business or training.

## SECTION 10

## TRANSFER

10.1.  This Agreement shall inure to the benefit of the successors and assigns of Franchisee.  The interests of Franchisee in this Agreement are personal and may not be sold, assigned, transferred, shared or divided in any manner, by operation of law or otherwise (each, a "Transfer"), by Franchisee without the written consent of Franchisor, which consent shall not be unreasonably withheld.  Franchisee shall provide to Franchisor prior to the Transfer, a copy of any written agreements relating to the proposed Transfer, or any additional information which Franchisor may require in order to determine if it will grant its consent to the proposed Transfer.  For purposes of this Agreement, any change in stock ownership, voting or other control whatsoever of a corporation or other

JANI-KING OF CALIFORNIA, INC.                          INT _____ INT _LS_
FRANCHISE AGREEMENT: 5/10                          PAGE 23 OF 34

entity which acts as a Franchisee under this Agreement constitutes a Transfer.  For all purposes herein, a beneficiary of a trust which owns a beneficial interest in a Franchisee which is an entity shall be deemed to have an interest in the Franchise Agreement. Provided further, for all purposes herein, in the event that a trust owns a beneficial interest in Franchisee which is an entity, any change in the beneficial interest of a beneficiary shall constitute a Transfer. Any transaction or series of transactions which would have such an effect must be approved by Franchisor on the same basis as any other Transfer as set forth herein. Franchisee hereby covenants and warrants (i) that its certificate or articles of incorporation or formation, corporate charter, by-laws, LLC agreement, and/or company agreement limit Transfers as described in this Section 10, and (ii) if Franchisee is a corporation, that each security shall bear a legend (in a form to which Franchisor consents) indicating that any Transfer is subject to this Section 10.

10.2.  Franchisee agrees to pay to Franchisor the greater of $2,000.00 or 10% of the sales price or exchanged value as a transfer fee (the "Transfer Fee").  This Transfer Fee must be paid before Franchisor will grant consent to the Transfer. If no monetary consideration or other exchange of value is made for the Transfer of a franchise, no Transfer Fee will be charged for a transfer to: (1) any party currently holding an interest in the franchise at the time of the Transfer; (2) a controlled corporation in which the current owners of the franchise retain 90% percent or greater of the outstanding shares of stock; or (3) if the Transfer is to an immediate family member of the current owner (for the purposes of this Section 10.2, family members include Franchisee's mother, father, brother, sister, and children only), whether a life time Transfer or upon death. An administrative fee will be charged to cover necessary and reasonable costs and preparation of the documents associated with the Transfer if no Transfer Fee is assessed. The current administrative fee is $250.00, but may be increased by Franchisor in the future.

10.3.  Prior to the Transfer of the franchise, Franchisee will provide to Franchisor a copy of any written agreements relating to the proposed Transfer or any additional information which Franchisor may require in order to determine if it will grant consent to the proposed Transfer. It is agreed that consent for Transfer will be granted only when: (a) all obligations under the terms of this Agreement have been fulfilled, (b) all money owed by Franchisee to Franchisor and Franchisor's affiliates have been paid in full, (c) the purchaser of the franchise agrees to undergo and successfully completes the training required of a new Jani-King franchisee and (d) the purchaser of the franchise executes Franchisor's most current franchise agreement which may differ substantially from this Agreement. Franchisee agrees to continue providing service to all of the Franchisor's contracts to which Franchisee is providing service at the time of the proposed Transfer, until items (a) through (d) above are complete and such Transfer is consummated.

10.4.  Franchisee also agrees to provide, as a condition of Franchisor's consent to the Transfer, a personal covenant to the purchaser not to compete in the cleaning and/or maintenance services industry, nor to seek to divert business from Franchisor or its franchisees for a period of two years after the Transfer. This covenant is in addition to the non-compete covenants contained in this Agreement. The transferor must also execute a general release, in a form satisfactory to Franchisor, of any and all claims against Franchisor, Franchisor's parent corporation and affiliated corporations, and the officers, directors, shareholders and employees of Franchisor and each parent and affiliate corporation in their corporate and individual capacities including, without limitation, claims arising under this Agreement and federal, state and local laws, rules and ordinances.

10.5.  This Agreement is fully assignable by Franchisor and shall inure to the benefit of any assignee or other legal successor to the interest of Franchisor.

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/10

INT _____ INT _LS_
PAGE 24 OF 34

# SECTION 11

## RIGHT OF FIRST REFUSAL

11.1.  In the event Franchisee receives a bona fide arms-length offer to purchase Franchisee's interest in this Agreement (or in the business conducted hereunder) from any third party, or in the event Franchisee proposes to convert, assign, or otherwise transfer Franchisee's interest in this Agreement (or in the business conducted hereunder), in whole or in part, to any third party, Franchisee hereby agrees to offer to Franchisor a first right to purchase or otherwise receive Franchisee's interest under the same terms and conditions offered to or accepted from the third party (the "Right of First Refusal").  Franchisee's failure to offer to Franchisor the Right of First Refusal will be an act of default of the terms of this Agreement.  Notwithstanding anything contained herein to the contrary, Franchisee shall not be obligated to offer Franchisor the Right of First Refusal Transfer is solely between Franchisee and either (a) a corporation whose original sole shareholders are individuals who comprise the original Franchisee and/or (b) the immediate family of Franchisee or the immediate family of the individuals described in (a) herein.  For the purpose of this section, immediate family shall mean the spouse, children, siblings, or parents of Franchisee only.

11.2. Franchisee shall make available to Franchisor in a written statement verified by Franchisee the terms of the offer received or made by Franchisee, and Franchisor shall have 30 days from the receipt of said statement to either accept or refuse such offer.  Written notice of Franchisor's decision to accept or refuse said offer shall be delivered to Franchisee.  Acceptance by Franchisor shall be at the same price and on the same terms set forth in the written statement submitted by Franchisee.

11.3.  In the event Franchisor fails to accept the offer within the 30-day period, Franchisee shall be free to effect the disposition described in the statement upon the exact terms set forth in the statement delivered to Franchisor, provided that nothing in this paragraph shall be interpreted as limiting the requirements of Section 10 hereof relating to Transfer of the Agreement.

11.4.  Furthermore, in the event Franchisee is insolvent, or upon the filing of any petition by or against Franchisee under any provisions of any bankruptcy law, Franchisor shall have the first right to purchase the business conducted by Franchisee, for an amount and pursuant to terms established by an independent appraiser selected by Franchisor.

# SECTION 12

## GENERAL

12.1.  Nothing in this Agreement shall be construed to prevent Franchisee from freely setting its own prices and discounts for services and products which it may render or sell provided such actions do not affect the business of Franchisor.

12.2.1.  Should any part of this Agreement for any reason be declared invalid or unenforceable, such decision shall not affect the validity of the remaining portion, which remaining portion shall remain in full force and effect as if this Agreement had been executed with the invalid or unenforceable portion eliminated, and the parties to this Agreement agree that they would have executed the remaining portion of this Agreement without including any such part, parts, or portion which may, for any reason, hereafter be declared invalid or unenforceable.

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/10

INT _____ INT _LS_
PAGE 25 OF 34

12.2.2.  If any applicable and binding law or rule of any jurisdiction requires a greater prior notice of the termination of or refusal to renew this Agreement than is required hereunder, or the taking of some other action not required hereunder, or if under any applicable and binding law or rule of any jurisdiction, any provision of the Agreement or any specification, standard or operating procedure prescribed by Franchisor is invalid or unenforceable, the prior notice and/or other action required by such law or rule shall be substituted for the comparable provisions hereof, and Franchisor shall have the right, in its sole discretion, to modify such invalid or unenforceable provision, specification, standard or operating procedure to the extent required to be valid and enforceable.  Franchisee agrees to be bound by any promise or covenant imposing the maximum duty permitted by law which is comprehended within the terms of any provision hereof, as though it were separately articulated in and made a part of this Agreement, that may result from striking from any of the provisions hereof, or any specification, standard or operating procedure prescribed by Franchisor, any portion or portions which a court may hold to be unenforceable in a final decision to which Franchisor is a party, or from reducing the scope of any promise or covenant to the extent required to comply with such a court order.  Such modifications to this Agreement shall be effective only in such jurisdiction, unless Franchisor elects to give them greater applicability, and shall be enforced as originally made and entered into in all the jurisdictions.

12.3.  This Agreement and the Attachments and Exhibits hereto constitute the entire Agreement between us and you concerning the subject matter hereof and supersede all prior agreements, negotiations, representations, and correspondence concerning the same subject matter; provided, however, that nothing in this Agreement or any related agreement is intended to disclaim the representations we made in the Franchise Disclosure Document that we furnished to you. All transactions between Franchisee and Franchisor regarding any operation of a Jani-King franchise business granted under any franchise agreement dated prior to this Agreement shall be controlled by this Agreement and the most current publication of the Jani-King Policies and Procedures Manual.  Any amendment or modification to this Agreement is invalid unless made in writing and signed by all the parties.

12.4.  Franchisee acknowledges that neither Franchisor nor anyone on its behalf has made any representations, promises or agreements, orally or otherwise, respecting the subject matter of this Agreement which is not embodied herein.

12.4.1.  Franchisee acknowledges that it has carefully read this Agreement, that ample opportunity has been provided for Franchisee to obtain the services of an independent legal or financial advisor, and that Franchisee has had the opportunity to have this Agreement and all supporting disclosure documentation, as well as any other information gathered by the Franchisee, reviewed by an attorney or financial advisor of its own choice.

12.4.2.  Franchisee further acknowledges that Franchisor does not authorize any representative of Franchisor to make any oral, written, visual or other claim or representation that are not contained in the Franchise Disclosure Document provided to Franchisee by Franchisor and does not permit any promises, agreements, contracts, commitments or representations to be made to Franchisee except those stated in this Agreement.

12.5.  Franchisor may also conduct the type of business operated by the Franchisee.

12.6. Franchisee acknowledges that the franchised business and all documents and information Franchisee receives from Franchisor relating to the operation of the franchise, including the manuals and communication tools and the training will be presented to Franchisee in the English language.  Franchisee acknowledges that Franchisee is required to have a representative who is fluent in the English language present during any training provided by Jani-King and available for any translating necessary during the operation of my franchise.

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/10

INT _____ INT LS
PAGE 26 OF 34

12.7.  It is agreed and understood that Franchisee will act at all times as an independent contractor and will not, at any time, directly or indirectly, hold itself out as an agent, servant or employee of Franchisor.

12.8.  No waiver by Franchisor of any default in performance on the part of Franchisee, time being of the essence, or like waiver by Franchisor of any breach or series of breaches, of any of the terms, covenants and conditions of this Agreement shall constitute a waiver of any subsequent breach or waiver of said terms, conditions or covenants.

12.9.   Any notice required or permitted under this Agreement must be in writing and delivered by personal delivery service or by deposit in the U.S. mail, certified, return receipt requested or by a recognized express delivery service providing written receipt of delivery at the address listed for the Franchisee in the Franchise Summary or to Franchisor at the following address:

Jani-King of California, Inc.
6170 Cornerstone Court
Suite 330
San Diego, California 92121

A party to this Agreement may change its notice information by providing written notice to the other parties pursuant to the notice requirements stated above, and such change shall be effective as to each other party on the 10th day after delivery to such other party.

12.10.    THE PARTIES AGREE AND INTEND THIS INSTRUMENT TO BE EXECUTED, INTERPRETED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT REFERENCE TO CONFLICT OF LAWS PRINCIPLES.  TEXAS LAW SHALL APPLY TO ALL CLAIMS, DISPUTES, AND DISAGREEMENTS BETWEEN THE PARTIES, WHETHER ARISING FROM ALLEGED BREACHES OF THE CONTRACT OR AGREEMENT OR OTHER CLAIMS ARISING IN ANY WAY FROM THE PARTIES' DEALINGS.   JURISDICTION AND VENUE IS DECLARED TO BE EXCLUSIVELY IN DALLAS COUNTY, IN THE STATE OF TEXAS.

12.11.  The submission of this Agreement does not constitute an offer to license, and this Agreement shall become effective only upon execution thereof by Franchisor and Franchisee and the compliance with Section 12.13.

12.12.  THE PARTIES AGREE THAT ANY DAMAGES SOUGHT BY OR AWARDED TO FRANCHISEE SHALL BE LIMITED TO FRANCHISEE'S TOTAL INVESTMENT WITH FRANCHISOR, AND NO PUNITIVE OR EXEMPLARY DAMAGES WILL BE AWARDED TO FRANCHISEE.

12.13.  This Agreement shall not be binding on Franchisor unless and until it has been accepted and signed by an officer or director of Franchisor at Franchisor's home office in Addison, Dallas County, Texas.

12.14.  The numbers and headings of paragraphs used herein are for convenience only and do not affect the substance of the paragraphs themselves.

12.15.  Franchisee certifies and warrants that all owners and spouses of owners and all persons who are a shareholder, member, manager, officer or director of any corporation who holds the franchise: (1) are listed in the attached SCHEDULE OF PRINCIPALS; and  (2) that all such parties will execute all Guarantees or other documents required by Jani-King.

JANI-KING OF CALIFORNIA, INC.                        INT _____ LS
FRANCHISE AGREEMENT: 5/10                          PAGE 27 OF 34

IN WITNESS WHEREOF, the parties hereto have set their hands this 8      day of OCTOBER
2010          .

JANI-KING OF CALIFORNIA, INC.                    FRANCHISEE:

BY: _____                      _____
                                                 (Signature of Owner, Partner or Authorized
                                                 Officer)

TITLE: LAURENCE SHARPE / DIRECTOR OF FRANCHISE SALES     SOTERO ENRIQUEZ _____
                                                 (Print Name)
                                                 Social Security # ▓▓▓▓▓▓▓

                                                 Managing member _____
                                                 (Title of Authorized Officer)

                                                 Franchise Federal Tax ID#: ▓▓▓▓▓▓▓

ACCEPTED by the Home Office of Franchisor on this 15th day of October          , 2010

BY: _____
     Authorized Representative



JANI-KING OF CALIFORNIA, INC.                    INT _____ INT LS
FRANCHISE AGREEMENT: 5/10                         PAGE 28 OF 34

115

## SCHEDULE OF PRINCIPALS

ANY OTHER PERSON NOT LISTED IN THIS AGREEMENT WHO IS A SPOUSE, PARTNER, OR AN OFFICER, DIRECTOR, MANAGER, MEMBER OR SHAREHOLDER OF FRANCHISEE:

Name:      SOTERO ENRIQUEZ
Relationship:      MANAGING MEMBER
Taxpayer ID:      ▮▮▮▮▮
Address:      575 PADRONE PL
     CHULA VISTA, CA, 91910
Telephone:      ▮▮▮▮▮

Name:      YVONNE ENRIQUEZ
Relationship:      SPOUSE OF MANAGING MEMBER
Taxpayer ID:      ▮▮▮▮▮
Address:      575 PADRONE PL
     CHULA VISTA, CA, 91910
Telephone:      ▮▮▮▮▮

Name:
Relationship:
Taxpayer ID:
Address:

Telephone:

Name:
Relationship:
Taxpayer ID:
Address:

Telephone:

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/10

INT. ____ INT ⟋S
PAGE 29 OF 34

**SCHEDULE ONE**
**"OFFICE SUPPLY AND ADVERTISING PACKAGE"**

LIST OF MATERIALS PROVIDED TO FRANCHISEE
PURSUANT TO THE FRANCHISE AGREEMENT

| ITEM | AMOUNT |
|---|---|
| Business Cards (imprinted logo) | 1,000 |
| JANI-KING Logo/Border Paper (matching envelopes) | 100 |
| Color Tri-Fold | 50 |
| JANI-KING Tunics | 3 |
| JANI-KING Golf Shirt | 1 |
| JANI-KING Polo Shirts | 4 |
| Inspection Pads | 5 |
| Memo Pads | 5 |
| Past Performance Pads | 5 |
| Account Bid Sheet Pad | 1 pad |
| Contact Evaluation Pad (replace as needed) | 1 pad |
| Discover JANI-KING Media | 1 |
| JANI-KING Logo Binders | 2 |
| JANI-KING Executive Pad Holder | 1 |
| JANI-KING Tri-fold Pad Holder | 1 |
| JANI-KING Training Videos | 1 set |
| JANI-KING Customer Relations Handbook | 1 |
| Account Follow-up Sheets (replace as needed) | 5 |
| New Account Start-Up (replace as needed) | 5 |
| Initial Clean Sign-Off Sheets (replace as needed) | 5 |
| Franchisee Request Cards (replace as needed) | 5 |
| Authorization for Extra Work Forms (replace as needed) | 5 |
| JANI-KING Business Card Order Forms | As Needed |

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/10

INT _____ INT _LS_
PAGE 30 OF 34

## "SUPPLY AND EQUIPMENT PACKAGE"

### THE FOLLOWING SUPPLIES AND EQUIPMENT MUST BE PURCHASED BY EACH FRANCHISEE PURSUANT TO THE FRANCHISE AGREEMENT AND PRIOR TO FRANCHISOR OFFERING ANY OF THE INITIAL BUSINESS

The products listed may be purchased from Franchisor, subject to shipping restrictions, or any other source. Prices currently charged by Franchisor may be changed or modified in the future.

| ITEM | AMOUNT |
|------|--------|
| All Purpose Cleaner (Biodegradable for use on walls, formica, etc. | 1 – one gallon container (or equivalent) |
| Glass Cleaner | 1 – one gallon container (or equivalent) |
| Restroom Disinfectant | 1 – one gallon container (or equivalent) |
| Cream Cleanser | 2 – one quart containers (or equivalent) |
| Neutral Floor Cleaner | 1 – one gallon container (or equivalent) |
| Carpet Cleaning Concentrate (Bonnet Method) | 1 gallon |
| Carpet Spot Remover | 1 can (or equivalent) |
| Floor Finish Stripper | 1 gallon |
| High Gloss Floor Finish | 1 gallon |
| Stainless Steel Cleaner | 1 can |
| Dust Mop Treatment | 1 can |
| Small Trash Liners (10-12 gallon capacity) | 1 case |
| Large Trash Liners (40-45 gallon capacity) | 1 case |

| ITEM | AMOUNT |
|------|--------|
| Mop Bucket (26 quart minimum with wet floor caution inlayed) . | 2 |
| Mop Wringer; Down Press | 2 |
| Wet Mop Handle | 2 |
| Wet Mop Head (24 oz.) | 4 |
| Dust Mop Head (24 inch) | 1 |
| Dust Mop Frame (24 inch) | 1 |
| Swivel Dust Mop Handle | 1 |
| Metal-Tipped Handle for Doodle Bug | 1 |
| Doodle Bug Holder and Pads (3) | 1 |
| Plastic Angler Broom | 1 |
| Corner Brush | 1 |
| Toy Broom | 1 |
| Janitor Dust Pan | 1 |

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/10

INT _____ INT _LS_
PAGE 31 OF 34

## "SUPPLY AND EQUIPMENT PACKAGE" – Continued

| ITEM | AMOUNT |
|---|---|
| 17" Black Stripping Pad | 5 |
| 17" Red Buffing Pad | 5 |
| 17" Bonnet Pad | 1 |
| Window Squeegee Handle | 1 |
| 14" Window Stripwasher with Sleeve | 1 |
| 12" Squeegee Channel | 1 |
| Commercial Sponge with Scrubber | 1 |
| Commercial Sponge | 1 |
| Roll-around Trash Container (32 gallon) | 1 |
| Brute Container Caddy | 1 |
| Lambswool Duster (Telescoping) | 1 |

| ITEM | AMOUNT |
|---|---|
| Disposal Wipes | 1 package |
| Disposal Gloves | 1 box |
| Putty Knife | 1 |
| Sanitary Bowl Swab | 2 |
| Rubber Door Stop | 1 |
| Wet Floor Caution Sign | 4 |
| One Quart Spray Bottle | 6 |
| Trigger Sprayer | 6 |
| 8 oz. Measuring Cup | 1 |
| Cellular Phone (not Available through Franchisor) | 1 |

Franchisor may adjust the items included in the Supply and Equipment Package as industry standards change.

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/10

INT _____ INT _LS_
PAGE 32 OF 34

## "ADDITIONAL ELECTRIC EQUIPMENT"

THE FOLLOWING EQUIPMENT MUST BE PURCHASED BY EACH
FRANCHISEE PURSUANT TO THE FRANCHISE AGREEMENT AND PRIOR
TO FRANCHISOR OFFERING ANY OF THE INITIAL BUSINESS

The products listed may be purchased from Franchisor or any other source.
Prices currently charged by Franchisor may be changed or modified in the future.

| QUANTITY | DESCRIPTION | UNIT PRICE |
|---|---|---|
| 1 | 17" Heavy Duty Floor Machine with 1.5 HP electric motor, triple planetary gearing, includes pad driver, 175 rpm, with easy adjusting handle | $863.36 each |
| | Or | |
| 1 | 17" Heavy Duty Floor Machine with 1.5 HP electric motor, triple planetary gearing includes pad driver, 175 rpm | $769.70 each |
| 1 | Wet/Dry vacuum with 15 gallon tank includes tool package | $544.60 each |
| | Or | |
| 1 | Wet/Dry vacuum with 13 gallon tank includes tool package | $646.38 each |

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/10

INT _____ INT _LS_
PAGE 33 OF 34

In addition to the above equipment, Franchisee must purchase one of the following equipment packages:

Equipment Package #1

| QUANTITY | DESCRIPTION | UNIT PRICE |
|---|---|---|
| 1 | 12" Upright commercial 7 amp vacuum, 50' cord, with cloth bag | $189.28 each |
| | Or | |
| 1 | 12" Upright commercial 7 amp vacuum, 50' cord, cloth bag with paper bag inserts | $312.48 each |
| 1 | Compact Portable Vacuum Cleaner (Canister Type) w/ shoulder strap and cloth bag | $126.00 each (CASH ONLY) |
| | Or | |
| 1 | Backpack Vacuum Cleaner, 10 qt. including tool package | $383.32 each |

or Equipment Package #2

| QUANTITY | DESCRIPTION | UNIT PRICE |
|---|---|---|
| 1 | 15" Upright commercial vacuum complete with the following:<br>• dual motor<br>• 40 foot cord<br>• paper filter collection system<br>• crevice tool<br>• upholstery and drapery tool<br>• attachment hose | $500.06 each |

JANI-KING OF CALIFORNIA, INC.
FRANCHISE AGREEMENT: 5/10

INT _____ INT _____
PAGE 34 OF 34

1/16/14 @34⊘

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

Additional Parties Attachment Form is attached

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

Additional Parties Attachment Form is attached

| FOR COURT USE ONLY |
|---|
| *(SOLO PARA USO DE LA CORTE)* |

**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego

**01/15/2014** at 08:22:48 AM
Clerk of the Superior Court
By My-Vinh B. Pham,Deputy Clerk

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: *(El nombre y dirección de la corte es):*  California Superior Court, San Diego | **CASE NUMBER:** *(Número del Caso):* |
|---|---|
| 330 West Broadway, San Diego, California 92101 | 37-2014-00083675-CU-FR-CTL |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Kara L. Gervais, Esq.  GERVAIS LAW, 10636 Scripps Summit Court #142, San Diego, CA (858) 549-1071

| DATE: 01/16/2014 *(Fecha)* | Clerk, by *(Secretario)*  M Pham  M. Pham | , Deputy *(Adjunto)* |
|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED: You are served**

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:

3. ☒ on behalf of *(specify)*: Jai-King of California, Inc, a Texas corporation

under: ☒ CCP 416.10 (corporation)  ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
☐ other *(specify)*:
4. ☐ by personal delivery on *(date)*:

Page 1 of 1

| Form Adopted for Mandatory Use Judicial Council of California SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465 www.courtinfo.ca.gov |
|---|---|---|

**SUM-200(A)**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Tervon, LLC et al. vs. Jani-King of California, Inc., et al. | |

## INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties *(Check only one box. Use a separate page for each type of party.)*:

☐ Plaintiff      ☑ Defendant      ☐ Cross-Complainant      ☐ Cross-Defendant

JANI-KING OF CALIFORNIA, INC., a Texas corporation, JANI-KING OF TEXAS, INC., a Texas corporation, JANI-KING INTERNATIONAL, INC., a Texas corporation, and DOES 1-100, Inclusive.

Page ___1___ of ___2___

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

123

**SUM-200(A)**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Tervon, LLC et al. vs. Jani-King of California, Inc., et al. | |

### INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties *(Check only one box. Use a separate page for each type of party.):*

[✓] Plaintiff   [ ] Defendant   [ ] Cross-Complainant   [ ] Cross-Defendant

TERVON, LLC, a California limited liability company, SUNYATA LITTLE and ELEANOR LITTLE, individuals; and MARIO GUTIERREZ, an individual.

Page __2__ of __2__

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

. CT Corporation

**Service of Process**
**Transmittal**
01/16/2014
CT Log Number 524229157

**TO:**   Stephen Hagedorn, General Counsel
Jani-King, Inc.
16885 Dallas Parkway
Addison, TX 75001

**RE:**   **Process Served in California**

**FOR:**   Jani-King of California, Inc. (Domestic State: TX)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Tervon, LLC, etc., et al., Pltfs. vs. Jani-King of California, Inc., etc., et al., Dfts. |
| **DOCUMENT(S) SERVED:** | Summons, Instructions, Complaint, Attachment(s), Schedule(s), Cover Sheet, Notice(s), Order(s), ADR Packet(s), Stipulation |
| **COURT/AGENCY:** | San Diego County - Superior Court - San Diego, CA<br>Case # 37201400083675CUFRCTL |
| **NATURE OF ACTION:** | Breach of Implied Covenant of Good Faith and Fair Dealing – Defendant significantly underbids the cleaning contracts it negotiates with its commercial clients and thereafter assigned such contracts to Plaintiffs making it impossible for Plaintiffs to operate a viable business |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Los Angeles, CA |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 01/16/2014 at 15:10 |
| **JURISDICTION SERVED :** | California |
| **APPEARANCE OR ANSWER DUE:** | Earliest Answer Date - Within 30 days after service (Document(s) may contain additional answer dates) |
| **ATTORNEY(S) / SENDER(S):** | Kara L. Gervais<br>Gervais Law<br>10636 Scripps Summit Court<br>Suite 142<br>San Diego, CA 92131<br>858-549-1071 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 01/17/2014, Expected Purge Date: 01/22/2014<br>Image SOP<br>Email Notification, Stephen Hagedorn shagedorn@janiking.com<br>Email Notification, Donald Burleson DBURLESON@JANIKING.COM |
| **SIGNED:** | C T Corporation System |
| **PER:** | Nancy Flores |
| **ADDRESS:** | 818 West Seventh Street<br>Los Angeles, CA 90017 |
| **TELEPHONE:** | 213-337-4615 |

Page 1 of 1 / NL

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

DELIVERED THIS ___ DAY OF ___
BY _____
PROFESSIONAL CIVIL PROCESS

**SUM-100**

# SUMMONS
## (CITACIÓN JUDICIAL)

**NOTICE TO DEFENDANT:**
**(AVISO AL DEMANDADO):**

Additional Parties Attachment Form is attached

**YOU ARE BEING SUED BY PLAINTIFF:**
**(LO ESTÁ DEMANDANDO EL DEMANDANTE):**

Additional Parties Attachment Form is attached

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

ELECTRONICALLY FILED
Superior Court of California,
County of San Diego

01/15/2014 at 08:22:48 AM

Clerk of the Superior Court
By Ivy-Vinh B. Pham, Deputy Clerk

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.

| | |
|---|---|
| The name and address of the court is: <br> (El nombre y dirección de la corte es):  California Superior Court, San Diego <br> 330 West Broadway, San Diego, California 92101 | CASE NUMBER: <br> (Número del Caso): <br> 37-2014-00083875-CU-FR-CTL |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):
Kara L. Gervais, Esq.  GERVAIS LAW, 10636 Scripps Summit Court #142, San Diego, CA (858) 549-1071

| DATE:  01/15/2014 | Clerk, by | M. Pham | , Deputy |
|---|---|---|---|
| (Fecha) | (Secretario) | M. Pham | (Adjunto) |

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).

**NOTICE TO THE PERSON SERVED: You are served**

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of (specify):

   *JANI-KING INTERNATIONAL, INC., a Texas corporation*

3. ☒ on behalf of (specify):

   under:  ☒ CCP 416.10 (corporation)    ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)    ☐ CCP 416.90 (authorized person)
          ☐ other (specify):
4. ☐ by personal delivery on (date):

Page 1 of 1

| | |
|---|---|
| Form Adopted for Mandatory Use <br> Judicial Council of California <br> SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465 <br> www.courtinfo.ca.gov |

 **CT Corporation**

**Service of Process Transmittal**
01/21/2014
CT Log Number 524252625

| | |
|---|---|
| **TO:** | Stephen Hagedorn, General Counsel<br>Jani-King, Inc.<br>16885 Dallas Parkway<br>Addison, TX 75001 |
| **RE:** | **Process Served in Texas** |
| **FOR:** | Jani-King International, Inc. (Domestic State: TX) |

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Tervon, LLC, etc., et al., Pltfs. vs. Jani-King of California, Inc., etc., et al. including Jani-King International, Inc., etc., Dfts. |
| **DOCUMENT(S) SERVED:** | Summons, Instructions, Cover Sheet, Notice(s), Information, Stipulation, Order, Requirements, Complaint, Attachment(s) |
| **COURT/AGENCY:** | California Superior Court - San Diego, CA<br>Case # 37201400083675CUFRCTL |
| **NATURE OF ACTION:** | Seeking compensatory and nominal damages against defendants for deceit by international misrepresentation, deceit by concealment, negligent misrepresentation of defendants |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Dallas, TX |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 01/21/2014 at 15:05 |
| **JURISDICTION SERVED :** | Texas |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after summons |
| **ATTORNEY(S) / SENDER(S):** | Kara L. Gervais<br>Gervais Law<br>10636 Scripps Summit Court<br>#142<br>San Diego, CA 92131<br>858-549-1071 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 01/22/2014, Expected Purge Date: 01/27/2014<br>Image SOP<br>Email Notification, Stephen Hagedorn shagedorn@janiking.com<br>Email Notification, Donald Burleson DBURLESON@JANIKING.COM |
| **SIGNED:**<br>**PER:**<br>**ADDRESS:**<br><br>**TELEPHONE:** | C T Corporation System<br>Beatrice Casarez-Barrientez<br>1999 Bryan Street<br>Suite 900<br>Dallas, TX 75201<br>214-932-3601 |

Page 1 of  1 / VP

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

# Superior Court of California
# County of San Diego

# NOTICE OF ELIGIBILITY TO eFILE
# AND ASSIGNMENT TO IMAGING DEPARTMENT

**This case is eligible for eFiling. Should you prefer to electronically file documents, refer to General Order 010214-24 at www.sdcourt.ca.gov for rules and procedures or contact the Court's eFiling vendor at www.onelegal.com for information.**

**This case has been assigned to an Imaging Department and original documents attached to pleadings filed with the court will be imaged and destroyed. Original documents should not be filed with pleadings. If necessary, they should be lodged with the court under California Rules of Court, rule 3.1302(b).**

On August 1, 2011 the San Diego Superior Court began the Electronic Filing and Imaging Pilot Program ("Program"). As of August 1, 2011 in all new cases assigned to an Imaging Department all filings will be imaged electronically and the electronic version of the document will be the official court file. The official court file will be electronic and accessible at one of the kiosks located in the Civil Business Office and on the Internet through the court's website.

You should be aware that the electronic copy of the filed document(s) will be the official court record pursuant to Government Code section 68150. The paper filing will be imaged and held for 30 days. After that time it will be destroyed and recycled. **Thus, you should not attach any original documents to pleadings filed with the San Diego Superior Court. Original documents filed with the court will be imaged and destroyed except those documents specified in California Rules of Court, rule 3.1806.** Any original documents necessary for a motion hearing or trial shall be lodged in advance of the hearing pursuant to California Rules of Court, rule 3.1302(b).

It is the duty of each plaintiff, cross-complainant or petitioner to serve a copy of this notice with the complaint, cross-complaint or petition on all parties in the action.

On all pleadings filed after the initial case originating filing, all parties must, to the extent it is feasible to do so, place the words **"IMAGED FILE"** in all caps immediately under the title of the pleading on all subsequent pleadings filed in the action.

# Please refer to the General Order - Imaging located on the San Diego Superior Court website at:

http://www.sdcourt.ca.gov/CivilImagingGeneralOrder

Page: 2

128

## ELECTRONIC FILING REQUIREMENTS OF THE

## SAN DIEGO SUPERIOR COURT

These requirements are issued pursuant to California Rules of Court ("CRC"), rules 2.250 et seq., Code of Civil Procedure Section 1010.6, and San Diego Superior Court General Order: In re Procedures Regarding Electronically Imaged Court Records, Electronic Filing, and Access to Electronic Court Records.

**Effective November 1, 2013, documents that are determined to be unacceptable for eFiling by the Court due to eFiling system restrictions or for failure to comply with these requirements will be rejected subject to being allowed to be filed nunc pro tunc to the original submittal date upon ex-parte application to the court and upon good cause shown.**

It is the duty of the plaintiff (and cross-complainant) to serve a copy of the General Order of the Presiding Department, Order No. 010313, and Electronic Filing Requirements of the San Diego Superior Court with the complaint (and cross-complaint).

### PERMISSIVE eFILING

Effective January 7, 2013, the court allowed subsequent documents to be filed electronically in predetermined non-mandated civil cases in the Central Division by the Soft Launch Authorized Project Participants.

Revised 11-5-13

**Effective March 4, 2013,** documents **may be filed electronically** in non-mandated civil cases in the Central Civil Division where either: (1) the case is first initiated on or after March 4, 2013; or (2) the case is already pending as of March 4, 2013 <u>and</u> has been imaged by the court.

## MANDATORY eFILING

The case types that shall be subject to mandatory eFiling are: civil class actions; consolidated and coordinated actions where all cases involved are imaged cases; and actions that are provisionally complex under CRC 3.400 – 3.403 (as set forth in the Civil Case Cover Sheet, Judicial Council form CM-010 – but not including Construction Defect actions). "Complex cases" included in mandatory eFiling include Antitrust/Trade Regulation, Mass Tort, Environmental/Toxic Tort, and Securities Litigation cases, as well as insurance coverage claims arising from these case types. Construction Defect cases, currently being electronically filed through File&Serve Xpress (fka Lexis Nexis File&Serve) website, will continue to be electronically filed through that system until further notice.

For cases of the type subject to mandatory eFiling that are initiated on or after March 4, 2013, all documents **must be filed electronically,** subject to the exceptions set forth below.

For cases of the type subject to mandatory eFiling that are already pending as of March 3, 2013, and provided that the case has been

Revised 11-5-13

imaged by the court, all documents filed on or after March 4, 2013 **must be filed electronically**, subject to the exceptions set forth below.

A party may request to be excused from mandatory electronic filing requirements.  This request must be in writing and may be made by ex parte application to the judge or department to whom the case is assigned.  The clerk will not accept or file any documents in paper form that are required to be filed electronically, absent a court order allowing the filing.

Self-represented litigants are not required to eFile in a mandatory eFile case; however, they may eFile if they choose to do so and/or are otherwise ordered to eFile by the court.

## **REQUIREMENTS FOR ALL eFILERS**

eFile documents can only be filed through the court's Electronic Filing and Service Provider (the "Provider").  See www.onelegal.com.

eFilers must comply with CRC 2.250 – 2.261.  Also, all documents electronically filed must be in a pdf format using Adobe Acrobat version 7 or higher that is also a text searchable format, i.e. OCR.  The court is unable to accept documents that do not comply with these requirements, or documents that include but are not limited to: digitized signatures, fillable forms, or a negative image.

Revised 11-5-13

Documents that contain exhibits must be bookmarked, as set forth on the Provider's site. Documents no so bookmarked are subject to rejection. Moving papers with exhibits that are not bookmarked will be rejected. (See CRC 3.1110(f) with bookmarking being the substitute for plastic tabs in electronically filed documents.)

Exhibits to be considered via a Notice of Lodgment shall not be attached to the electronically filed Notice of Lodgment; instead, the submitting party must provide the assigned department with hard copies of the exhibits with a copy of the Notice of Lodgment that include the eFiling Transaction ID# noted in the upper right hand corner.

Unless otherwise required by law, per CRC 1.20 (b) only the last four digits of a social security or financial account number may be reflected in court case filings. Exclusion or redaction is the responsibility of the filer, not the clerk, CRC 1.20(b)(3). Failure to comply with this requirement may result in monetary sanctions, CRC 2.30(b).

Proposed filings, such as proposed court orders and amended complaints, should be submitted as an exhibit and then re-submitted as a separate and new eFiling transaction once the Court has ruled on the matter to which the proposed document applies. See also CRC 3.1312.

Any document filed electronically shall be considered as filed with the Clerk of the Superior Court when it is first transmitted to the vendor and the

Revised 11-5-13

transmission is completed, except that any document filed on a day that the court is not open for business, or after 5:00 p.m. (Pacific Standard Time) on a day the court is open for business, **shall be deemed to have been filed on the next court day**.

Please be advised that you must schedule a motion hearing date directly with the Independent Calendar Department.  A motion filed without an appointment, even when a conformed copy of the filing is provided by the court, is not scheduled and the hearing will not occur.

If a hearing is set within 2 court days of the time documents are electronically filed, litigant(s) must provide hard copies of the documents to the court.  Transaction.ID numbers must be noted on the documents to the extent it is feasible to do so.  Hard copies for Ex Parte hearings must be delivered directly to the department on or before 12 Noon the court day immediately preceding the hearing date.

An original of all documents filed electronically, including original signatures, shall be maintained by the party filing the document, pursuant to CRC 2.257.

## DOCUMENTS INELIGIBLE FOR ELECTRONIC FILING

The following documents are **not eligible for eFiling** in cases subject to either mandatory or permissive filing, and shall be filed in paper form:

Revised 11-5-13

- Safe at Home Name Change Petitions
- Civil Harassment TRO / RO
- Workplace Violence TRO / RO
- Elder Abuse TRO / RO
- Transitional Housing Program Misconduct TRO / RO
- School Violence Prevention TRO / RO
- Out-of-State Commission Subpoena
- Undertaking / Surety Bonds
- Request for Payment of Trust Funds
- Writs
- Notice of Appeal of Labor Commissioner
- Abstracts
- Warrants
- Settlement Conference Briefs (to be lodged)
- Confidential document lodged conditionally under seal
- Interpleader actions pursuant to CC2924j

The following documents **may be filed in paper form**, unless the court expressly directs otherwise:

- Documents filed under seal or provisionally under seal pursuant to CRC 2.551 (although the motion to file under seal itself must be electronically filed)

Revised 11-5-13

- Exhibits to declarations that are real objects, i.e. construction materials, core samples, etc. or other documents, i.e. plans, manuals, etc., which otherwise may not be comprehensibly viewed in an electronic format may be filed in paper form

## DOCUMENTS DISPLAYED ON THE PUBLIC-FACING REGISTER OF ACTIONS

Any documents submitted for eFiling (and accepted) will be filed and displayed on the San Diego Superior Court's public-facing Register of Actions with the exception of the following documents:

- CASp Inspection Report
- Confidential Cover Sheet – False Claims Action
- Confidential Statement of Debtor's Social Security Number
- Financial Statement
- Request for Accommodations by Persons with Disabilities and Court's Response
- Defendant / Respondent Information for Order Appointing Attorney Under Service Members Civil Relief Act
- Request to Waive Court Fees
- Request to Waive Additional Court Fees

Documents not included in the list above, that are intended to be kept confidential, should NOT be eFiled with the court.

Page 7 of 7

Revised 11-5-13

F I L E D
Clerk of the Superior Court

JAN 03 2013

By: __Amy Kelfers__

THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN DIEGO

IN RE PROCEDURES REGARDING
ELECTRONIC FILING

GENERAL ORDER OF THE
PRESIDING DEPARTMENT

ORDER NO. 010313

THIS COURT FINDS AND ORDERS AS FOLLOWS:

On August 1, 2011, the San Diego Superior Court ("court") began an Electronic Filing and Imaging Pilot Program ("Program") designed to reduce paper filings and storage, facilitate electronic access to civil court files and, in Phase Two, allow remote electronic filing ("E-File" or "E-Filing") of papers in civil cases. The ultimate goal of the Program is to create a paperless or electronic file in all civil cases, as well as in other case categories.

Phase One of the Program, described in General Order: *In re Procedures Regarding Electronically Imaged Court Records, Electronic Filing, and Access to Electronic Court Records*, involved the court's scanning of papers in newly filed cases in designated divisions and departments (the "Imaging Project"). Phase Two of the Program is the implementation of electronic filing by counsel and parties through the court's E-File Service Provider.

Electronic filing under Phase Two of the Program will initially be limited to the Central Civil Division only. Probate and North County Civil Divisions of the Superior Court

136

are excluded from Phase Two of the Program.  This General Order relates to Phase Two, and supplements General Order: *In re Procedures Regarding Electronically Imaged Court Records, Electronic Filing, and Access to Electronic Court Records.*

Permissive E-Filing will begin January 7, 2013 in predetermined non-mandated civil cases in the Central Division, and expand as resources permit.  Beginning March 4, 2013, E-Filing will be mandatory in certain types of cases.  Further information on these initiatives can be found on the court's website, at www.sdcourt.ca.gov.

Filing and service of documents by electronic means is governed by Code of Civil Procedure Section 1010.6 and California Rules of Court ("CRC"), rules 2.250 et seq. and CRC 2.30.  In addition, the San Diego Superior Court's specific requirements for E-Filing are available on the court's website.  Litigants and attorneys electronically filing documents must comply with all applicable rules and requirements.

**GENERAL E-FILING REQUIREMENTS**

Documents can only be electronically filed through the court's electronic service provider (the "Provider").  E-File Provider information is available on the court's website.

Any document filed electronically shall be considered as filed with the Clerk of the Superior Court when it is first transmitted to the Provider and the transmission is completed, except that any document filed on a day that the court is not open for business, or after 5:00 p.m. (Pacific Time) on a day the court is open for business, shall be deemed to have been filed on the next court day.

Pursuant to Government Code section 68150 and California Rules of Court, rule 2.504, electronic documents, whether imaged by the court or filed by the parties, are certified as official records of the court.

Additional and more specific information on electronic filing can be found on the court's website.

///
///
///

137

1       This Order shall expire on December 31, 2013, unless otherwise ordered by this

2 court.

3       IT IS SO ORDERED.

4 Dated: January 3, 2013

*Robert Trentacosta*

5 **ROBERT J. TRENTACOSTA**
**Presiding Judge**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**

**ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION**

CASE NUMBER: 37-2014-00083675-CU-FR-CTL   CASE TITLE:
Tervon LLC vs Jani-King of California Inc [IMAGED]

**NOTICE:** All plaintiffs/cross-complainants in a general civil case are required to serve a copy of the following three forms on each defendant/cross-defendant, together with the complaint/cross-complaint:
      (1) this Alternative Dispute Resolution (ADR) Information form (SDSC form #CIV-730),
      (2) the Stipulation to Use Alternative Dispute Resolution (ADR) form (SDSC form #CIV-359), *and*
      (3) the Notice of Case Assignment form (SDSC form #CIV-721).

Most civil disputes are resolved without filing a lawsuit, and most civil lawsuits are resolved without a trial. The courts, community organizations, and private providers offer a variety of Alternative Dispute Resolution (ADR) processes to help people resolve disputes without a trial. The San Diego Superior Court expects that litigants will utilize some form of ADR as a mechanism for case settlement before trial, and it may be beneficial to do this early in the case.

Below is some information about the potential advantages and disadvantages of ADR, the most common types of ADR, and how to find a local ADR program or neutral. A form for agreeing to use ADR is attached (SDSC form #CIV-359).

<u>**Potential Advantages and Disadvantages of ADR**</u>
ADR may have a variety of advantages or disadvantages over a trial, depending on the type of ADR process used and the particular case:

| **Potential Advantages** | **Potential Disadvantages** |
|---|---|
| • Saves time | • May take more time and money if ADR does not resolve the dispute |
| • Saves money | • Procedures to learn about the other side's case (discovery), jury trial, appeal, and other court protections may be limited or unavailable |
| • Gives parties more control over the dispute resolution process and outcome | |
| • Preserves or improves relationships | |

<u>**Most Common Types of ADR**</u>
You can read more information about these ADR processes and watch videos that demonstrate them on the court's ADR webpage at http://www.sdcourt.ca.gov/adr.

**Mediation:** A neutral person called a "mediator" helps the parties communicate in an effective and constructive manner so they can try to settle their dispute. The mediator does not decide the outcome, but helps the parties to do so. Mediation is usually confidential, and may be particularly useful when parties want or need to have an ongoing relationship, such as in disputes between family members, neighbors, co-workers, or business partners, or when parties want to discuss non-legal concerns or creative resolutions that could not be ordered at a trial.

**Settlement Conference:** A judge or another neutral person called a "settlement officer" helps the parties to understand the strengths and weaknesses of their case and to discuss settlement. The judge or settlement officer does not make a decision in the case but helps the parties to negotiate a settlement. Settlement conferences may be particularly helpful when the parties have very different ideas about the likely outcome of a trial and would like an experienced neutral to help guide them toward a resolution.

**Arbitration:** A neutral person called an "arbitrator" considers arguments and evidence presented by each side and then decides the outcome of the dispute. Arbitration is less formal than a trial, and the rules of evidence are usually relaxed. If the parties agree to binding arbitration, they waive their right to a trial and agree to accept the arbitrator's decision as final. With nonbinding arbitration, any party may reject the arbitrator's decision and request a trial. Arbitration may be appropriate when the parties want another person to decide the outcome of their dispute but would like to avoid the formality, time, and expense of a trial.

**Other ADR Processes:** There are several other types of ADR which are not offered through the court but which may be obtained privately, including neutral evaluation, conciliation, fact finding, mini-trials, and summary jury trials. Sometimes parties will try a combination of ADR processes. The important thing is to try to find the type or types of ADR that are most likely to resolve your dispute.  Be sure to learn about the rules of any ADR program and the qualifications of any neutral you are considering, and about their fees.

<u>Local ADR Programs for Civil Cases</u>

**Mediation:** The San Diego Superior Court maintains a Civil Mediation Panel of approved mediators who have met certain minimum qualifications and have agreed to charge $150 per hour for each of the first two (2) hours of mediation and their regular hourly rate thereafter in court-referred mediations.

<u>On-line mediator search and selection:</u>  Go to the court's ADR webpage at www.sdcourt.ca.gov/adr and click on the "Mediator Search" to review individual mediator profiles containing detailed information about each mediator including their dispute resolution training, relevant experience, ADR specialty, education and employment history, mediation style, and fees and to submit an on-line Mediator Selection Form (SDSC form #CIV-005).  The Civil Mediation Panel List, the Available Mediator List, individual Mediator Profiles, and Mediator Selection Form (CIV-005) can also be printed from the court's ADR webpage and are available at the Mediation Program Office or Civil Business Office at each court location.

**Settlement Conference:** The judge may order your case to a mandatory settlement conference, or voluntary settlement conferences may be requested from the court if the parties certify that: (1) settlement negotiations between the parties have been pursued, demands and offers have been tendered in good faith, and resolution has failed; (2) a judicially supervised settlement conference presents a substantial opportunity for settlement; and (3) the case has developed to a point where all parties are legally and factually prepared to present the issues for settlement consideration and further discovery for settlement purposes is not required. Refer to SDSC Local Rule 2.2.1 for more information. To schedule a settlement conference, contact the department to which your case is assigned.

**Arbitration:** The San Diego Superior Court maintains a panel of approved judicial arbitrators who have practiced law for a minimum of five years and who have a certain amount of trial and/or arbitration experience.  Refer to SDSC Local Rules Division II, Chapter III and Code Civ. Proc. § 1141.10 et seq or contact the Arbitration Program Office at (619) 450-7300 for more information.

<u>More information about court-connected ADR</u>: Visit the court's ADR webpage at www.sdcourt.ca.gov/adr or contact the court's Mediation/Arbitration Office at (619) 450-7300.

**Dispute Resolution Programs Act (DRPA) funded ADR Programs:**  The following community dispute resolution programs are funded under DRPA (Bus. and Prof. Code §§ 465 et seq.):
- In Central, East, and South San Diego County, contact the National Conflict Resolution Center (NCRC) at www.ncrconline.com or (619) 238-2400.
- In North San Diego County, contact North County Lifeline, Inc. at www.nclifeline.org or (760) 726-4900.

**Private ADR:**  To find a private ADR program or neutral, search the Internet, your local telephone or business directory, or legal newspaper for dispute resolution, mediation, settlement, or arbitration services.

<u>Legal Representation and Advice</u>

To participate effectively in ADR, it is generally important to understand your legal rights and responsibilities and the likely outcomes if you went to trial. ADR neutrals are not allowed to represent or to give legal advice to the participants in the ADR process. If you do not already have an attorney, the California State Bar or your local County Bar Association can assist you in finding an attorney. Information about obtaining free and low cost legal assistance is also available on the California courts website at *www.courtinfo.ca.gov/selfhelp/lowcost*.

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO | FOR COURT USE ONLY |
|---|---|
| STREET ADDRESS: 330 West Broadway<br>MAILING ADDRESS: 330 West Broadway<br>CITY, STATE, & ZIP CODE: San Diego, CA 92101-3827<br>BRANCH NAME: Central | |

| PLAINTIFF(S): Sunyata Little et.al. |
|---|
| DEFENDANT(S): Jani-King of California Inc et.al. |
| SHORT TITLE: TERVON LLC VS JANI-KING OF CALIFORNIA INC [IMAGED] |

| STIPULATION TO USE ALTERNATIVE<br>DISPUTE RESOLUTION (ADR) | CASE NUMBER:<br>37-2014-00083675-CU-FR-CTL |
|---|---|

Judge: Ronald S. Prager                                      Department: C-71

The parties and their attorneys stipulate that the matter is at issue and the claims in this action shall be submitted to the following alternative dispute resolution (ADR) process.  Selection of any of these options will not delay any case management timelines.

☐ Mediation (court-connected)                    ☐ Non-binding private arbitration

☐ Mediation (private)                                    ☐ Binding private arbitration

☐ Voluntary settlement conference (private)    ☐ Non-binding judicial arbitration (discovery until 15 days before trial)

☐ Neutral evaluation (private)                        ☐ Non-binding judicial arbitration (discovery until 30 days before trial)

☐ Other (specify e.g., private mini-trial, private judge, etc.): _____
_____

It is also stipulated that the following shall serve as arbitrator, mediator or other neutral: (Name) _____
_____
_____

Alternate neutral (for court Civil Mediation Program and arbitration only): _____

Date: _____        Date: _____

_____        _____
Name of Plaintiff                                        Name of Defendant

_____        _____
Signature                                                Signature

_____        _____
Name of Plaintiff's Attorney                            Name of Defendant's Attorney

_____        _____
Signature                                                Signature

If there are more parties and/or attorneys, please attach additional completed and fully executed sheets.

It is the duty of the parties to notify the court of any settlement pursuant to Cal. Rules of Court, rule 3.1385.  Upon notification of the settlement, the court will place this matter on a 45-day dismissal calendar.

No new parties may be added without leave of court.

**IT IS SO ORDERED.**

Dated: 01/16/2014                                      _____
                                                        JUDGE OF THE SUPERIOR COURT

| SDSC CIV-359 (Rev 12-10) | **STIPULATION TO USE OF ALTERNATIVE DISPUTE RESOLUTION** | Page: 1 |
|---|---|---|

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Kara L. Gervais            (SBN 217134)<br>GERVAIS LAW<br>10636 Scripps Summit Court, Suite 142<br>San Diego, CA 92131<br>TELEPHONE NO.: 858-549-1071   FAX NO.: 858-549-1743<br>ATTORNEY FOR (Name): Plaintiffs, Tervon LLC, Little and Gutierrez | **ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of San Diego<br><br>**01/15/2014** at 08:22:48 AM<br>Clerk of the Superior Court<br>By My-Vinh B. Pham, Deputy Clerk |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF **San Diego**
STREET ADDRESS: **330 West Broadway**
MAILING ADDRESS: **330 West Broadway**
CITY AND ZIP CODE: **San Diego, CA 92101**
BRANCH NAME: **Central Division**

CASE NAME:
**Tervon LLC et al. v. Jani-King of California, Inc. et al.**

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: 37-2014-00083675-CU-FR-CTL |
|---|---|---|
| [✓] Unlimited   [ ] Limited<br>(Amount           (Amount<br>demanded        demanded is<br>exceeds $25,000)  $25,000 or less) | [ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | JUDGE: Judge Ronald S. Prager<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[✓] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition (not specified above) (43)

2. This case [ ] is [✓] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. [✓] monetary   b. [✓] nonmonetary; declaratory or injunctive relief   c. [✓] punitive
4. Number of causes of action (specify): Eight
5. This case [ ] is [✓] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: January 15, 2014
Kara L. Gervais, Esq.
(TYPE OR PRINT NAME)                                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | CIVIL CASE COVER SHEET | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>www.courtinfo.ca.gov |
|---|---|---|

CM-010

# INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you must complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the primary cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

## CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
    Damage/Wrongful Death
Uninsured Motorist (46) *(if the*
    *case involves an uninsured*
    *motorist claim subject to*
    *arbitration, check this item*
    *instead of Auto)*

**Other PI/PD/WD (Personal Injury/**
**Property Damage/Wrongful Death)**
**Tort**
Asbestos (04)
    Asbestos Property Damage
    Asbestos Personal Injury/
        Wrongful Death
Product Liability *(not asbestos or*
    *toxic/environmental)* (24)
Medical Malpractice (45)
    Medical Malpractice–
        Physicians & Surgeons
    Other Professional Health Care
        Malpractice
Other PI/PD/WD (23)
    Premises Liability (e.g., slip
        and fall)
    Intentional Bodily Injury/PD/WD
        (e.g., assault, vandalism)
    Intentional Infliction of
        Emotional Distress
    Negligent Infliction of
        Emotional Distress
    Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
    Practice (07)
Civil Rights (e.g., discrimination,
    false arrest) *(not civil*
    *harassment)* (08)
Defamation (e.g., slander, libel)
    (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
    Legal Malpractice
    Other Professional Malpractice
        *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
    Breach of Rental/Lease
        Contract *(not unlawful detainer*
            *or wrongful eviction)*
    Contract/Warranty Breach–Seller
        Plaintiff *(not fraud or negligence)*
    Negligent Breach of Contract/
        Warranty
    Other Breach of Contract/Warranty
Collections (e.g., money owed, open
    book accounts) (09)
    Collection Case–Seller Plaintiff
    Other Promissory Note/Collections
        Case
Insurance Coverage *(not provisionally*
    *complex)* (18)
    Auto Subrogation
    Other Coverage
Other Contract (37)
    Contractual Fraud
    Other Contract Dispute

**Real Property**
Eminent Domain/Inverse
    Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
    Writ of Possession of Real Property
    Mortgage Foreclosure
    Quiet Title
    Other Real Property *(not eminent*
        *domain, landlord/tenant, or*
        *foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal*
    *drugs, check this item; otherwise,*
    *report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
    Writ–Administrative Mandamus
    Writ–Mandamus on Limited Court
        Case Matter
    Writ–Other Limited Court Case
        Review
Other Judicial Review (39)
    Review of Health Officer Order
    Notice of Appeal–Labor
        Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.**
**Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
    *(arising from provisionally complex*
    *case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
    Abstract of Judgment (Out of
        County)
    Confession of Judgment *(non-*
        *domestic relations)*
    Sister State Judgment
    Administrative Agency Award
        *(not unpaid taxes)*
    Petition/Certification of Entry of
        Judgment on Unpaid Taxes
    Other Enforcement of Judgment
        Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified*
    *above)* (42)
    Declaratory Relief Only
    Injunctive Relief Only *(non-*
        *harassment)*
    Mechanics Lien
    Other Commercial Complaint
        Case *(non-tort/non-complex)*
    Other Civil Complaint
        *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate
    Governance (21)
Other Petition *(not specified*
    *above)* (43)
    Civil Harassment
    Workplace Violence
    Elder/Dependent Adult
        Abuse
    Election Contest
    Petition for Name Change
    Petition for Relief from Late
        Claim
    Other Civil Petition

CIVIL CASE COVER SHEET

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO | |
| --- | --- |
| STREET ADDRESS: | 330 W Broadway |
| MAILING ADDRESS: | 330 W Broadway |
| CITY AND ZIP CODE: | San Diego, CA 92101-3827 |
| BRANCH NAME: | Central |
| TELEPHONE NUMBER: | (619) 450-7071 |

**PLAINTIFF(S) / PETITIONER(S):**   Sunyata Little et.al.

**DEFENDANT(S) / RESPONDENT(S):**   Jani-King of California Inc et.al.

TERVON LLC VS JANI-KING OF CALIFORNIA INC [IMAGED]

| **NOTICE OF CASE ASSIGNMENT** **and CASE MANAGEMENT CONFERENCE** | CASE NUMBER: 37-2014-00083675-CU-FR-CTL |
| --- | --- |

**CASE ASSIGNMENT**

Judge:  Ronald S. Prager                                  Department: C-71

**COMPLAINT/PETITION FILED:** 01/15/2014

| TYPE OF HEARING SCHEDULED | DATE | TIME | DEPT | JUDGE |
| --- | --- | --- | --- | --- |
| Civil Case Management Conference | 12/12/2014 | 01:00 pm | C-71 | Ronald S. Prager |

A case management statement must be completed by counsel for all parties or self-represented litigants and timely filed with the court at least 15 days prior to the initial case management conference. (San Diego Local Rules, Division II, CRC Rule 3.725).

All counsel of record or parties in pro per shall appear at the Case Management Conference, be familiar with the case, and be fully prepared to participate effectively in the hearing, including discussions of ADR* options.

IT IS THE DUTY OF EACH PLAINTIFF (AND CROSS-COMPLAINANT) TO SERVE A COPY OF THIS NOTICE WITH THE COMPLAINT (AND CROSS-COMPLAINT), THE ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION FORM (SDSC FORM #CIV-730), A STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (ADR) (SDSC FORM #CIV-359), AND OTHER DOCUMENTS AS SET OUT IN SDSC LOCAL RULE 2.1.5.

ALL COUNSEL WILL BE EXPECTED TO BE FAMILIAR WITH SUPERIOR COURT RULES WHICH HAVE BEEN PUBLISHED AS DIVISION II, AND WILL BE STRICTLY ENFORCED.

TIME STANDARDS: The following timeframes apply to general civil cases and must be adhered to unless you have requested and been granted an extension of time.  General civil cases consist of all civil cases except: small claims proceedings, civil petitions, unlawful detainer proceedings, probate, guardianship, conservatorship, juvenile, parking citation appeals, and family law proceedings.

COMPLAINTS:  Complaints and all other documents listed in SDSC Local Rule 2.1.5 must be served on all named defendants, and a Certificate of Service (SDSC form #CIV-345) filed within 60 days of filing.

DEFENDANT'S APPEARANCE:  Defendant must generally appear within 30 days of service of the complaint.  (Plaintiff may stipulate to no more than 15 day extension which must be in writing and filed with the Court.) (SDSC Local Rule 2.1.6)

JURY FEES:  In order to preserve the right to a jury trial, one party for each side demanding a jury trial shall pay an advance jury fee in the amount of one hundred fifty dollars ($150) on or before the date scheduled for the initial case management conference in the action.

*ALTERNATIVE DISPUTE RESOLUTION (ADR):  THE COURT ENCOURAGES YOU TO CONSIDER UTILIZING VARIOUS ALTERNATIVES TO TRIAL, INCLUDING MEDIATION AND ARBITRATION, PRIOR TO THE CASE MANAGEMENT CONFERENCE. PARTIES MAY FILE THE ATTACHED STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (SDSC FORM #CIV-359).

Case 3:14-cv-00367-BAS-JMA   Document 1-2   Filed 02/17/14   Page 146 of 149



2014 College Football Schedules | 2013-14 Bowl Schedule | 2014 NFL Schedules

Search FBSchedules.com          Subn

**HOME     NCAA SCHEDULES     NFL SCHEDULES     FAN SHOP     TICKETS     MORE**



## Book online, Pay at Hotel

Booking.com
Holiday Inn Express Hotel & Suites San Diego-Escondido



BUY FOOTBALL TICKETS!   ticket liquidator

| San Diego Chargers | 2 |
|---|---|

Team Home • NFL • Playoffs

### Expert Game Analysis
www.sourceone4picks.com
Put our expertise to work for you! Over 25 years experience

RECENT HEADLINES

BYU, Arizona State Schedule 2020-21 Home-and-Home Football Series

2014 AAC Football Opponents Announced

Lucas Oil Stadium Tops List of NFL Stadium Experiences for 2013 Season

Illinois, UConn Schedule 2019-20 Home-and-Home Football Series

Season: 2012

### 2012 San Diego Chargers Football Schedule
### Final Record: 7-9, 4-2 (AFC West)

| Date | Opponent | Result | Tickets |
|---|---|---|---|
| Monday Sept. 10 | at Oakland Raiders<br>O.co Coliseum, Oakland, CA | Won 22-14 | — |
| Sunday Sept. 16 | Tennessee Titans<br>Qualcomm Stadium, San Diego, CA | Won 38-10 | — |
| Sunday Sept. 23 | Atlanta Falcons<br>Qualcomm Stadium, San Diego, CA | Lost 27-3 | — |
| Sunday Sept. 30 | at Kansas City Chiefs<br>Arrowhead Stadium, Kansas City, MO | Won 37-20 | — |
| Sunday Oct. 7 | at New Orleans Saints<br>Mercedes-Benz Superdome, New Orleans, LA | Lost 31-24 | — |
| Monday Oct. 15 | Denver Broncos<br>Qualcomm Stadium, San Diego, CA | Lost 35-24 | — |
| Sunday Oct. 21 | BYE | — | |
| Sunday Oct. 28 | at Cleveland Browns<br>Cleveland Browns Stadium, Cleveland, OH | Lost 7-6 | — |
| Thursday Nov. 1 | Kansas City Chiefs<br>Qualcomm Stadium, San Diego, CA | Won 31-13 | — |
| Sunday Nov. 11 | at Tampa Bay Buccaneers<br>Raymond James Stadium, Tampa Bay, FL | Lost 34-24 | — |
| Sunday Nov. 18 | at Denver Broncos<br>Sports Authority Field at Mile High, Denver, CO | Lost 30-23 | — |
| Sunday Nov. 25 | Baltimore Ravens<br>Qualcomm Stadium, San Diego, CA | Lost 16-13 (OT) | — |
| Sunday Dec. 2 | Cincinnati Bengals<br>Qualcomm Stadium, San Diego, CA | Lost 20-13 | — |
| Sunday Dec. 9 | at Pittsburgh Steelers<br>Heinz Field, Pittsburgh, PA | Won 34-24 | — |
| Sunday Dec. 16 | Carolina Panthers<br>Qualcomm Stadium, San Diego, CA | Lost 31-7 | — |



Looking to Increase your Online Presence?
We can help.

LAWYER.COM
LAWYER SEARCH EXPERTS
800-620-0900          Click Here

Find us on Facebook

FBSchedules.com
Like

17,145 people like FBSchedules.com.

| Sil ve | W ay | K ell | Je ro | Ri c |
| Ja ne | Ja m | Fr ed | Mi ch | P av |

Facebook social plugin

145

| Sunday Dec. 23 | at New York Jets<br>MetLife Stadium, East Rutherford, NJ | Won 27-17 | --- |
| Sunday Dec. 30 | Oakland Raiders<br>Qualcomm Stadium, San Diego, CA | Won 24-21 | --- |



SHOP NEW
NFL NIKE & NEW ERA GEAR
$4.99 3-Day Delivery • Easy 365-Day Returns
FANATICS   SHOP NOW

## NFL Football Schedule Headlines

Lucas Oil Stadium Tops List of NFL Stadium Experiences for 2013 Season
CBS to Produce and Televise NFL's 2014 Thursday Night Football
Seattle Seahawks Super Bowl XLVIII Champions T-Shirts & Fan Gear
Super Bowl XLVIII – Denver Broncos vs. Seattle Seahawks
FanKave Giveaway: Seahawks, Broncos Limited Edition Super Bowl Jersey
Super Bowl XLVIII Tickets – Seattle vs. Denver
Denver and Seattle to meet in Super Bowl XLVIII
Seattle Seahawks 2013 NFC Champions T-Shirts & Apparel
Denver Broncos 2013 AFC Champions T-Shirts & Apparel
2014 AFC & NFC Championship Games Set
Lucas Oil Stadium, Notre Dame Stadium Highlight Top 100 Stadium Experiences of 2013
2013-14 NFL Playoffs: Divisional Round Match-Ups Set
2013-14 NFL Playoffs: Colts, Saints Advance
2014 NFL Opponents Announced
2013-14 NFL Playoffs Schedule Announced
2013 NFL Playoff Scenarios – Week 17
Dec. 29 Eagles-Cowboys Game Moved to Sunday Night Football, Three Games Moved to 4:25pm ET
2013 NFL Schedule: Dec. 22 Bears-Eagles Moved to 8:30pm; Patriots-Ravens to 4:25pm
2014 NFL International Series Schedule Finalized
2013 Thanksgiving Week Football TV Schedule

Tweets by @FBSchedules



| Home | College Football | NFL Football | | FACEBOOK |
| NCAA Schedules | 2014 Schedules | 2014 Schedules | | TWITTER |
| NFL Schedules | 2015 Schedules | 2014 Opponents | | RSS |
| Fan Shop | 2016 Schedules | 2015 Schedules | | SUBSCRIBE VIA EMAIL |
| About Us | Bowl Schedule | Playoffs Schedule | | |
| Contact Us | Tickets | Tickets | | |
| Links | | | | |
| Tickets | | | | |

FANATICS   GET GAME DAY READY
ON17
SHOP NOW
3 DAY SHIPPING • 365 DAY RETURNS

© 2014 FBSchedules.com™ - College Football Schedules and Pro Football Schedules
Partner of USA TODAY Sports Digital Properties.



2014 College Football Schedules | 2013-14 Bowl Schedule | 2014 NFL Schedules

Search FBSchedules.com          Subm

HOME     NCAA SCHEDULES     NFL SCHEDULES     FAN SHOP     TICKETS     MORE






San Diego State Aztecs
Team Home • NCAA • MWC


CAT  Cat Footwear     available at JOURNEYS

Season: 2012

| 2012 San Diego State Aztecs Football Schedule<br>Final Record: 9-4, 7-1 (MWC) | | | |
|---|---|---|---|
| Date | Opponent | Time/TV | Tickets |
| Saturday<br>Sept. 1 | at Washington Huskies<br>CenturyLink Field, Seattle, WA | Lost 21-12 | — |
| Saturday<br>Sept. 8 | Army Black Knights<br>Qualcomm Stadium, San Diego, CA | Won 42-7 | — |
| Saturday<br>Sept. 15 | North Dakota<br>Qualcomm Stadium, San Diego, CA | Won 49-41 | — |
| Saturday<br>Sept. 22 | San Jose State Spartans<br>Qualcomm Stadium, San Diego, CA | Lost 38-34 | — |
| Saturday<br>Sept. 29 | at Fresno State Bulldogs<br>Bulldog Stadium, Fresno, CA | Lost 52-40 | — |
| Saturday<br>Oct. 6 | Hawaii Warriors<br>Qualcomm Stadium, San Diego, CA | Won 52-14 | — |
| Saturday<br>Oct. 13 | Colorado State Rams (HC)<br>Qualcomm Stadium, San Diego, CA | Won 38-14 | — |
| Saturday<br>Oct. 20 | at Nevada Wolf Pack<br>Mackay Stadium, Reno, NV | Won 39-38 | — |
| Saturday<br>Oct. 27 | UNLV Rebels<br>Qualcomm Stadium, San Diego, CA | Won 24-13 | — |
| Saturday<br>Nov. 3 | at Boise State Broncos<br>Bronco Stadium, Boise, ID | Won 21-19 | — |
| Saturday<br>Nov. 10 | Air Force Falcons<br>Qualcomm Stadium, San Diego, CA | Won 28-9 | — |
| Saturday<br>Nov. 17 | — Open Date | — | — |
| Saturday<br>Nov. 24 | at Wyoming Cowboys<br>War Memorial Stadium, Laramie, WY | Won 42-28 | — |
| 2012 San Diego County Credit Union Poinsettia Bowl | | | |
| Thursday<br>Dec. 20 | BYU Cougars<br>Qualcomm Stadium, San Diego, CA | Lost 23-6 | — |

San Diego State Aztecs Headlines

RECENT HEADLINES

BYU, Arizona State Schedule 2020-21 Home-and-Home Football Series

2014 AAC Football Opponents Announced

Lucas Oil Stadium Tops List of NFL Stadium Experiences for 2013 Season

Illinois, UConn Schedule 2019-20 Home-and-Home Football Series



Find us on Facebook



FBSchedules.com
Like

17,145 people like FBSchedules.com.

Facebook social plugin

Case 3:14-cv-00367-BAS-JMA   Document 1-2   Filed 02/17/14   Page 149 of 149

San Diego State Aztecs Complete 2014 Non-Conference Football Schedule
Penn State adds San Diego State to 2015 Football Schedule
The Hawaii Exemption – 2013 Edition
Toughest 2013 MWC Non-Conference Football Schedules
2013 Mountain West Football Schedules announced
San Diego State to stay in Mountain West Conference
Report: San Diego State to remain in Mountain West
San Diego State adds future games vs. California, NMSU and San Jose State
Ohio State adds San Diego State to 2013 Football Schedule
San Diego State, California schedule 2015-16 Home-and-home Football Series
Report: Ohio State could host San Diego State in 2013
2012 Mountain West Football Schedules Announced
Big East announces addition of five schools for 2013
Report: Boise State, Houston, SDSU, SMU & UCF to join Big East in 2013
Washington Huskies announce changes to 2012 Football Schedule
Oregon State completes 2014 Non-conference Football Schedule
San Diego State Aztecs release 2011 Football Schedule
Arizona State, San Diego State Schedule 2017-18 Home-and-home Football Series
Fresno State adds California and San Diego State to 2011 Football Schedule
Michigan adds San Diego State to 2011 Football Schedule
2010 San Diego State Aztecs Football Schedule Posted
San Diego State Aztecs announce Future Non-Conference Football Schedule
2009 San Diego State Aztecs Football Schedule announced

Tweets by @FBSchedules

Home
NCAA Schedules
NFL Schedules
Fan Shop
About Us
Contact Us
Links
Tickets

College Football
2014 Schedules
2015 Schedules
2016 Schedules
Bowl Schedule
Tickets

NFL Football
2014 Schedules
2014 Opponents
2015 Schedules
Playoffs Schedule
Tickets

FANATICS GET GAME DAY READY
ON LIN 17
SHOP NOW
3-DAY SHIPPING · 365 DAY RETURNS

FACEBOOK
TWITTER
RSS
SUBSCRIBE VIA EMAIL

© 2014 FBSchedules.com™ - College Football Schedules and Pro Football Schedules
Partner of USA TODAY Sports Digital Properties.

http://www.fbschedules.com/ncaa-12/mtn-west/2012-san-diego-state-aztecs-football-sched...   2/13/2014